# EXHIBIT A

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock St.<br>Denver, CO 80202 | DATE FILED<br>July 30, 2024 9:11 AM<br>FILING ID: D6D15E602BBAD<br>CASE NUMBER: 2024CV32321 |
| **Plaintiff:**<br><br>VICTOR MOSES,<br><br>v.<br><br>**Defendants:**<br><br>CITY AND COUNTY OF DENVER, COLORADO,<br>DENVER HEALTH AND HOSPITAL AUTHORITY,<br>TODD GENTRY, individually.<br>STEPHEN MARINO, individually;<br>ANTHONY NORMAN, individually;<br>FELIPE CERVANTES, individually;<br>KYLE CARTER, individually;<br>JOHANNA AITKEN, individually;<br>LISA AITKEN-NELSON, individually;<br>JASON MOORE, individually;<br>DAMON ROMAN, individually;<br>E. M. ALFARO, individually;<br>BRIAN CAMOZZI, individually;<br>COURTNEY WHAM, individually;<br>TAEGIN SUNG, individually. | ▲COURT USE ONLY▲<br>_____<br><br>Case No.: |
| Plaintiff's Counsel<br><br>John R. Holland, #5246<br>Anna Holland Edwards, #35811<br>Erica Grossman, #39342<br>Holland, Holland Edwards, & Grossman, LLC<br>1437 High Street<br>Denver, CO 80218<br>Phone: 303-860-1331<br>Facsimile: 303-832-6506<br>john@hheglaw.com<br>anna@hheglaw.com<br>erica@hheglaw.com<br><br>Darold W. Killmer, #16056<br>Reid R. Allison, # 52754<br>KILLMER LANE, LLP<br>1543 Champa St., Ste. 400 | |

| | |
|---|---|
| Denver, CO 80202<br>Phone: 303-571-1000<br>Facsimile: 303-571-1001<br>dkillmer@killmerlane.com<br>rallison@killmerlane.com | |
| **COMPLAINT AND JURY DEMAND WITH CERTIFICATE OF REVIEW** | |

Plaintiff Victor Moses, by and through his attorneys, HOLLAND EDWARDS & GROSSMAN, LLC and KILLMER LANE, LLP, respectfully alleges as follows:

## I. INTRODUCTION

1.      Victor Moses was a police recruit at the Denver Police Academy. He took this picture in his recruit uniform, when he was still proudly hoping to become a Denver Police Officer:



2.      Victor Moses never became a police officer. Instead, he was catastrophically injured and permanently disabled on January 6th, 2023, during the Police Academy's extremely violent recruit hazing ritual, known to all Denver Police as "Fight Day":



2

3.     "Fight Day" is a training by the Police Academy that requires recruits to do scenario-based drills, related to arrest, arrest control, overcoming resistance, self-defense, rendering aid, and follow up techniques.

4.     While "Fight Day" purportedly provides necessary police arrest and seizure training, in reality, it has become a barbaric hazing ritual. During this four-stage "run the gauntlet" event, Denver police recruits must endure extreme exertion while being subjected to a series of violent assaults. Each recruit must complete all four stages as a condition of becoming a police officer.

5.     During his Fight Day, Victor Moses, who Defendants knew had sickle cell trait, was repeatedly assaulted by multiple Denver Police officers, while Denver Health and Hospital Authority paramedics watched, tolerated, and enabled the officers. Even after his blood pressure crashed, his head slammed onto a tile floor, he repeatedly collapsed and lost consciousness, he reported experiencing extreme cramping and fatigue, and was so incapacitated he could not stand up or walk even with assistance, he was pressured by police and cleared by paramedics to endure even more assaults, until he was finally transported to the hospital unconscious, facing death.

6.     Victor Moses was hospitalized for the next four months. He underwent numerous surgical and medical procedures, including multiple fasciotomies and extensive dialysis. Both of his legs were amputated just below the knee.

## II.  **PARTIES**

7.     At all times pertinent to the subject matter of this litigation, Plaintiff Victor Moses was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

8.     Defendant City and County of Denver ("Denver" or "Denver Police") is a Colorado municipal corporation, and is properly sued for the conduct complained of herein of its police department and officers.

9.     Defendant Denver Health and Hospital Authority ("Denver Health" or "DHHA") was created by the Colorado legislature as a body corporate and political subdivision of the State of Colorado, pursuant to Colorado Revised Statutes § 25-29-101, et seq. The work of Denver Health paramedics is directly related to the operation and purposes of a public hospital. Paramedic services are a core service of DHHA, which oversees and controls the paramedic division's operations, policies, and practices. DHHA which through the hospital supervises and trains paramedics, including the specific individual paramedics sued herein.

10.     Defendant Todd Gentry is a Technician employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

11.     Defendant Stephen Marino is an Officer employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

12.     Defendant Anthony Norman is a Technician employed by the Denver Police Department, and was at all material times a resident of the State of Colorado.

13.     Defendant Felipe Cervantes is an Officer employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

14.     Defendant Kyle Carter is an Officer employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

15.     Defendant Johanna Aitken is a Technician employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

16.     Defendant Lisa Aitken-Nelson is a Technician employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

17.     Defendant Jason Moore is a Technician employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

18.     Defendant Damon Roman is a Technician employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

19.     Defendant E.M. Alfaro is a Technician employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

20.     Defendant Brian Camozzi is an Officer employed by the Denver Police Department and was at all material times a resident of the State of Colorado.

21.     Defendant Courtney Wham was at all material times a Paramedic employed by Defendant Denver Health and Hospital Authority in the Paramedic Division (DHPD), and a resident of the State of Colorado. Defendant Wham provides medical care and medical transportation to injured individuals consistent with the definition of a public hospital.

22.     Defendant Taegin Sung was at all material times a Paramedic employed by Defendant Denver Health and Hospital Authority in the Paramedic Division (DHPD), and a resident of the State of Colorado. Defendant Sung provides medical care and medical transportation to injured individuals consistent with the definition of a public hospital.

## III.  JURISDICTION AND VENUE

23.     This action arises under the Constitution and laws of the State of Colorado and of the United States. Claims are asserted herein under Colo. Rev. Stat. § 13-21-131 against the individual defendant peace officers acting under color of law, under Colo. Rev. Stat. § 24-10-106(1)(b) against DHHA for negligence in the operation of a public hospital, and under Colo. Rev. Stat. § 24-10-118 against the individual paramedics for their willful and wanton acts and omissions. Claims are also asserted against all defendants under 42 U.S.C. § 1983.

24.     Venue is proper in the City and County of Denver District Court under Colorado Rule of Civil Procedure 98, as Denver County is the county in which Plaintiff resides, where most if not all defendants reside or can be found, as the County where all of the events complained of took place, and it is also the venue choice designated by Plaintiff.

25.     Timely notice of claims was given to Denver Health under Colo. Rev. Stat. § 24-10-101 et seq as required by the Colorado Government Immunity Act.[1]

26.     This action is exempt from C.R.C.P. 16.1. Plaintiff and counsel have explored the options and potential benefits of Rule 16.1 and application of the Rule to this action would not be appropriate. Additionally, Plaintiff seeks a monetary judgment substantially in excess of the limitations for action under Rule 16.1. Therefore, C.R.C.P. 16 shall govern this action.

## IV.   <u>FACTUAL ALLEGATIONS</u>

27.     Victor Moses was raised in Florida and earned a Bachelor of Science degree from Florida State University in 2016. At the age of 27, he moved to Denver, hoping to embark on a career of service as an officer with the Denver Police Department.

28.     Victor Moses began the process of applying to become a Denver Police Officer in the early part of 2022.

29.     He passed the interview and background investigation stages of the process, was hired as a Police Officer Recruit, and accepted into the DPD Police Academy.

30.     Mr. Moses excelled through his first three months of training, including frequent strenuous gym workouts, as well as practicing use of force techniques.

**Victor Moses Disclosed Having Sickle Cell Trait in His DPD Academy Application**

31.     The Denver Police Department mandates recruits to disclose certain medical conditions on a Medical History Form, which requires evaluation and approval by a Denver Health doctor.

32.     The Medical History Form was explicitly intended to put Denver and Denver Health on notice of, among other things, physical or medical conditions that might impact the appropriateness of a candidate for the position of Police Officer, conditions that may need accommodations to safely complete police training or perform police work, or conditions that the department should be aware of in its program.

---

[1] Although not required, as no state tort claims governed by the Colorado Government Immunity Act are stated against the individual officers or the City and County of Denver, Plaintiff also gave notice of claims to Defendant Denver.

33.     The Medical History Form specifically states that it seeks to identify any "issues of particular concern," which include "risk factors for rhabdomyolysis (such as thyroid disease, renal disease, statin use, sickle cell trait, and sickle cell disease.)."

34.     Section 3.6 of the form asks specifically about Blood Disorders.

35.     On the application's Medical History Form, Mr. Moses expressly disclosed that he had sickle cell trait ("SCT") by checking off the box for SCT and adding "both my parents & I have the trait but never had any problems":

| Blood disorders – Have you ever had or have you now any of the following? | | | |
|---|---|---|---|
| 132 | Sickle cell disease | | X | |
| 133 | Sickle cell trait | √ | | Both my parents & I have the trait but never had any problems |
| 134 | Anemia | | X | |
| 135 | Blood transfusion | | √ | |

36.     Dr. Kelsey Smithhart at Denver Health cleared Mr. Moses in July 2022 to participate in the Academy training regimen, including "Fight Day."

37.     Thus, before and during Fight Day, Defendants Denver and Denver Health both knew that Victor Moses had SCT.

**"Fight Day" is an Official and Mandatory DPD Academy Program**

38.     Denver requires all Police Officer candidates to complete the DPD Police Academy as a condition of becoming a badged officer.

39.     Nearly half-way through their training in the Academy, the recruits participate in scenario-based drills, which are supposed to train and test them on arrest control techniques. Per P.O.S.T., the drill must at least include the following techniques: "Proper initial approach and contact, verbal skills, de-escalation of subject/scenario, escalation and de-escalation of force, self-defense, arrest control, overcoming resistance and proper follow-up procedures such as handcuffing, rendering aid, etc."

40.     One of its stated objectives is to teach arrest control, "ability to engage/escalate and disengage/de-escalate as appropriate," and principles of when to render aid.

41.     The Dynamic Action Drill (DAD) has come to be known among Academy recruits and graduates, as "Fight Day." All recruits are told that failure to complete Fight Day will result in their being dropped from the program, meaning they cannot become a Denver Police Officer.

42.     Denver clearly knows that completion of the DAD program will require substantial physical and mental stress and exertion by the recruit. Thus, DPD's Arrest Control Techniques Subject Matter Expert, Technician Klukas, reports:

DAD 1 is designed to induce stress on the recruit's cognitive abilities that will armor them against overactivation of the Sympathetic Nervous System (SNS) in future high stress situations. Through inoculating them in this fashion, it should provide them with a winning schema.

43.    DAD consists of four stations, and the total time of the exercise is supposed to be 8 minutes in length.

44.    **Station 1** is the Combatives/Defensive Tactics stage. This drill is supposed to last two minutes, with a sufficient break after the completion of the drill to ensure it is safe to continue to the next stage. This station requires the recruit to deliver repeated punches, kicks and knee strikes against either a standup dummy or pads wielded by the drill trainers upon command, while simultaneously receiving multiple commands and physical distractions. The recruits are encouraged to keep striking as if they were engaged in an altercation. A primary focus of this station is to cause the recruit to become physically tired because of the significant endurance required to complete this stage.

45.    **Station 2** is the Baton Endurance Drill. This drill is supposed to last one minute and thirty seconds. The focus of this stage is to require the recruit to confront multiple "assaultive subjects" and others. The recruit is given a padded baton and they enter an area where there are four staff members, who each have a large pad. The staff members attack the recruit with 2 foot by 2 foot padded bags, simulating an attack by more than one assaultive subject. The recruit is supposed to strike the pad holder that attacks them, where the pad holder should take a step back, simulating that the strike was effective. This is a dynamic part of the drill where the recruits often are knocked to the ground, as was Plaintiff Moses.

46.    **Station 3** is the Ground Fighting Drill, which is supposed to last two minutes. The recruit is stripped of their protective gear and placed on the ground, where a staff member, who is specifically trained in ground fighting, maintains a dominant position. According to DPD, this is done to have the recruit fight through fear to continue to protect themselves, as well as attempt simulated radio communication to request help.

47.    **Station 4** is the Arrest Scenario Drill and is supposed to last two minutes and thirty seconds. The recruit is put back in their protective gear and given instructions to contact and arrest the primary aggressor in an assault that they witness. The "assault" is two staff members, both in protective gear, mimicking an assault where one of them is clearly the aggressor. When the recruit contacts the aggressor, the aggressor (staff member) begins to assault the recruit, where they have to defend themselves and win the confrontation, resulting in a prone handcuffing position.

48.    The police officer trainers, supervisors, assistants and role players during Fight Day, were conducting a live police training, specifically intended to properly instruct and model to recruits how to constitutionally perform the duties of police officers, including with respect to de-escalating the use of force and rendering of medical care to injured persons during arrests and seizures.

49.     Thus, it is also clear that this express arrest and seizure training practice is governed by the constitutional principles "learned during Academy training," which all reasonable police officers know govern the use of force, arrests, seizures and care of the injured in police custody.

50.     These principles obviously include clearly established Fourth and Fourteenth Amendment principles the Academy teaches recruits govern the use of police force, seizure and rendering aid to injured persons in police custody after police encounters, as here.

51.     Following such clearly established use of force and rendering aid principles, all police defendants were constitutionally obligated during these training exercises "to immediately stop a drill if they have reason to believe a participant's health or safety is in jeopardy."

52.     Describing the partnership with Denver Health and its paramedics, the DAD program assures the recruits that a "Sergeant pre-arranges for EMS to be on scene at least seven days prior to the event (prefer two ambulances)."

53.     Many police recruits have been injured over the years during this ritual.

54.     Technician Klukas also asserted in the Fight Day written materials (despite evidence to the contrary): "I can say with complete confidence that the drill is run safely, controlled and in the utmost professional manner possible to deliver this valuable and tangible skill set."

55.     The written time restrictions are routinely violated, as are the duration of the required rest periods between stations, causing recruits to endure the physical and emotional stress for longer than reflected in the written program materials, at increased danger to the health and well-being of the Recruit Officer.

56.     The DAD program specifically requires that, for safety reasons, the following "will" occur on the day of the Program's administration:

o    "During this briefing, recruits will be given the opportunity to disclose specific or general limitations."

o    "Recruits should also disclose any medications they are taking that may affect their motor control or coordination. Recruits will be told that they may disclose limitations/medications during the safety briefing or privately at any point during the training. At least two Academy staff members will be present during this safety briefing."

57.     Contrary to these mandatory safety conditions, Denver did not provide the opportunity for Plaintiff to again disclose his specific or general limitations, and only Technician Gentry was present during the brief safety briefing, rather than "at least two" staff members being present.

58.     While people with SCT like Mr. Moses can safely participate in extensive physical training exercises, they are at increased risk for serious medical complications such as exertional collapse, rhabdomyolysis, and even death.

59.     Rhabdomyolysis is a life-threatening medical condition causing a breakdown of muscle tissue. It can occur when the body is pushed too hard, such as during high-intensity exercise, and can lead to permanent disability or death.

60.     Denver Police and Denver Health indifferently ignored and failed to implement well-known training guidelines designed to ameliorate the known recurring risks associated with SCT and extreme physical exertion or force, guidelines specifically developed for recruits with SCT and widely used in similar situations such as training for the military or professional athletes.

61.     Despite knowing of the potential complications associated with sickle cell trait, and that Mr. Moses had it, Defendants Denver and Denver Health did not adequately train its officers or the paramedics assigned to Fight Day to recognize the signs and symptoms of exertional collapse, or provide accommodations that would have mitigated the risks inherent in excessive exertion at high altitudes by people with SCT.

**Victor Moses Became Permanently Disabled by the Unreasonable Force Used During Fight Day, and by the Deliberate Indifference to his Obvious, Serious Medical Needs**.

62.     On January 6, 2023, Fight Day was held at the Denver Police Academy for the approximately 40 recruits in Plaintiff's Basic Recruit Class.

63.     Victor Moses was the last recruit officer in his class to begin the Fight Day gauntlet.

64.     Before his turn, one of his fellow recruits had already suffered a broken nose, and several others had sustained injuries, requiring treatment at the hospital. Technicians were not stopping their assaults when they should. Recruit Officer Kimmie Shui reported that on Fight Day there were "lots of injuries getting thrown everywhere" and reported that on an earlier Fight Day she had torn her ACL.

65.     After completing Station 1, Mr. Moses was very fatigued, which individual Defendants all knew.

66.     Despite his fatigue, Mr. Moses was moved to Station 2 – the Baton Drill.

67.     During this station, Victor Moses was hit and knocked down multiple times by very aggressive officers, including Defendant Marino. Officer Marino used his large pad and body to hit Moses so hard that, during one of the many knock downs, Officer Marino violently drove him completely off the large mat, causing him to fall over and slam his head on the hard tile floor.

68.     Mr. Moses was observed to be winded, bending over, and trying his best to continue, even after being shoved off the padded mat and hitting his head on the tile. During Station 2, he collapsed multiple times, even losing consciousness.

69.     Despite hitting his head on the tile, passing out and collapsing, Defendant Technicians exerted pressure and coercion on him to continue, including physically lifting him up themselves so he would complete Station 2.

70.     Finally, Mr. Moses collapsed to the point that Defendant Safety Officer Gentry called paramedics over to check on him.

71.     Paramedic Defendants Wham and Sung were stationed near the drills and were responsible for monitoring them. They were called upon to assess and treat their patient Victor Moses after he was injured due to the force inflicted upon him.

72.     These Paramedic Defendants had been sitting there for hours throughout the morning, watching all the recruits go through Fight Day. They saw Mr. Moses hit so hard that he fell off the large padded mat and traumatically slammed his head on the tile. They also saw Moses fall from repeated hits and blows, before they were called over to evaluate him because he lost consciousness.

73.     Paramedic Defendants saw that Mr. Moses was unable to even stand up or freely move, even after he again briefly regained consciousness in their presence. Moses was described by staff to POST inspectors as having "spaghetti legs" and "unable to get up."

74.     Mr. Moses **told paramedics that he was "extremely fatigued" and experiencing "extreme leg cramping."**[2]

75.     Cramping in the lower extremities is a well-known danger sign for people with SCT, as military and police training protocols widely recognized.

76.     The Paramedics took Mr. Moses's blood pressure, which was 90/60, an extremely low blood pressure for a person engaging in strenuous physical activity.

77.     Exercise induced hypertension is commonly understood to occur during such strenuous exercise, causing blood pressures that can approach or exceed 200 on the top.

78.     Given Plaintiff's extreme exertion which they had just observed, with little recovery time between stations, these paramedics knew Victor Moses's blood pressure should have been significantly higher at the time.

79.     A sickling-type event causes lower blood pressure by decreasing blood flow.

---

[2] Throughout this complaint, Plaintiff is highlighting various specific factual quoted statements and other allegations. Undersigned counsel has supplied these emphases.

80.     Any reasonably trained paramedic knows that exertional sickling is a medical emergency in persons carrying the sickle cell trait, that fatigue, debilitating leg cramping, and low blood pressure during strenuous physical activity is associated with SCT, and that these serious medical symptoms put people at risk for serious injury and death without proper treatment and rest.

81.     Mr. Moses expressly told these paramedics that he had SCT, as they charted in the Ambulance Report: "Pt reported that he had sickle cell trait but not sickle cell."

82.     Thus, these paramedics knew that Moses, who had SCT and was engaged in strenuous activity at high altitude, was fatigued, complaining of leg cramping, had lost consciousness, had a low blood pressure, was unable to stand or move on his own, and was in danger of exertional collapse and resulting serious medical complications.

83.     Notably, Defendant Wham was then a 3rd or 4th year medical student.

84.     Nonetheless, the Paramedic Defendants cleared him to continue the Fight Day drills.

85.     They specifically told the Defendant officers that his blood pressure was measuring only at 90/60, but that while "his blood pressure was low. . .he could continue."

86.     These paramedics 'cleared' Mr. Moses to keep fighting despite knowing that it was medically necessary to stop the training drills, given the severity of symptoms and related further likely risk to Mr. Moses.

87.     Here is a picture of Defendant Paramedic Wham and Defendant Officer Gentry with an incapacitated Victor Moses:



88.     Defendant Paramedics evinced their awareness of the obvious danger to Moses in clearing him for more physical force and exertion, by making a plan to keep "medics standing close by with pram and equipment."

89.     Defendant Paramedics and Defendant Officers heard involved officers, including Defendant Gentry, repeatedly pushing Victor Moses to continue despite his incapacitated physical state, telling him to "not give up."

90.     Defendant Paramedics and Defendant Officers knew that Moses did not under those circumstances have the capacity to voluntarily consent to continued fighting and force, and that these officers could not rationally ask a person who had been knocked unconscious and seriously concussed, if they wanted to continue (knowing that if they did not, they would lose their potential career as a police officer).

91.     Defendant officers tried to get Mr. Moses to his feet to take off his pads and walk to Station 3. Mr. Moses still could not stand up. He was too weak to take off his own pads and move to the area where Station 3 was held.

92.     Plaintiff was so obviously incapacitated and unable to move that the trainers of the drill, including Defendant Gentry, gave direct orders to have Station 3 *brought to him* because Plaintiff was unable to freely move himself due to his injuries from the intentional assaults inflicted on him in Station 2.

93.     Victor Moses was unable to meaningfully participate in the Station 3 drill, in which a trained officer mounts the recruit, and the recruit is supposed to try to break free.

94.     Nevertheless, Defendant Camozzi began "ground fighting" and wrestling with the incapacitated Mr. Moses, hitting him in the head several times.

95.     About 30 seconds into Station 3, while Defendant Camozzi was putting his body weight and pressure on him, Mr. Moses gasped "I can't breathe," feeling like he was suffocating.

96.     This is a picture of Defendant Camozzi laying on Moses with Defendant Gentry:



97.     He eventually "became limp" and unresponsive.

98.     Defendant Paramedics again came to check on Mr. Moses, who was now unarousable even by sternal rub – a pain technique used to arouse people who have lost consciousness.

99.     Then Recruit Officer Kimmie Shui noted about this final event that:

> After another maybe, 20-30 seconds Moses got on his side and the technician got off of him, the paramedics ran out on the mats and put him on the stretcher. At this point the staff gathered everyone and introduced all the volunteers. I could see Moses in the back on the stretcher by the scenario house and it looked like Moses was having trouble. . . After another short period it looked like Moses lost consciousness and the paramedic was performing sternal rubs.

100.    Mr. Moses arrived at the hospital unconscious, tachycardic, hypotensive with no effective ventilations, experiencing severe lactic acidosis and hypertrophic cardiomyopathy.

101.    He was near death.

**The Paramedics and Officers Lied to Doctors at the Hospital,<br>Compromising his Course of Care and Treatment**

102.    Defendant Technician E.M. Alfaro was reportedly the first to arrive at the hospital after the ambulance driven by the Paramedic Defendants. He was followed by Sergeant Quinones.

103.    Defendant Paramedics and involved Defendant Officers told Dr. Martin Ezekiel Musi about Mr. Moses passing out in Station 2, specifically telling him that he was "2 phases into the training when he experienced a syncope."[3]  They further stated: "Before starting the next phase of training (grappling) patient become weak and suddenly collapsed, attempted to stand up, and again collapsed with syncope and change in mental status."

104.    The officers and paramedics knew that he had been rendered unconscious several times. They also knew that he had engaged in substantial exhausting physical exercise, knew he suffered direct trauma, including repeated traumas to his body during the drills, knew that he had fallen several times, and knew that he had violently hit his head on a hard concrete surface.

105.    However, in response to repeated questions by the emergency medical team about Mr. Moses's injuries and the cause, Denver police officials and paramedics repeatedly falsely stated that Moses had not experienced "direct trauma."

---

[3] Syncope is the medical term for fainting or passing out. Someone is considered to have syncope if they become unconscious and go limp.

106.    Thus, ER Dr. Musi charted that he met with the paramedics and with a "**Police Academy Instructor**," stating that, "**repetitive times the instructor denied direct trauma** to the chest abdomen pelvis or suffocation," and said that there was "**no significant traumatic mechanism of injury. . .**"

107.    Doctors were asking these questions because it impacts critical medical decisions which must be made based upon the information provided to the doctors, including what medications would be given to Mr. Moses. These falsehoods denying any "direct trauma" were especially pernicious as the emergency room hospital staff were asking these questions precisely so that they could properly and optimally treat Plaintiff while trying to save his life.

108.    Dr. Musi and the hospital medical team made care decisions based on being misled by paramedic defendants and by Defendant Instructor Alfaro, and/or Sergeant Quinones, that Victor Moses had experienced no "direct trauma."

109.    Mr. Moses developed severe compartment syndrome, rhabdomyolysis, malignant hyperthermia, and severe hyperkalemia. He was intubated, in a coma, and near death.

110.    He spent over four months bedridden in the hospital. He has undergone many surgeries, including below the knee amputations of both legs, multiple fasciotomies, and arm surgeries. He also suffered severe internal injuries to multiple organs, which continues to require significant medical care. In July 2024 he underwent major surgery for about 8 hours in an effort to restore some gripping function in one hand.

111.    Mr. Moses now has prostheses which often bleed when he uses them, requiring him to endure the daily risk of infection and further amputation. His arms and hands are severely compromised. The pain he has consistently experienced is truly incomprehensible, requiring daily high doses of pain and other medications. His injuries and damages caused by the events of January 6, 2023, are profound and lifelong.

112.    Victor Moses did not become a police officer. Fight Day rendered him permanently and severely disabled.

### Denver Tried to Cover-up Their Conduct and Liability

113.    Despite his express disclosures of having SCT to the Police Department and Denver Health, DPD members, including Defendant Gentry, Sergeant Virginia Quinones, and Defendant Moore, falsely reported to investigators that DPD asks recruits about their medical background and conditions, but "Moses never provided information to indicate he had any medical concerns or restrictions."

114.    While Victor Moses was still in the hospital, DPD told the media that this was all caused by a pre-existing and *undisclosed* medical condition.

115.    Denver police officers also continue to lie about their own conduct and the resulting trauma Mr. Moses suffered, specifically denying that he slammed his head on the hard floor when they pushed him off the mat.

116.    Many officers saw Victor Moses hit his head hard on the unpadded floor. Indeed, Officer Marino, the one who with excessive force drove him off the mats when he hit his head, included that information in his report.  Yet not one other Defendant Technician, Training Officer, or Academy supervisor included the obviously significant information that Mr. Moses hit his head and none of them included that he had passed out in their reports.

117.    On a Recruit group chat soon after Fight Day, Recruit Officer Zachary Vasquez joined a discussion about how the DPD, through Michelle Folmer and Defendant Alfaro, were falsely asserting that Victor Moses did not hit his head or suffer any trauma, writing: "**I mean the bulk of us witnessed him fall head first on the tile, they don't have much of an argument against it**. . ." He added: "**Best thing we can do is give an honest account of what we saw. An utter lack of care for the well being of recruits**."[4]

118.    Jacob Mills further shared that: "I brought it up and Folmer looked at Alfaro like 'I never heard that and Alfaro said that it didn't happen he was watching him the whole time.'"  Jacob Mills added: "If they try to say something different, I won't let Moses go out like that. They need to be accountable for their actions."

119.    These knowingly false statements were made to divert from and cover-up their own responsibility for Plaintiff's injuries.

120.    Defendant Denver Police has also represented that there is no video footage of Mr. Moses during Fight Day.

121.    However, on the Recruit chat board, Kimmie Shui stated that there is video of all this: "Tech [A]itkin is in charge of videography and she has all the footage of the entire thing.  If she says they don't they['re lying."

122.    Any video footage (or other evidence) that existed, if destroyed, will be subject to spoliation sanctions.

### The Violent Assaults and Deliberately Indifferent Medical Response Was Witnessed by Many Police Recruits and Officers

123.    While Defendants tried to cover up their own liability, many recruits and officers witnessed Victor Moses concussively slamming his head onto the ground, repeatedly losing consciousness, and being pressured to continue the drills by multiple defendant officers.

---

[4] This was in response to statements by Recruit Officer Jacob Mills, who was also hospitalized for injuries from this Fight Day.

124.    Many of Victor Moses's classmate recruits have powerfully described these events in their reports and in statements to one another on the Recruit Chat text string.

125.    Recruit Officer Ashley Bravo Gallagher reported that after Defendant Marino knocked Victor "off of the mats on to the tile," she saw "**Moses stand back up and walk back onto the mats where he struck a pad and then collapsed**." She says Victor Moses was then "able to stand up again, hit another pad and fell to the ground again. **This time he did not stand up right away. I saw Tech Roman grab him by the bar on his right head gear**." After they talked she reports she saw "**Moses stood back up one last time before he fell to the ground again**."

126.    Recruit Officer Donald Thomas observed that during the Station 2 Baton Drill "[a]fter multiple pushes from the trainers, **Moses fell backward, towards the stage, off of the mat, and hit his head on the concrete**. . . Moses appeared winded and began to bend at the waist. At one point Moses fell to his knees, got up and fell to his back. . ."

127.    Recruit Officer Wayne Lacrue also observed the Station 2 Baton Drill and Technicians pressuring him to continue, stating: "After striking the bags a couple of times, Moses was then shoved by a bag holder causing him to fall backwards off of the padded area and onto the concrete floor.  **When Moses fell onto the concrete floor, he hit the back of his head**.  Moses laid there for a couple of seconds but then was pulled up and told not to give up. Moses continued with Phase 2 but **appeared to be dazed**".  . . [Moses] continued and was "getting shoved by the bagholders. **Moses then appeared to pass out** and fell to the ground. Moses was then checked by the paramedics. Moses was then cleared by the paramedics and continued to Phase 3 but **appeared to be dazed and out of it**.  Moses then started Phase 3 (ground fight) and halfway through it **Moses passed out and went limp**. . ."

128.    Recruit Officer Ivan Lopez reported that he watched the Station 2 baton phase, stating that: "I could see that R.O Moses was tired by this time. . . Once the second phase began, R.O Moses was knocked down about four times. One time in particular R.O. Moses was pushed off the mats and **fell backwards onto the concrete floor where his back of the head slammed down on the concrete**. After that he attempted to get back to his feet but was having a difficult time doing so. He continued the drill until he was knocked down again on the mats and appeared to not have the strength or balance to get back up.  **After a few attempts from the staff to help him on his feet, he collapsed and the medical staff rendered assistance**. . ."

129.    Recruit Officer Joseph Herkimer reported with respect to Station 2 that: "I witnessed him go off the mat and get knocked over on the mat and get back up. I then saw [M]oses get knocked down on the mat again but this time he did not get back up.  **I saw the Officers and Technicians try and stand him up and he collapsed back down**.  The officers and techs then started taking his pads off. **It looked like Moses passed out** so I informed the paramedics that I thought Moses just passed out. . ." He also reports seeing Victor Moses next "continuing in DAD to Stage Three. I was confused because I thought he had just passed out…"

130.    Recruit Officer Zachary Vasquez reports that he "watched Moses start the second part of the drill, the baton drill. Shortly into the drill I witnessed one of the pad holders strike [M]oses with a pad, pushing Moses off the mats where he fell back and hit his head on the tile of the hanger. Moses got back up and kept trying to fight, **however he began what appeared to be blacking out (arms and legs going limp, eyes closing, head falling back approximately 3 or 4 times**.)" After the paramedics cleared him to continue, "**Moses laid on the ground while one of the participating officers mounted him for ground fighting**. Moses appeared to be having the same issues and blacked out after the officer tried to engage him."

131.    On the group chat, Recruit Vasquez noted: "**What got me was the lack of attention from the paramedics**, **they should have stepped in way sooner and stopped it**."

132.    Recruit Officer Kimmie Shui reported that during Station 2, she saw Moses **"collapse to the ground**. I saw him get back up again, **only to collapse again**." She saw the "paramedics check Moses pulse on the wrist. . .it seemed as if the paramedics were ok with his status and allowed it to continue. . . The staff and Moses then continued the baton station, after what seemed like another 5-10 seconds **I saw Moses collapse to the ground again**. It looked like the technicians were talking to him while he was on the ground and instead of physically moving him to the next station, station #3 (Ground Fighting) **they took off his pads on the ground and started station #3 right where he laid**."

133.    Recruit Officer Preston Riley saw Victor Moses lose consciousness during Station 2, writing: "During this baton section I saw Victor get pushed off of the northeast side of the mats where he fell to the ground and hit his head. He then got back up again where he was again struck by a pad holder and fell to the ground. He got up once more only to be knocked back to the ground where he fell unconscious for a brief period of time. After becoming conscious Victor was inspected by the paramedics who had been called over[.]"

134.    Recruit Officer Parker Anderson reported that after Station 1, Victor Moses was "completely out of breath and more disoriented than the rest of the recruits that I watched go. Starting the second phase of baton strikes, I watched Moses get repeatedly knocked to the ground. One of the strikes knocked Moses off the mat and onto the ground where he was very slow to get up. **Every strike from that point, I watched him collapse. I watched Moses collapse 3-4 times before he eventually did not get back up**."

135.    Recruit Officer Timothy Hays reported:

In one of the padded attacks, RO Moses fell to the floor just beyond the mats, hitting his head on the unprotected ground. He got back on the mats and continued to fight for just a short amount of time (roughly 10-15 seconds) before falling down multiple times.  After his last drop, the staff stripped him of his protective gear. . . The paramedics checked RO Moses, cleared him to get going and the Academy staff allowed Moses to keep going and allowed Moses to proceed to the next evolution (ground fighting).  In summary, Moses was physically fatigued entering the second evolution of D.A.D. One of the staff participating in the baton drill

17

struck RO Moses with sufficient force to knock him to the ground. **RO Moses did hit his head on the ground and Moses was visibly unfit to continue through the remainder of the baton drill and the ground fighting drill**.

136.     Recruit Officer Jason Wright stated: "**Every time [Moses] got struck with a pad he collapsed over and over until one of the times he did not get back up. It appeared to me that Moses was unconscious.**" After the paramedics checked and cleared him, he saw "Moses wrestling with one of the officers. After about 30 seconds of wrestling **I saw Moses go unconscious again**."

137.     Recruit Officer Alex Keiller saw Victor Moses was extremely fatigued and passed out thereafter:

> the **two volunteers were striking violently**, not giving him a chance to strike back. Then 1 of the volunteers hit Moses with the pad off the mat and Moses footing got tripped up and he fell on his back, arms out extended and **hit the back of his head on the concrete**. He got up slowly, continued with the drill. He then in my view fell down on the mat in exhaustion. **2 people picked him up by his arms had him continue**. Another strike immediately after he passed out fell again and this happened for a third and final time. **He looked unconscious from my view.** Paramedics came over checking him they walked off then the next stage ground wrestling guy got on top of him at Stage two location and started the next phase. Then a tech called the stage over and had the paramedics rush[ed] back out . . .

138.     Recruit Officer Kirk Duhon observed: "I saw him get hit with a pad and fall on the mats. He stood up and continued the drill. I then saw him get hit with a pad and fall off at the south side of the mats, **hitting his head on the floor**. He was helped up and back onto the mats. He started the drill again and fell on the mats. I saw medical personnel run to him. . ." After the paramedic defendants cleared Mr. Moses, R.O. Duhon further reported that he saw him "helped back to his feet and appeared to not be able to stand on his own. He laid on his back as it appeared as he was starting the ground fighting stage.  I saw someone start this stage and within 30 seconds (estimated) the person was no longer on Moses and Moses laid on the ground. . . I saw medical personnel rush out to Moses and placed him on a stretcher" . . .

139.     Many of the police recruits felt that Fight Day was more of an intentional hazing than training.

140.     Recruit Jason Wright wrote on the group chat board: "These guys on those bags over did it bro. It was more dirty then trying to tire us out." He added: "Couldn't even practice baton strikes. Just got pummeled the whole time. They were trynna hurt us." He also stated that: "**The part that blows my mind is after [M]oses woke back up they tried to make him finish it again.**" He further commented that, "**once I saw him wrestling after going down and passing out it was totally fucked**". "**Moses legit was out cold. Woke back up. And then they let him go straight back into the wrestling portion and then passed back out cold.**" Recruit Wright concluded: "Yeah they really don't care, academy staff is a joke man. Getting tired of it."

18

141.    Supporting the conclusion that Fight Day was more of a hazing than training, Kirk Duhon wrote on the recruit chat board: "**To me this seemed like a r[ite] of passage instead of training**" to which Jacob Mills replied: "**It was like a gang jump in**," "[t[]here's no reason we can barely stand and have to fight against someone who is 100% and have bloody noses/busted lips/bruises." Recruit Duhon responded that: "**Staff should have stopped it**," "[h]e was passed out and they were trying to make us clean up[.]"

142.    Jacob Mills responded to Recruit Duhon, saying: "I don't care if they fucking hate me after I stand up for Moses. I hope POST comes out, I'll sing like a song bird."

143.    Recruit Officer Brian Shoonmaker agreed that the Denver police officers and trainers did not care about Moses or any of the recruits well-being or safety that day: "Yeah it was bad. When they are trying to bring Moses back on the stretcher and all the staff cares about is introducing the fighters to us. **they don't give a fuck**." Recruit Shoonmaker emphasized: "Everything about that training was bad. **We need to be willing to tell the truth even if DPD tries to cover it up**."

144.    Since the events complained of herein, Station 2 has reportedly been abolished by DPD or substantially modified to make it less violent, reckless, and dangerous to the Recruit Officers.

## Moses was Seized and Subjected to Excessive Force
## in Violation of the United States and Colorado Constitutions

145.    During Station 2, Victor Moses was rendered unconscious, and unable to stand up, walk, remove his equipment, or physically move himself to the Station 3 location. Any consent Victor Moses initially might have given to participate in Fight Day, was entirely vitiated by Defendants' intentional assaults, causing his multiple collapses and losses of consciousness during Station 2.

146.    Victor Moses was thus subjected to excessive force and "seized" within the meaning of the Fourth Amendment and Article II, Section 7 of the Colorado Constitution, as he was incapacitated, and his freedom of movement was terminated.

147.    These intentional assaults and resulting incapacity of Victor Moses created a custodial relationship and a joint duty among all the Defendants to stop the beating of Moses, and provide him with immediate medical care, which he obviously needed.

148.    As willful participants in this joint unconstitutional activity, all of the Denver Police and Paramedic Defendants, unreasonably, recklessly and/or intentionally joined in the obviously impossible mission of securing Victor Moses' completion of his Fight Day by violating his Fourth and Fourteenth Amendment rights and his rights under the Colorado Constitution.

149.    All of the Individual Defendants actively participated in and/or tolerated additional intentional assaults in their coordinated use of excessive force and seizure on Victor Moses. In this excessive force, all individual law enforcement officers contributed to it. It was a group effort. Thus, the axiomatic principle that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury applies here. Their conduct is to be judged as a whole.

150.    Despite knowing Victor Moses had been rendered incapacitated and was suffering from an obvious medical crisis, all of the Individual Defendants were deliberately indifferent in failing to timely secure or provide emergency medical care.

151.    If this had been a football game or boxing match, the head injury and losses of consciousness would have ended any continued participation or fighting immediately.

152.    But here, not one Defendant police officer or paramedic intervened to stop the continued unreasonable excessive force beating of Victor Moses, or to assure his timely emergency hospitalization, despite their constitutional obligations under Article II, Sections 7 and 25 of the Colorado Constitution, and the Fourth Amendment and Fourteenth Amendment of the United States Constitution.

153.    This is how strong the culture and policy of violence was on Fight Day, January 6, 2023, at the Denver Police Academy.

154.    These multiple Defendants also concurrently and consecutively produced the single indivisible injury and are jointly and severally liable for the entire resulting injuries, because they willfully participated in this joint group activity, and they failed to intervene to stop the continued harm being inflicted on Mr. Moses.

Defendant Todd Gentry

155.    Defendant Todd Gentry was one of the assigned leaders and "Safety Officers" for Victor Moses's Fight Day experience. In his 1/11/23 report, he admitted that: he "intermittently observed RO Moses during Station 2 (Baton Stage). During the stage, I observed RO Moses get knocked down one time, a second time (where he was knocked off the north side of the mats and onto the concrete), and one more time after that."

156.    Defendant Gentry wrote that during "the halfway point in Stage Two (+/- 45 seconds), RO [M]oses seemed to have difficulty getting to his feet after he had been knocked down."

157.    Defendant Gentry says he went to "check on him and called paramedics over. A paramedic checked RO Moses" and asked, "what was going on with him" to which Mr. Moses stated his "legs were cramping."

158.    Defendant Gentry heard "**the paramedic ask[] him if had Sickle Cell. RO Moses stated no but that he does have the trait**."

159.    Defendant Gentry also watched the paramedic check Mr. Moses's blood pressure and knew that "it was 90/60" -- the extreme opposite of what he expected under such rigorous exertion and indicative of a serious medical problem.

160.    To this Defendant's knowledge, Victor Moses was then physically and medically severely compromised to the point of losing consciousness and likely concussed. He could not move freely or voluntarily consent to anything, and was rendered a custodial subject.

161.    With deliberate indifference to the consequences of SCT under these circumstances of extreme physical duress where he already had fatigue, leg cramping, loss of consciousness, and low blood pressure, Defendant Gentry ordered that Station 3 be brought to Mr. Moses.

162.    Defendant Gentry, with the agreement and cooperation of Defendant Paramedics, then authorized *continued* assaults on an incapacitated Moses, and prevented him from obtaining the emergency medical care he obviously needed, until it was too late. Despite opportunity and duty, he did not intervene to stop his being further assaulted and ensure timely emergency aid was rendered.

Defendant Stephen Marino

163.    Defendant Gentry assigned Defendants Marino, Norman, Cervantes, and Carter to the Station 2 Baton Phase.

164.    Defendant Marino "observed Recruit Officer fall to the ground on the padded mat after receiving a shove from a pad holder. Recruit Moses got up and continued the drill by delivering strikes."

165.    Defendant Marino then pushed and struck Mr. Moses all the way to the edge of the large mat and until he fell backwards, hitting his head on the hard floor.

166.    Defendant Marino describes this event in his report as follows: "A short time later Recruit Officer Moses was shoved by a pad holder and fell on the concrete ground just past the padded mat. I observed Recruit Officer Moses hit the concrete ground and landing on his shoulder then hitting his head."

167.    Per Officer Marino, Mr. Moses got off the "concrete ground," "got back up and walked on to the padded area." He then had to "**sit down and complained of cramps in his legs**." Defendant Marino "walked over to Recruit Officer Moses and attempted to assist him to his feet."

168.    Defendant Marino knew that Mr. Moses had lost consciousness and was now "unable to stand up." He knew that Plaintiff's freedom of movement had been intentionally

21

terminated through the use of force by him and the other Defendants assigned to Station 2. He knew that Mr. Moses was thereby seized and in custody, and obviously needed medical care.

169.    Because Mr. Moses obviously was too incapacitated to remove his own equipment, Defendant Marino personally "removed his chest and shoulder protector and called for the Denver paramedic on the scene."

170.    He also heard from the paramedics that they "determined his blood pressure was low." Defendant Marino heard Mr. Moses report his fatigue, extreme leg cramping and his SCT to paramedics.

171.    Despite ample opportunity, Defendant Marino did nothing to discharge his constitutional duties to intervene to stop the continuing grossly excessive force by his three mat partners or Defendant Camozzi during Station 3, or act to get him obviously needed emergency medical attention.

<u>Defendants Anthony Norman, Felipe Cervantes, and Kyle Carter</u>

172.    Defendants Norman, Cervantes and Carter were also assigned to Station 2. They each were involved in excessively forcefully beating Mr. Moses, along with Defendant Marino, and failing to intervene to prevent further infliction of excessive force.

173.    Each of them knew that Moses had just hit his head on the tile, that he had repeatedly collapsed, and that he had gone unconscious. Nonetheless, each of these three Defendants shockingly continued to assault Victor Moses, each knocking him down again and again when he managed to get up, individually and as a group. They continued doing this until he was not even able to stand up.

174.    Each of these Defendants had constitutional duties not to engage in incapacitating excessive force and to intervene to stop each other from continuing such unconstitutional excessive force under the State and Federal Constitutions. Despite having ample opportunities to intervene, each of these three Defendants decided to continue assaulting him instead and all failed to secure emergency medical care for him that was obviously required.

175.    They then stood by and watched as Defendant Camozzi took over their beating.

<u>Defendant Johanna Aitken</u>

176.    Defendant Johanna Aitken was working as a Technician at the Denver Police Academy during this Fight Day. She was checking on the well-being of another recruit who was also suffering and struggling after completing DAD when she heard "staff call for paramedics" who she reports were "on stand-by for safety during DAD due its dynamic nature."

177.     Defendant Aitken was responsible for videoing Fight Day and did so according to Recruit Shui. It appears that any such evidence pertaining to Victor Moses Fight Day events has been spoliated.

178.     This Defendant says she "followed the paramedics to the main mats and observed Recruit Officer Moses on his back on the mats. Due to where he was on the mats it appeared he was on phase 2 of the training. He was awake and alert and was moving around saying his legs were cramping."

179.     Defendant Aitken personally saw that Victor Moses could not then stand or walk, that his freedom of movement was then terminated, he was physically incapacitated and in and out of consciousness. She knew that this constituted a seizure of Mr. Moses.

180.     She also has reported that "[t]he female paramedic asked her partner to get the blood pressure cuff out of their gear near the Virtra tent. When he returned, she was trying to get his blood pressure but told him he needed to try to stay still and not move. RO Moses was moving his hips back and forth and was complaining of cramping. She took his blood pressure and I heard her tell Tech. Gentry who was kneeling beside RO Moses his BP was 90/60. She said it was low but that he was ok. I walked away and went back to check on the other recruit. When I walked back out to the mats just a few minutes later it looked like staff had begun Stage three of the training with R/O Moses."

181.     Defendant Aitken also knew that Mr. Moses had just been engaged in extreme exertion and, even as a lay person, that it was very abnormal to have such a low blood pressure in that context.

182.     This Defendant heard this interaction with the paramedics and thus also knew that Mr. Moses had SCT.

183.     Despite knowing all of this, she too did nothing to protect him and ensure that he not be further assaulted in Station 3, despite having a full opportunity to do so, in violation of her Colorado and Federal Constitutional obligations to intervene to stop further excessive force.

184.     She did not act to end his restraint and get him emergency medical care at a hospital, she just stood by watching doing nothing. The infliction of force on Mr. Moses thus continued, with the Station 3 ground control drills although Mr. Moses was incapacitated and defenseless.

<u>Defendant Lisa Aitken-Nelson</u>

185.     Defendant Lisa Aitken Nelson began watching Victor Moses after she "posted on the side of the mats as a safety officer." She has written that she "noticed Rec. Ofc. Moses fall during the Baton Drill (Station 2) and as they tried to stand him up, I heard him say out loud that his legs were cramping. I observed the DHMC Paramedics come onto the mats and attend to him. I observed them take his pulse and blood pressure and ask him some questions."

186.    This Defendant, hearing the conversation between Moses and the paramedics, no doubt not only heard this but also saw that he was extremely fatigued and heard that he had SCT.

187.    She also no doubt heard the paramedics report that his blood pressure was very low, 90/60.

188.    Nonetheless, she willfully participated in this joint activity with her co-defendant group. She knew that Victor Moses' freedom of movement was terminated. She saw that he could not stand up or walk on his own. She knew he was then in custody from his repeated intentional police assaults, and she knew that he did not have the capacity to voluntarily consent to being additionally assaulted.

189.    Despite knowing all of this, and despite having been assigned the role of Safety Officer, Defendant Aitken-Nelson too did nothing to protect Moses and ensure that he not be further assaulted in Station 3, despite having a full opportunity to do so, in violation of her Colorado and Federal Constitutional obligations to intervene to stop further excessive force.

190.    She did not act to end his restraint and get him emergency medical care at a hospital, but rather just stood by watching doing nothing. This willful inaction is especially damning given her role on Fight Day of "safety officer."

191.    She also then knew that he was incapacitated but did not intervene to protect him and ensure that he not be further assaulted in violation of the State and Federal Constitutional obligations to stop such excessive force, despite opportunity and obligation to do so.

192.    Instead, Defendant Aitken-Nelson just "watched a ground fighting officer come to Rec. Ofc. Moses' location on the mats in station two." She reported:

> I heard several officers ask Moses 'You good, you good?' I observed the ground fighting officer roll Moses over and he appeared to be checking on him. I then saw the paramedics run onto the mat and grab Rec. Ofc. Moses by his torso and belt and lift him onto the gurney. I stayed at my location on the east side of the mats and was just talking to people. I looked over toward where the paramedics were and observed people hurrying around. I started to walk that way and as I arrived at the side of Rec. Ofc Moses I heard the female paramedic say 'This isn't good'. . . Paramedics began or finished an IV and started to collect their gear and wheel Moses out. I grabbed the IV bag and began to order recruits to grab paramedic gear and bags. I observed Moses and he appeared to be unresponsive. As the paramedics wheeled Moses across the hanger and towards the east hanger doors, I began sternum rubs on Moses to try to wake him up. Paramedics got Moses into the ambulance and I requested two officers to ride in the ambulance to assist with CPR if needed.

<u>Defendant Jason Moore</u>

193.     On 01/06/23, Defendant Jason Moore was working at the Denver Police Academy as a Technician for the DPD.

194.     Defendant Moore had extensive knowledge of Victor Moses's incapacitated state and knew his freedom of movement had been terminated by the group's collective assaultive force.

195.     Defendant Moore also knew that Moses did not have the capacity to voluntarily consent to the continued use of force against him given his debilitated condition after collapsing and going unconscious several times during Station 2.

196.     Defendant Moore nevertheless also made the deliberate decision not to intervene to end the continued unconstitutional excessive force seizure of Victor Moses and instead obtain emergency medical care for him despite having ample opportunity and obligation to do so.

197.     Defendant Moore "<u>saw that he was knocked to the ground more than once. The last time … he did not get up</u>." Defendant Moore then knew Moses could no longer freely move.

198.     Defendant Moore saw and heard as "Technician Gentry, who is the Academy lead instructor for ACT, was the specific Safety coordinator for stages three and four, approached Recruit Moses and spoke to him while he was on the ground."

199.     Defendant Moore heard "Technician Gentry request the paramedics, who are always on standby during a DAD, to come and check on Recruit Moses. I later learned that Recruit Moses was stating that he had leg cramps. After a very short while, perhaps a few minutes or so, the paramedics left the mat area where Recruit Moses was and I saw that staff were helping Recruit Moses out of his protective gear and they began stage three, right where Recruit Moses had gone down."

200.     "After what seemed like thirty seconds or so," Defendant Moore also witnessed "Technician Gentry call[]the paramedics back over" because it appeared "that Recruit Moses was not moving. He was placed on a gurney and taken off of the mats."

201.     Defendant Moore then knew that Victor Moses's freedom of movement was terminated to the point that he could not even remove his own protective gear or stand up or walk. He knew he was so disabled they could not even get him to Stage 3, and that they had to bring Stage 3 to Victor Moses where he knew he "had gone down."

202.     Defendant Moore knew that Moses was immobilized and incapacitated, thereby being rendered involuntarily into police custody by the gauntlet of intentional assaults.

203.     Defendant Moore had full and ample opportunity to end this violence but deliberately chose an alternative option – not to intervene – despite a constitutional duty to prevent

unreasonable excessive force and unlawful seizure. He also did nothing to secure obviously needed emergency hospital or other medical care.

## Defendant Damon Roman

204.    Technician Damon Roman also watched Victor Moses knocked off the padded mat where he slammed his head on the tile.

205.    Thereafter, Defendant Roman grabbed Victor Moses "by the bar on his right head gear" and pulled him up to his feet.

206.    After Plaintiff was forced to stand up, Defendant Roman let go and Mr. Moses fell down in front of him. He obviously could not then stand up on his own without being physically held up by others.

207.    After he was briefly pulled back up onto his feet by his head gear, Defendant Roman instructed Plaintiff "[n]ot to give up."

208.    Knowing that Victor Moses's freedom of movement was terminated, that he hit his head, had been knocked unconscious, and that he lacked any capacity to voluntarily consent to any further use of force upon him, Defendant Roman continued to exert undue pressure and hands on force to keep Victor Moses in the fight until he was irretrievably injured.

209.    Defendant Roman had full opportunity to end this violence but deliberately chose instead to both physically force and mentally coerce Victor Moses to continue to subject himself to such force.  This Defendant thus failed to intervene despite constitutional duties to do so. He thereby willfully joined in continuing to intentionally restrain Victor Moses from getting immediately to the hospital for obviously needed emergency medical care.

## Defendant E.M. Alfaro

210.    Defendant Technician E.M. Alfaro was "one of the timekeepers during the D.A.D for the class." He "ended up being the timekeeper for R/O Moses." He observed and timed him going through the drills until he was taken to the hospital.

211.    During Station 2 he saw "R/O Moses did get knocked down, he stumbled and fell off the edge of the mats, falling to the floor. He landed on his right side, shoulder, and may have hit his head."

212.    This Defendant knew Moses had lost consciousness, and continued to be assaulted thereafter, but consciously omitted it from his reports.

213.    Defendant Alfaro knew Victor Moses could not get up and his freedom of movement was terminated, nothing that: "[W]e attempted to get him back to his feet, calling him to get up and assisting."

214.     Defendant Alfaro knew that Moses was incapacitated and his freedom of movement terminated. He also knew that Moses was incapable of providing voluntary consent to continue. Despite this, he personally was urging, physically assisting, instructing, and pressuring Victor Moses to get up and continue with the drill despite obvious risks to his life, safety, and well-being.

215.     Despite his and the collective efforts of this group to force Victor Moses to continue by trying to lift him up physically while verbally urging him to continue, Defendant Alfaro witnessed that "R/O Moses was not able to get up."

216.     When the paramedics came over, Defendant Alfaro also heard Victor Moses who was "obviously winded" "complain of cramps to his legs." He also no doubt learned, as did the others hearing this conversation, that Moses had SCT, very low blood pressure despite extreme exertion, had gone unconscious, and was extremely fatigued.

217.     Defendant Alfaro had full opportunity and constitutional obligation to stop this excessive force, but chose not to do so or to secure obviously required emergency medical care. Defendant Alfaro instead joined this Defendant group in trying to force Victor Moses to continue. After the Defendant paramedics also decided to assist in letting the mandatory exertion and infliction of force continue, Defendant Alfaro still did not intervene, and instead watched as the "officers doing the ground fighting, grappling, stage, came over and removed R/O Moses's chest protector and helmet. . ."

218.     Defendant Alfaro saw that Plaintiff could not move enough to even take his safety equipment off on his own.

219.     Defendant Alfaro stood by until he saw that "R/O Moses couldn't get up to continue" and the paramedics came over again. Mr. Moses "was placed on the pram and moved off the mats to where the paramedics were staged, next to the scenario house."

220.     He saw the paramedics "moving R/O Moses towards the east hanger door, where the ambulance was staged." Defendant Technician Moore instructed Defendant Alfaro to "follow the ambulance to the hospital per policy. . ."

221.     After watching Mr. Moses be assaulted through multiple stages, Defendant Alfaro also lied to doctors at the hospital about the nature and cause of Mr. Moses' injures, affecting his course of care and impacting the severity of his injuries, as set forth above.

<u>Defendant Brian Camozzi</u>

222.     Defendant Brian Camozzi, a former professional Mixed Martial Artist fighter known as "The Mantis," was assigned to Station 3.

223.     This Defendant's excessive force towards Plaintiff Moses finally rendered Moses completely unresponsive.

224.    Defendant Camozzi states he was "instructed to use ground maneuvers to control the Recruit Officers on the ground" and "deliver light open-handed taps to the Recruit Officers while an instructor acted as dispatch asking for further information regarding the situation."

225.    Defendant Camozzi watched Plaintiff Moses in Station 2 before he became directly involved.

226.    Defendant Camozzi watched as "Academy staff and other Officer helpers there attempted to help the Recruit Officer to his feet where he stood for a brief moment and then sat back down."

227.    Defendant Camozzi saw the group's failed attempts to lift, jerk and assist Victor Moses to stand up and thus knew that Victor Moses was so disabled he could not remain standing. He thus saw Moses unable to arise from his previous assaults and losing consciousness.

228.    This Defendant also knew that Mr. Moses complained of leg cramping and that he was reporting SCT and no doubt heard that Moses's blood pressure was very low.

229.    Thus, Defendant Camozzi knew that Moses' freedom of movement was terminated, and he did not have the capability to voluntarily consent to further assaults upon himself.

230.    Despite knowing all of this, when Defendant Gentry instructed him to "begin station 3" with Moses, Defendant Camozzi willingly acquiesced, assaulting Moses while he laid on the ground. He did nothing to intervene to stop his assaults or secure emergency care despite his obvious need for it and his constitutional duties.

231.    During this phase Defendant Camozzi delivered what he called "light open hand taps to the head" of Victor Moses.  In other words, he repeatedly hit him in the head, which is after Moses had fallen onto his head on the concrete in Station 2.

232.    About 30 seconds into Station 3, while Defendant Camozzi was laying on top of him, Moses again lost consciousness, was unable to be revived and was taken to the hospital.

233.    Despite knowing that Mr. Moses became unarousable during Station 3, in an attempt to cover up his role, Defendant Camozzi falsely stated in his report that Moses completed station 3 while still conscious, writing "[a]t the conclusion of station 3 I stood up and the Recruit Officer lay on the ground for another moment still fully conscious."

234.    In fact, he was totally unconscious and had collapsed under his weight long before completion.

235.    Defendant Camozzi has outrageously further stated that the Academy staff and officers, including himself, "attempted to get the Recruit Officer up to prepare him for the last station however the Recruit Officer refused to stand."

236.     Victor Moses did not refuse to stand. He could not move. He could not stand.

**The Unconstitutional and Willful and Wanton Conduct of Paramedic Defendants Courtney Wham and Taegin Sung**

237.     Defendant Paramedics Courtney Wham and Taegin Sung were willful governmental participants in this joint activity and were acting under color of state law.

238.     In clearing Mr. Moses to continue, Defendant Paramedics knew that he was so incapacitated by these assaults that he was in police custody and also then an obvious emergency medical patient in their care.

239.     Nonetheless, these Paramedic Defendants impermissibly agreed to aid and facilitate this obviously unreasonable excessive unconstitutional beating of Victor Moses who they treated not as their very badly injured patient in need of immediate emergency medical care in a hospital, as he had obviously become, but as someone they were there to keep fighting.

240.     Defendants Wham and Sung, not merely negligently, but recklessly, actively and egregiously participated with the shared goal with each other and with the law enforcement defendants of making Moses complete all four stages – no matter what.

241.     In doing so, they actually knew:

- that he had SCT;
- that he was then experiencing an altered mental state and had been beaten into repeated bouts of unconsciousness;
- that he had extreme fatigue;
- that he was experiencing extreme leg cramping which the paramedics knew was associated with SCT;
- that he had a far too abnormally low blood pressure after such extreme exertional activity with only very brief rest periods which the paramedics knew was associated with a sickling event;
- that he had hit his head hard off mat on the tile;
- that he had fallen repeatedly both after being hit and just on his own;
- that he was then incapacitated and defenseless;
- that he did not have the capacity to take off his own safety equipment, to get up or stand up, stay standing, even when being held up by defendant officers; he could not ambulate himself voluntarily to the place on the mats where Stage 3 was to occur; and
- that he could not then make rational decisions or give meaningful voluntary consent about his health.

242.     Despite knowing all these things, the Paramedic Defendants, as willful governmental participants in this joint activity with the officer Defendants, decided and/or agreed

to return Victor Moses immediately into the drill for his further physical battering and arduous and exhausting physical and mental stress.

243.     They did this by actively facilitating and enabling the continued infliction of shocking force.

244.     At all times relevant to Mr. Moses, Defendants Wham and Sung were jointly acting to assist the police Defendants in attaining their goal of getting Moses to complete Fight Day, rather than caring for him as a patient and providing necessary medical/paramedic emergency care and instructing the police to cease inflicting physical trauma on him under his severely compromised and vulnerable circumstances.

245.     These Defendant paramedics already knew from watching 39 or so recruits go through it before Victor Moses that "Fight Day" is a brutal, exhausting set of physical endurance combat drills intentionally constructed to challenge the officer applicant's ability to withstand overwhelming physical force inflicted by veteran officers who volunteered to inflict such violent force.

246.     Defendant paramedics should have been there to protect from and treat injuries pursuant to their patient paramedic duties, but instead were acting as police agents or adjuncts in their role during Victor Moses's Fight Day.  They were there, not to provide him with patient care, but to keep him propped up to get through the fight, regardless of the injuries sustained.

247.     In refusing to intervene to protect Moses's health and welfare, and actually deciding and agreeing not to end his Fight Day, these Defendants were not merely negligent, but reckless and willful and wanton in ignoring the obvious risks to his health and safety of which they were actually aware.

248.     They did this knowing they were thereby assisting his being kept intentionally restrained to endure more excessive force when circumstances dictated that he needed emergent medical care at a hospital.

249.     These Defendants completely abdicated their constitutional, statutory, and ethical patient care duties to end this debacle while there was time to save Mr. Moses from this terrible outcome.

250.     They did not just passively watch these events unfold. They actively helped to ensure that it continued.

251.     These paramedics as government actors acted in conscious solidarity with police to effectuate and continue the hazing of Victor Moses without regard to the then well-known and highly foreseeable ruinous consequences for Moses's life and health.

252.     In so acting and in refusing to intervene to stop this destruction of Victor Moses these two Defendant paramedics knew that Victor Moses had been knocked unconscious *before*

they first came to him on the mats as he laid on the ground after his earlier beatings which they also both saw.

253.    Allowing physical assaults to continue given what they knew was egregiously shocking, willful and wanton and done with complete disregard to the then known to them serious likelihood of additional severe bodily harm or death to Victor Moses.

254.    These paramedic Defendants were not at Fight Day to end or treat excessive force or to minimize injuries. They were there rather in Victor Moses's case to facilitate it and permit it to continue.

255.    The many watching police recruits were horrified by what they had just witnessed, and some specifically also identified these Defendant Denver Health paramedics as equally culpable for abandoning Mr. Moses in his medical crisis.

256.    These Denver Health paramedics/EMTs had an obligation to supervise the drill with an acute and sole focus on his health and medical needs during an obviously arduous series of drills.

257.    These two Paramedic Defendants thus gave their entirely non-medical and pretextual willful and wanton approval to allowing Victor Moses to continue being subjected to unconstitutional intentionally inflicted excessive force.

258.    They and all other individual Defendants also failed to intervene to end such unreasonable excessive force and seizure and to obtain obviously needed hospitalization as Article II Sections 7, 25 and 3 of the Colorado Constitution and as the 4th and 14th Amendments mandated in these custodial/care circumstances, despite opportunity to do so.

259.    These Paramedic Defendants also participated in misleading the doctors at the hospital as aforealleged.

260.    This conduct was willful and wanton within the meaning of 24-10-118, C.R.S. because they were consciously aware that their acts or omissions were likely creating preventable harm, danger and risk to the health, wellbeing, life and safety of Victor Moses and nevertheless both acted without regard to these then known risks of harm health, wellbeing and life.

**Fight Day is the Result of a Policy Choice and Culture of Violence, Hazing, and Training That Causes Unnecessary Injuries Among Recruits**

261.    Fight Day had long been sanctioned by the Denver Police Department and its entire management staff, including specifically Police Chief Ron Thomas, and is an official program of the City of Denver's Public Safety training regimen.

262.    Fight Day is an ingrained, customary official program used by Denver with the assistance of Denver Health to train prospective officers and to inculcate them in the use of excessive force.

263.    Denver's policy or custom, which was the moving force behind the constitutional deprivations described herein, is demonstrated by the existence of at least the following:

(1) The formal regulations and policy statements regarding the Fight Day training regimen and the Dynamic Action Drill, a mandatory process required for graduation from the Academy;

(2) An informal custom amounting to a widespread practice that, even if not authorized by express municipal policy, has been so permanent and well settled as to constitute a custom or usage with the force of law, including the administration of the "hazing" component of the training intended to inflict an unnecessarily violent and dangerous rite of passage on new recruits causing many injuries as a condition of gaining membership into the fraternity of officers who themselves were previously required to undergo Fight Day and related drills, beyond the legitimate needs of training necessary to become an effective law enforcement officer;

(3) The decisions of employees with final policymaking authority or employees that have been delegated such authority, including Police Chief Ron Thomas, regarding the required training regimen that recruits are subjected to as a mandatory condition of becoming a Denver Police Officer;

(4) The ratification of such final policymakers, including Chief of Police Ron Thomas, the manager of the Department of Public Safety, and the members of the police Command Staff to whom training authority has been delegated, of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to the policymakers' review and approval; and

(5) The failure to adequately train or supervise employees who are conducting the training of the recruits as to the limitations imposed upon them on inflicting force or assuring that they intervene to ensure adequate medical care and treatment during the foreseeably violent and dangerous training known as Fight Day.[5]

264.    Denver has for many years fostered and tolerated a "culture" at the Academy which includes hazing and intense physical and emotional repercussions for failure to adequately complete the Fight Day endurance tests.

265.    Over the years, many recruits have been injured and had to be medically treated or even hospitalized during Fight Day, including several on the same day Victor Moses had his life so profoundly damaged.

---

[5] *Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

266.    In 2014, for example, Denver Police Recruit Kimberly Lockinour experienced hazing and the infliction of unnecessary and excessive force against her during her efforts to become a Denver Police Officer.

267.    Lockinour was a decorated police officer in Carbondale, Illinois who decided to move to Denver to become a police officer. Given her experience and resume, Denver hired Ms. Lockinour as an Officer Recruit and enrolled her in its Spring 2014 Police Academy class.

268.    Lockinour experienced abuse and, according to her, "100% hazing" during the Dynamic Action Drill Fight Day drills. She reported that she was intentionally injured by one of the DPD instructors during the Fight Day drills.

269.    Among the abusive, violent, and excessively forceful actions taken against her during Fight Day, Ms. Lockinour was slapped and put into a dangerous chokehold, requiring medical care.

270.    Another female recruit in the same class told internal investigators that she too was put in a neck hold, and that the same thing happened to several of the other recruits. Another recruit reported during the Internal Affairs investigation into the Lockinour complaint that some of the recruits lost consciousness during the Fight Day drills, describing them as "[k]ind of like knocked out/choked out."

271.    A Denver Internal Affairs report revealed that a trainer threatened to "slap the 's*@#' out of her," and actually did slap her one time with an open hand. The male trainer also admitted to using a "carotid control hold" on Lockinour, not to show her how the hold works, but rather to "make the recruit aware they need to become more aggressive."

272.    Lockinour described the abusive treatment as an effort of the instructor to see if she was tough enough and would keep her mouth shut even if she thought he had crossed the line. She described this as "**the Denver way as they say in the academy. The Denver way**."

273.    Lockinour attributed the purpose of the training as less concerned about preparing recruits for duty and more interested in testing their willingness to keep the Blue Code of Silence. Officer Lockinour observed in an on-camera interview with FOX31 Denver that the Fight Day-type training "breeds aggressive police officers. I think it teaches people to fight first and talk later and that doesn't work."

274.    Records show that when Lockinour did not complete the Dynamic Action Drill training day, she was deemed to have resigned, and DPD records say that she "quit."

275.    FOX31 television in Denver confirmed that there is video and audio tape of Lockinour's treatment during the drills that led to her complaint, but DPD refused to release such evidence to the station, using as an excuse in its denial that "[r]evealing details of tactical training could impact officer safety and in turn, public safety."

276.   Lockinour, a Black woman, filed a charge of discrimination and retaliation, alleging that she was targeted because of her race, sex, and/or color and in retaliation for her speaking out against her treatment during her prior training at the Denver Police Academy.

277.   Pursuant to this customary and pervasive culture, Individual Defendants collectively forced and pressured an incapacitated Moses to continue to fight, preventing his emergency hospitalization until it was too late.

278.   Defendants did so to force and pressure his completion of Fight Day in the prescribed manner as is the custom, practice and policy of Defendant Denver as a condition of being hired as a Police Officer.

279.   Fight Day hazing is designed to include excessive force assaults against recruits. This hazing tradition, policy and custom of assaulting recruits is a mandatory Denver rite of initiation and passage.

280.   The unnecessary and excessive violence inflicted by Denver and its trainers upon Recruit Officers trained during Fight Day has also long been unconstitutionally used by DPD and Defendant Denver to train, inculcate and imbue recruits with the personal understanding that excessive force by them is officially tolerated, and indeed culturally expected, as a job requirement.

281.   This trained willingness to inflict violence on citizens has contributed to Denver's sullied reputation nationally and in Colorado, while costing Denver taxpayers many millions of dollars in settlements and judgments arising out of police brutality, excessive force, and other law enforcement misconduct. Through Fight Day, each recruit is conditioned to intentionally assault and even continue hurting people past the point of unconsciousness, as shown in this case, and they are taught that such force is approved and authorized by police supervisors and command staff, not restricted and discouraged.[6]

282.   Defendant Denver Police had actual or constructive notice that their actions or failures to act as described more fully herein were substantially certain to result in a constitutional violation against Plaintiff Moses, but they consciously or deliberately chose to disregard the risks of harm. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

---

[6] What happened here can perhaps be explained as an extreme example of Groupthink, a psychological phenomenon that occurs within a group of people in which the desire for harmony or conformity in the group results in an irrational or dysfunctional decision-making outcome. Significant initial research about Groupthink was done by Irving Janis, a Yale Research psychologist, and followed up and corroborated by many researchers and professionals in the area of behavioral psychology. Here, Groupthink contributed to all the Defendants ignoring life and death symptoms in pursuit of their common goal of getting Victor Moses to complete Fight Day, no matter what the cost.

283.    Denver's training of its officer recruits, as exemplified by the implementation and administration of the Fight Day drills, was deliberately indifferent to the federally and Colorado protected constitutional rights of those officer recruits. This is so despite Denver's express written DAD descriptions that the recruits are there to be trained and tested by all involved in proper arrest and seizure techniques, including de-escalation of force and rendering aid to those injured in such situations.

284.    The constitutional violations alleged herein were the inevitable consequence of Defendant Denver's policy or training. The violation of federal and state constitutional rights, including the rights of Plaintiff Moses, was a 'highly predictable' or 'plainly obvious' consequence of Denver's inadequate and customary training regarding the Fight Day drills.

285.    Based on the City's long implemented training program, which mandated enduring Fight Day, its policymakers knew "to a moral certainty" that Denver would inflict unnecessary and unreasonable excessive force upon its recruits, including Moses, incurring unwarranted risks of serious bodily injury or death on the recruits.

286.    In this regard, DAD instructions expressly mandate that: "[r]ole players and assistants will immediately stop a drill if they have reason to believe a participant's health or safety is in jeopardy."

287.    The Academy training staff, however, are inadequately trained to follow such constitutional principles governing excessive force and to respond by immediately rendering aid in medical emergencies, which foreseeably result from the Fight Day drills.

288.    The Academy training staff are inadequately trained on how to properly accommodate and handle recruits with SCT in conformity with national military and police training protocols.

289.    Denver Police's custom and practice of obtaining critically important medical information from its Recruit Officer applicants and then ignoring such information, failing to share it with officers or paramedics, demonstrates deliberate indifference to the constitutional rights of such applicants.

290.    Denver Police are also deliberately indifferent in failing to train supervisors, trainers, assistants and role-playing officers during Fight Day drills to accommodate for such known risks to recruits in the training and supervision of the officers working Fight Day with such recruits.

291.    The need to train officers and medical staff differently to provide care during Fight Day regimen was so obvious' that failure to do so by both governmental entity Defendants is properly characterized as deliberate indifference.

292.     The training decisions complained of herein "reflect" the Denver Police's final delegated policy makers' deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights.

293.     The Police Officer Standards and Training investigation and findings demonstrated that Plaintiff Moses's injuries were incurred pursuant to the official customs, policies, practice and training of the Denver Police Academy.

294.     A POST-compliance investigation was performed after the events of January 6, 2023, concluding as follows:

> After the investigation, it was determined by POST Staff and the Subject Matter Experts who attended that the Denver Police Academy followed all standard safety protocols. There appeared to be no evidence of wrongdoing on behalf of the Denver Police Academy.

295.     The violence inflicted on recruits during Defendant Denver's Fight Day is unreasonable and unnecessary for legitimate law enforcement training.

296.     In fact, since these events, Station 2 has reportedly been abolished by DPD or substantially modified to make it less violent, reckless, and dangerous to the Recruit Officers.

297.     This conduct demonstrates deliberate indifference to the foreseeable injuries that Denver knew could likely result from its unconstitutional policies, customs and training.

**Denver Police Did Not Act Alone – Denver Health was also Deliberately Indifferent in its Policies, Customs and Training**

298.     Denver Health and Hospital Authority as part of the operations of a public hospital has long supplied such paramedics to cover and augment the law enforcement training staff administering Fight Day. This has gone on for many years. This Defendant's complained of policy, custom and training was also the moving force behind the constitutional deprivations described herein.

299.     Denver Health and Hospital Authority is also deliberately indifferent in the training of paramedic staff to respond to medical emergencies which will foreseeably result from Fight Day drills. It does this by allowing and enabling paramedics to focus primarily on helping recruits complete Fight Day drills even where medically contraindicated, unwise or dangerous, rather than properly focusing solely as paramedics on the medical health, welfare and well-being of the recruit that is undergoing physically exhausting trauma – and to do so without regard to the job consequences for such recruits who are medically unable to continue.

300.     The need to train medical professionals assigned to Fight Day to provide adequate care was so obvious that failure to do so by both governmental entity Defendants is properly characterized as deliberate indifference.

301.    In fact, the practice of using paramedics to diagnose and "clear" injured recruits to continue fighting is recklessly outside their scope of practice. Paramedics are inherently unqualified by their medical licensure to rule out causes for serious symptoms such as loss of consciousness and Denver Health has a practice of requiring paramedics assigned to Fight Day to practice medicine outside of their scope.

302.    Denver Health and Hospital Authority has had a longstanding policy or practice and custom of allowing, training and instructing its paramedics to be posted during Fight Day on location, and to tolerate significant police recruit injuries while acting not as independent paramedic professionals but rather as police adjuncts and agents with severely compromised duties of due care in the service of non-medical DPD goals of facilitating police recruits like Victor Moses completing fight day regardless of the severe known high risk medical consequences to that recruit.

303.    DHHA also has a longstanding policy, practice or custom of not even requiring attending paramedics to be aware of special disclosed medical circumstances pertaining to each police recruit that are known to DHHA from its administration of the medical clearance assessments of every such recruit, including regarding Plaintiff Moses who disclosed he had SCT to DHHA agents and employees which as part of this derelict policy was not shared with these assigned paramedics.

304.    Denver Paramedics are deliberately indifferently and inadequately trained on how to properly accommodate and handle recruits with SCT in strenuous training exercises.

305.    Denver Health custom and practice of obtaining critically important medical information from Denver Recruit Officer applicants and then ignoring such information, failing to share it with officers or paramedics, demonstrates deliberate indifference to the constitutional rights of such patients.

306.    It is approved policy and established practice of DHHA to supply paramedics to cover and assist the Denver Police Department with the Academy's Fight Day. Such attendance and participation and its personnel is intended to support the Denver Police Department's training regimen for new recruits, thus serving a law enforcement function.

307.    These training decisions "reflect[s] DHHA's final delegated policy makers' deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights."

308.    This conduct demonstrates deliberate indifference to the foreseeable injuries that Denver Health knew could likely result from its unconstitutional policies, customs and training.

### Victor Moses' Injuries, Damages and Losses

309.    Victor Moses was an active, healthy, happy, vibrant young man prior to Fight Day.

310.    He graduated from Florida State University:

 

311.    He had an active social life:

 

312.    He enjoyed spending time outdoors, exercising, and in nature:

 

 

 

313.     These photographs show snapshots of the full life Victor Moses has lost, resulting in severe physical injuries and disabilities, extreme grief, post-traumatic stress, depression, and suicidal ideation.

***Plaintiff Experienced Elongated and Extraordinary Pain and Suffering at the Hospital***

314.     The UC Health Sciences Hospital provides this discharge summary of Victor Moses's several months stay:

28 yo M w/ sickle cell trait who presented to the ED after collapsing during strenuous combat training at Denver PD likely 2/2 ECAST and was found to have rhabdomyolysis c/b compartment syndrome of bilateral upper and lower extremities, acute renal failure with severe hyperkalemia and AGMA requiring CRRT [Dialysis]. While admitted, patient has had BLE [Bilateral Lower Extremity] fasciotomies and subsequently found to have developed MDR [Multi Drug Resistant] Enterobacter infection in BLE [Bilateral Lower Extremity] and RUE [Right Upper Extremity] requiring BLE [Bilateral Lower Extremity] BKA [Below Knee Amputation] and BUE [Bilateral Upper Extremity] surgical interventions. Patient transferred to Medicine from SICU for pain and antibiotic management with

c/f persistent MDR enterobacter [Multi Drug Resistant] infection in the RLE [Right Lower Extremity].

315.    Victor Moses underwent numerous surgical procedures at the hospital during this 4-month period. These included multiple grim fasciotomies in an attempt to save his legs by releasing the four compartments of the lower legs.

316.    While in the hospital, Mr. Moses had amputations of both legs just below the knee and had innumerable painful surgeries and procedures to try to save his life, organs, and limbs.

317.    Victor Moses frequently experiences flashbacks and nightmares enduring these numerous procedures, surgeries and recoveries. He remembers every time coming back to his room after each of them only to endure the post-surgical or wound care treatment pain and suffering.

318.    The following paragraphs provide a partial description of Victor Moses' extraordinary pain and suffering and the sheer horror of his experience in the hospital in his own words:

> I would say the worst pain by far would be the wound care. The wounds shown in the graphic photos from my fasciotomies would have to be constantly changed. That was by far the worst. The physical pain was one thing but the mental pain was indescribable.

> I'd also have to look at my limbs that had then given me an amazing 28 years of life completely mutilated -- from the exposure of my bone in my right arm, to my dead thumb and darkened fingers.

> I had to look at my body rotting on a hospital bed -- for months. I also had to endure my caregivers doing excruciatingly painful wound care on my legs (at the time I still had them), my arms, and my torso. I had to hope, in vain, for weeks that they would at least be able to save my rotting right leg only to come out of a surgery for another body part and told they were going to have to amputate it as well.

> I had to look at my bare bone on my arm for weeks before they gave me a skin graft from my thigh.

> The pain I endured at the hospital was consistently excruciating. I couldn't do anything. I couldn't get up and walk away because I was completely bed ridden.

### FASCIOTOMIES — GRAPHIC PHOTOS

319.    To try to save his limbs, Mr. Moses underwent many extremely painful fasciotomies in an effort to restore circulation to areas that were dying. The fascia under the muscles are cut to reduce pressure.

320.    He had many open places on his body where he could see his own bones and the insides of his body, which was extremely mentally, emotionally, and psychologically distressing. Ultimately the leg fasciotomies were unsuccessful and he had to lose much of his legs anyway.

321.    **WARNING: The following fasciotomy and other photos are graphic and show Plaintiff's exposed bones, muscles and tissue in his arms and legs from his fasciotomies, which preceded his amputations.**  Mr. Moses saw these and had to suffer through them every day for months, with extensive permanent scarring:









322.    In the following paragraphs Victor Moses in part describes his experience of the progression from fasciotomies and limb wound care, to his bilateral Below the Knee (BKA) amputations:

> My parents did everything to make sure I didn't see my feet before they were amputated and I thank them for that. The wound care changes were painful even

with the meds. The doctors ordered me to get extra medication (Oxycontin and Dilaudid) but they barely helped. I remember telling hospital staff optimistically that I would be out soon, over and over.

Before my left leg got amputated I was telling them that I would be out that week, even that very day depending on the drugs I was on and nurse I was around.

But that day kept turning into another day, turning into another week, turning into an amputation, turning into another day, weeks, and months and then into another leg amputation a few weeks later. The fasciotomies I had endured did not save them.

Out of everything I have experienced, getting my legs cut off was one of the worst things. I never thought the human body could go through what I went through and yet, after enduring all the rotting, both my legs were cut off.

I will never forget when they cut off my left leg in late January.

I remember briefly making peace because this one leg amputee told me it would get easier and that there were other one legged amputees and one even bilateral that would go on hikes, breweries, etc. My situation sucked but at least I had one leg and he told me the many stories of triumph he's endured because of it.

But then, after all the earlier surgeries and wound care, I will also never forget being wheeled back in my hospital bed one day in March and seeing one of my surgeons waiting for me in the room. This was unusual.  He cut to the chase and told me: "There is nothing we can do to save your right leg." And then I had surgery to remove my right leg as well just below the knee.

There is another kind of pain that came with the amputations. Doctors call it phantom pain.  Phantom pain is tough to describe unless you experience it. After they amputated me it would feel like I was never amputated. My nonexistent toes would be on fire but I couldn't do anything because they weren't there. I still have to deal with this phantom pain daily.

One of the most strange and painful additional procedures I had to endure and recover from was when to save my hand, the surgeons cut my stomach open after mid-March and attached my arm and stuck my thumb inside my stomach for tissue growth. They said it was a popular procedure during World War 1.

I had to have my arm attached for three weeks to my stomach and couldn't move it. Outside of the pain I couldn't do anything if I wanted to stretch and the medication didn't help. The wound care for that procedure was also excruciating. When I went for surgery to get it removed, they had to wait another week or so because of something went wrong while my arm was surgically attached.

323.    Dialysis was also extremely painful:

I never really fully understood dialysis until I went to UCHealth and it was also another one of the worst things that anyone can endure.

My kidneys are damaged and I was on TWO dialysis machines. I understand I was one of the first, or maybe the first patient they have ever done that to. I was the most scared in my life because I didn't want to be on dialysis. I still live with the very strong fear that my kidneys will take a turn for the worse.

I had tubes that lived in my neck for a few months and were painful among every other severe pain I was then daily experiencing. Someone would wheel in this huge machine and spend 5-10 minutes at least connecting and disconnecting you.

They then would leave the room and monitor you thru a window while this beyond loud machine would transfer blood in and out that was extremely cold. If you moved your neck even the slightest alarms would sound and that person would have to come back and adjust positioning.

I had almost every tube connected to me you could think of. The biggest thing I remember was later down the road was when they had to change or add the feeding tube they put down my nose. I was begging them to put me to sleep even because of the pain but it was supposed to be quick so they couldn't. One of the nurses messed up so they had to take it out and get someone else to do it.  The position of the tube would make me throw up consistently whenever I tried to eat because it would always be scratching something. The hospital said that they couldn't take it out because I needed to get my daily calories.

I couldn't even talk to anyone because the tube would painfully scratch some part of my insides and almost make me throw up again. I had to position my head in one place and stay in that position because if I shifted my head it would be an immediate issue with pain.

324.    During his hospitalization, Victor Moses lived with constant pain requiring pain medications even apart from the painful procedures. He has also written about this aspect of his experience:

Even with all the powerful drugs I was always in pain for months. And if a nurse was late to give me my scheduled pain medication it was a nightmare.

I never could sleep at the hospital. Imagine being on your back for four months and you're awake for most of it. I never slept more than two hours without being disturbed from a hospital staff member or agonizing from the pain.

> I had some of the most pain powerful drugs (including Fentanyl) inside me during my four month stay but I was still always in pain. It was physical pain from hell but saying this does not include the agonizing mental and emotional pain I endured as well. It's tough to say but the only time I was at peace was when I was dreaming. Even if it was a nightmare, it was a nightmare without pain.

325.    Beyond enduring the Fasciotomies, amputations, and other surgeries, as well as the constant physical pain, his emotional pain and distress and degradation at the hospital was overwhelming.

326.    Victor Moses describes the depression and embarrassment he suffered at the hospital:

> I don't think anyone can fully understand the level of embarrassment and humiliation that made me want to die that I experienced.

> I was on one of the highest floors in the hospital and had a view of the Denver skyline. I could literally see in the distance my building, my home. I could see the city lights knowing people were out having fun with friends and family for four months.

> For months, I had to have random caregivers wipe my bottom and prepare me to "use the bathroom". I've had at numerous different people do this for me. They'd have to turn me over to put a bed pan under me and ask if I wanted them to wait or leave. This was the most humiliating thing I've ever experienced. I had male, female, young, old caregivers do this for me.

> Because I was also on dialysis I couldn't urinate for weeks.  I had to have nurses and CNAs help me pee. This included sticking some rod down my penis shaft to help. When I finally peed it felt like someone won the Superbowl. Tears, joy, crying for brown pee… This was my life.

> Before going to the hospital, my last real shower was when I woke up around 5 a.m on January 6th, 2023. At the hospital, I had to be wiped down with a cloth and soap but I couldn't ever get a full bath for months I was bedbound.

327.    Here are some pictures taken not long after Plaintiff Moses finally got out of the hospital and was in his own apartment. These pictures partially depict Victor Moses' current injury status and BKA bilateral amputations:







Right Arm Post-Surgery                    Right Arm and Right Leg post-surgery



Upper Legs Post-Surgery

328.     Plaintiff Moses has undergone a great deal of rehabilitation therapy. He now must use prosthetics, which have had to be refitted and redone multiple times -- they are still not right because of the difficulties of fitting the stumps.

329.     Plaintiff Moses is still learning to use prosthetics, to stand up from the ground and negotiate curbs but not steps. He uses two canes to walk every step because without them he cannot maintain balance.

330.     He still also regularly experiences bleeding from his stumps after using and taking off his prosthetics, often having cups of blood and bodily fluids come out of them, which puts him in regular fear of infections and further amputations:

 

331.     The use of these prosthetics has caused Moses substantial pain, further physical injury, and emotional distress related to his understandable fear that his injuries will not heal properly.

### *Plaintiff's Ongoing Pain, Suffering, and Loss of Enjoyment of Life*

332.     In the following paragraphs, Mr. Moses describes his profound loss of enjoyment of life.

It is extremely hard to find the will to keep living. Saying my life has been ruined is a complete understatement. I had everything going for me in life and it was all taken away. I have had many thoughts of not wanting to live.

I still have to have a random person I've never met help me get undressed to shower and use the toilet.

I used to meet with friends every weekend and during the week and now my social life is almost non-existent.

I'll never get to have the feeling of sand going between my toes or the feeling of the ocean waves splashing against my feet. I can't even tie my shoes to put on my fake plastic feet.

What I've seen my parents go through because of this is almost as painful as the injury itself. My family has been broken from this. My family friends tell me they've noticed changes in my parents watching their youngest child go through this. As the youngest, I always hoped and was on the path to be successful and retire my parents and help take care of them. Instead, they are pushing me, at the age of 29, onto the toilet and into the shower.

333.    Victor Moses still has excruciating persistent pain:

I have been in pain every day since I remember waking up from my coma towards the beginning of January. I wake up in pain, I go throughout my day in pain, and I go to sleep in pain.

I have not been one to take painkillers before this such as Advil or Tylenol and never any other medication outside of antibiotics if I was sick. Now I'm taking Oxycodone daily, Venlafaxine, sleeping medication, nerve pain and a lot of other medication when I was in the hospital such as fentanyl and ketamine (which made me go unconscious and crazy when they injected me with it).

I never have been hospitalized or even broken a bone in my 29 years of life and am now on my 20th surgery in well less than a year and a half and still face more.

Since January 6, I have rarely had the chance to get privacy. From nurses coming in the room at any time of day or night at the hospital, to CNAs coming now in my home all day long. This is not because I want the help but because I need the help.

My right arm still doesn't work and my left arm is barely functional.[7]

There are so many things in my normal life that I considered at the time that I would do anything to experience again.

I slowly find myself becoming a Victor I've never met. I'm starting to isolate from my friends and family, gain too much weight, not be able to sleep, etc. I'm reminded of what happened to me every day I look in the mirror.

My future is uncertain.  I have to check the ends of my stumps for signs of infection, because they can always get cut higher. I'm always reminded this by my doctor and

---

[7] On June 24, 2024, Plaintiff underwent an almost eight (8) hour surgery in an effort to try to create some gripping and improve function in his right hand, borrowing tissue from his thigh.

therapists. I can't begin to tell you the paranoia I have on a weekly basis if one or both my stumps have an infection because of the thought of losing one of my knees.

I haven't been able to travel back home due to the numerous issues of going through the airport or being on a plane. I haven't been able to attend weddings, birthdays, or vacations with friends and family.

I'm unable to do basic house and life chores that I've always done on my own, such as the dishes, vacuuming, sweeping, mopping, laundry, making my bed, grocery shopping etc. It's a struggle to even change my prosthetics let alone put them on because I only have one functional pair.

334.    Here is a list of other things Mr. Moses can no longer do that were important to him:

He can't run
He can't cook
He can't work
He can't drive easily
He can't date
He can't write legibly
He can't assemble things
He can't swim, jet ski, paddle board, kayak, hunt or fish
He can't use a knife to cut food
He can't get packages or check the mail
He can't take stairs
He can't fight or take flight to defend himself
He can't be independent
He can't start a family at this point

335.    Mr. Moses has also suffered significant distress at the way he has been maligned by Denver police from the time of his first amputation, while laying in the hospital:

One of my friends who came to visit often said that an article was written about me in which the Academy was victim blaming me as having a pre-existing condition which my trainers falsely stated that I did not disclose although I did very clearly write about having SCT on my application.  This press was around the middle of February, weeks after they cut off my left leg. This created an extremely painful feeling in me.

336.    Victor Moses has suffered extraordinary damages entitling him to recover compensatory, consequential, and special damages for his past and future loss of his pleasure of living, including his enjoyment of the many activities of his life and his expectations for his life's future prospects, and for all his past, present and continuing pain and suffering for his lifetime, all in amounts to be proven at trial.

337.    Had the infliction of this unreasonable excessive force been stopped when Moses first began collapsing and losing consciousness or shortly thereafter, and had he been emergently treated and hospitalized, it is medically probable that he would not have suffered the devastating losses of limbs and other injuries described herein.

338.    Victor Moses is entitled to compensation for the severe emotional distress, embarrassment, disfigurement, scarring functional impairments, limitations and accompanying humiliation that has been permanently caused, and the damage to his pleasure of his life and many loving relationships for the period of his expected normal mortality table life span.

339.    More particularly, Victor Moses's loss of consortium damages also encompass damages to his many relationships with his family and their enjoyment, and the same losses and damages with numerous other persons in his life with whom he also had intrinsically significant relational interests.

### *Plaintiff's Economic Damages and Losses*

340.    Victor Moses's resulting extensive permanent damages and losses also includes past and ongoing loss of earning capacity, lost past and future earnings, and other economic and special damages.

341.    With respect to his permanent wage and earnings losses, Mr. Moses's Workers Compensation benefits do not even remotely approach a fair valuation of the same and, in fact, even his WC Average Weekly Wage benefits have been arbitrarily, capriciously and unfairly limited by Defendant Denver to unreasonably save itself money. Victor Moses was a very hard worker.  He has been robbed of his career, his career prospects, and career choices.

342.    Victor Moses's damages, injuries and losses also include his extensive past and future medical and rehabilitative care charges, and the costs of his permanent care across the spectrum of his disabilities, impairments, and dysfunctions caused by Defendants.

343.    Victor Moses's damages, injuries and losses additionally include both recovery for any lien/subrogation claim(s), and his right to fully recover for all of his billing charges for all of his past and ongoing hospital, medical, psychological and rehabilitative care, treatment and services.  Such care is likely to continue for his lifetime.  In this regard, the charges and bills for all such care, treatment and services are still being ascertained, and will be proven at trial.

344.    The full extent of Plaintiffs injuries damages and losses are not known at this time.

345.    Victor Moses is also entitled to punitive damages against Individual Defendants on his state and federal civil rights claims, because Defendants acted maliciously, willfully and with a reckless and wanton disregard of the constitutional rights of Plaintiff.

346.    Plaintiff is entitled to attorneys' fees and costs pursuant to 13-21-131, C.R.S and to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by state and federal law.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Excessive Force and Seizure – Colorado Constitution, Article II, Section 7,
Colo. Rev. Stat. § 13-31-131
(Against Individual Police Defendants)**

347.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if they were fully set forth again here.

348.    Plaintiff Moses brings this action against Defendants Todd Gentry, Stephen Marino, Anthony Norman, Felipe Cervantes, Kyle Carter, Johanna Aitken, Lisa Aitken-Nelson, Jason Moore, Damon Roman, E. M. Alfaro and Brian Camozzi, each in their individual capacities.

349.    At all times relevant hereto, all Defendants to this claim were acting under the color of law in their capacities as police officers or technicians working for the City and County of Denver and the Denver Police Department. Each was a peace officer as peace officer is defined by Colo. Rev. Stat. § 24-31-901(3).

350.    During Station 2 and Station 3 Victor Moses was thus subjected to excessive force and "seized" in violation of Article II, Section 7 of the Colorado Constitution.

351.    Colo. Rev. Stat. §13-21-131 (1)-(3) authorizes inter alia excessive force claims against police officers and provides, emphasis supplied, that:

(1) A peace officer, as defined in section 24-31-901 (3), who, under color of law, subjects or causes to be subjected, **including failing to intervene, any other person** to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief.

352.    Individual Police Defendants participated in the deprivation of individual rights secured by the State Constitution pursuant to Colo. Rev. Stat. §13-21-131 (1)-(3), and Article II, Section 7 of the Colorado Constitution.

353.    Under Article II, Section 7 of the Colorado Constitution, Victor Moses is entitled to "be secure" from "unreasonable searches and seizures."

354.    The above-described excessive force and failure to intervene in excessive force unreasonably subjected Plaintiff to deprivation and violation of his Colorado constitutional rights as a person to be free from excessive force and unreasonable seizure.

355.     Mr. Moses was so incapacitated from Station 2 that he was unable to stand up, walk, remove his equipment or physically move himself to Station 3 location. Thus, his freedom of movement was terminated.

356.     This incapacity was known to all Individual Police Defendants and rendered him into police custody.

357.     These intentional assaults also terminated his ability to voluntarily consent to continue fighting and risk further bodily injury.

358.     These intentional assaults also thereby created an involuntary custodial wardship and a joint duty among all the Defendants to stop the use of force against him.

359.     All of the Individual Defendants to this claim actively participated in, authorized, facilitated, tolerated, enabled, engaged in or permitted a coordinated use of excessive force on Victor Moses.

360.     All the Defendant officers contributed to the excessive force in this case. Their conduct is to be judged as a whole.

361.     Not one Individual Defendant Law Enforcement Officer intervened to timely stop the excessive force against Mr. Moses despite their duty and opportunity to do so.

362.     Defendants to this claim are jointly and severally liable.

363.     In failing to intervene to protect Victor Moses's health, life and welfare, and actually deciding to continue Fight Day after he was incapacitated, these peace officer Defendants all ignored the obvious serious risks to his life, health and safety of which they were each aware.

364.     Individual Defendants to this claim are not immune from suit, the CGIA does not apply to this claim, and there is no qualified immunity or any other form of immunity for this claim.

365.     These violations by Individual Police Defendants proximately caused Plaintiff all the damages injuries and losses he has described herein and entitle him against each of these Defendants individually and collectively the resulting past, ongoing and future general, compensatory, special, economic, non-economic and punitive damages, attorneys fees and costs he has identified above.

366.     Under 13-21-131, C.R.S. the Defendant City and County of Denver is expressly required to indemnify all the Defendant peace officers for all the injuries, damages and losses they have caused to Victor Moses.

367.     As a relatively new statute, the Colorado Supreme Court has not determined the precise standard for claims against peace officers for deprivations of rights to be free from excessive force and seizure under Article 2, Section 7. Specifically, it has not determined the full extent and nature of the right to be free from unreasonable force or seizure and thus this is therefore a matter of first impression. *See* Colo. Rev. Stat. § 13-17-201(2).

## SECOND CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 – Fourth Amendment Excessive Force/Seizure
### (Against All Defendants)

368.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if they were fully set forth again here.

369.     42 U.S.C § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

370.     Victor Moses is a citizen of the United States and Defendants to this claim are all persons for the purposes of 42 U.S.C. §1983.

371.     Each Individual Defendant to this claim was acting under color of state law and is liable to the Plaintiff for violation of 42 U.S.C. §1983.

372.     Under the Fourth Amendment, Plaintiff had a clearly established constitutional right to be secure in his person against unreasonable seizure and excessive force.

373.     At the time of the events, Mr. Moses was a police recruit engaged in use of force training procedures. At no time was he a criminal suspect.  He did not pose any imminent threat of death or serious bodily harm to anyone. He was incapacitated and defenseless. He was known to be unarmed.  He was not attempting to flee or resisting arrest.  He was unable to move, stand or walk.

374.     It is clearly established that police officers, including police recruits, do not forfeit their constitutional rights when they become a member of the police force. They maintain their constitutional rights (including Fourth Amendment rights) which, if violated by a state actor, can result in liability under state and federal law.

375.     The Fourth Amendment also prohibits excessive force and unreasonable seizure by a government agent against a government agent.

376.    At all times, police officers maintain their right to be free from unreasonable seizures and excessive force by fellow officers while performing police work.

377.    Victor Moses became incapacitated as he was in and out of consciousness.  Because of his incapacitated state, he was unable to consent to continue Fight Day.

378.    His freedom of movement and ability to leave on his own was restricted by his incapacity and the continued intentional use of force against him including even laying on top of him as shown in the picture above until he lost consciousness for minutes.

379.    All Individual Defendants knew he could not consent to continued use of force against him. All Individual Defendants know it is excessive force to assault someone who is defenseless and incapacitated. All police and paramedics know that they are required to intervene to stop excessive police force from being inflicted on incapacitated persons in their custody and care.

380.    These drills were governed by these clearly established Fourth Amendment principles, with the stated purposes in DAD documents of conducting training and testing recruits in de-escalation of force, and rendering aid during police contacts as needed.

381.    Individual Defendants continued to use unnecessary, objectively unreasonable, and excessive force on an incapacitated Plaintiff.

382.    All Defendant officers who were involved in supervising, training, testing, assisting or role playing in the training of police recruits during Victor Moses's Fight Day drills knew that these constitutional principles applied to them, including their disengaging and de-escalating as appropriate, and their "rendering aid" for recruits whose health or safety was jeopardized during these events.

383.    Any reasonable police officer involved in this training should have realized that the complained of continued use of force against Victor Moses, the failure to intervene to immediately stop it from continuing, and the failure to secure emergency care and aid, was unconstitutional.

384.    All police Defendants were also all on fair notice that the conduct complained of hereinafter was an egregious violation of the Fourth Amendment rights of Plaintiff Moses jeopardizing his health and safety -- the very rights they were there to train and teach recruits to follow.

385.    Paramedic Defendants as his caregivers knew they were not qualified to diagnose the cause of his symptoms, to rule out serious conditions or to practice medicine in clearing recruits to keep fighting. Despite knowing of his symptoms and their inability to clear him by training and licensure, Paramedic Defendants actively approved the continued use of force against him by "clearing" him to continue.

386.     Paramedics were operating as police adjuncts and agents in facilitating the continuation of Fight Day drills by "clearing" recruits to continue to be assaulted even when faced with symptoms the cause of which they knew they could not diagnose.

387.     All Individual Defendants knew Mr. Moses was being subjected to excessive force and unreasonable seizure, but did not intervene. They also were aware of his medical condition, his incapacity, his SCT, and the extremely concerning medical condition he was in.

388.     His incapacity and his resulting involuntary custody was so obvious that, in order to continue to fight with and further assault him, the trainers of the drill gave direct orders to have Station 3 brought to him because his freedom of movement had been terminated by the unreasonable excessive force from the intentional assaults inflicted on him in Station 2.

389.     These intentional assaults also thereby created a custodial wardship and a joint duty among all the Defendants to stop his beating.

390.     Each of the Individual Defendants personally participated in the excessive force.

391.     Individual Paramedic Defendants as police adjuncts and agents also had a Constitutional Duty to intervene to stop the excessive force, and an opportunity to do so but allowed it to continue.

392.     Individual Defendants engaged in the complained of conduct despite being expressly aware of Plaintiff's known serious medical needs and recklessly disregarding a substantial risk of physical harm and death to Plaintiff.

393.     Defendant City and County of Denver and Denver Health are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, customs and practices, which were moving forces in the violation of Mr. Moses' Fourth Amendment rights, his injuries, damages, and losses. This was part of an aggravated pattern and practice of encouraging excessive force, as alleged in the statement of facts.

394.     The unconstitutional acts and omissions of Entity Defendants were moving forces in the unconstitutional acts of the Individual Defendants.

395.     Entity Defendants jointly facilitate Fight Day.

396.     Fight day itself, coupled with the culture and expectation of pushing recruits through all the stages regardless of their incapacity was a policy choice by the City and County of Denver.

397.     Defendant Denver's "Fight Day" training regimen is an implemented or executed policy statement, ordinance, regulation, or decision officially adopted or promulgated by the Department of Public Safety and the Denver Police Department and their respective management

and command staffs, whose edicts or acts may fairly be said to represent official policy of the City of Denver.

398.    The same is true for DHHA and their management and medical leadership staffs, whose edicts or acts may also be said to fairly represent official policy of DHHA, which was also a moving force in causing the complained of conduct and injuries. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 (1978).

399.    Defendant Denver and DHHA are both liable for the injuries described more fully herein for the constitutional deprivations visited upon Plaintiff Moses pursuant to Denver's and DHHA's "custom" even if such custom had not received formal approval through Denver's of DHHA's official decision-making channels. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690-91 (1978).

400.    "Fight Day" training drills have been so permanent and well settled as part of the Denver Police Academy's training regimen that they constitute a "custom or usage" with the force of law within Denver. *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 and fn. 56 (1978).

401.    Both Entity Defendants approach Fight Day as something that must be completed no matter the cost, creating, tolerating and condoning a culture of senseless violence against recruits even though both knew it to be likely to cause constitutional violations and serious injuries.

402.    Denver Police and Denver Health jointly work to staff Fight Day with paramedics, who are recklessly underqualified within their medical licensure to diagnose and "clear" a recruit with medical symptoms to continue to be assaulted. These Entity Defendants do so to give Fight Day a false air of safety, when in fact these organizations have done nothing to develop obviously needed training on the recurring situation of serious medical symptoms, and specifically SCT, and that the only proper role for paramedics is to provide care, secure emergency medical attention, or to facilitate communications between individuals and entities about medical conditions of recruits.

403.    Entity Defendants were deliberately indifferent in failing to adopt obviously needed regulations or procedures for Fight Day for recruits with SCT, a foreseeable and recurring issue, despite knowing of the well-established procedures that allow those with SCT to fully participate in similar professions, such as the army, and the recurring nature for the need for such procedures.

404.    It was the execution of Defendant Denver's and Defendant DHHA's policies and customs that inflicted the injuries upon Plaintiff Moses. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978).

405.    Entity Defendants were deliberately indifferent in failing to adequately train Academy law enforcement and paramedic staff regarding SCT, a foreseeable and recurring issue, despite knowing of the well-established dangers to the safety, health and well-being of people with sickle cell trait, the vast majority of whom are Black, when subjected to extreme physical stressors at substantial elevation with only short rest periods, such as were mandated for the Fight Day event at issue here.

406.    The acts or omissions of Defendants as described herein deprived Mr. Moses of his constitutional rights and were substantial significant contributing proximate causes of Mr. Moses' injuries and damages.

407.    DHHA, Denver Police, Individual Police Defendants and Individual Paramedic Defendants are all jointly and severally liable for the complained of injuries.

408.    As a proximate result of Defendants' unlawful conduct, Mr. Moses has suffered injuries and losses, including economic damages in the form of lost past and future wages, diminished earning capacity, past and future medical expenses, and including non-economic damages in the form of loss of constitutional rights, pain, suffering, inconvenience, loss of enjoyment of life, and diminished quality of life and other special damages, all in amounts to be proven at trial.

409.    Plaintiff is also entitled to punitive damages against Individual Defendants, as their actions were done maliciously, and with a reckless disregard to the rights of Plaintiff.

410.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

### THIRD CLAIM FOR RELIEF
**Due Process and Inalienable Rights Deprivations – Colorado Constitution, Article II, Sections 25, 3**
**Colo. Rev. Stat. § 13-31-131**
**(Against Individual Police Defendants)**

411.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if they were fully set forth again here.

412.    Plaintiff Moses brings this action against Defendants Todd Gentry, Stephen Marino, Anthony Norman, Felipe Cervantes, Kyle Carter, Johanna Aitken, Lisa Aitken-Nelson, Jason Moore, Damon Roman, E. M. Alfaro and Brian Camozzi, each in their individual capacities.

413.    At all times relevant hereto, all Defendants to this claim were acting under the color of law in their capacities as police officers or technicians working for the City and County of Denver and the Denver Police Department.  Each was a peace officer as peace officer is defined by Colo. Rev. Stat. § 24-31-901(3).

414.    Mr. Moses was so incapacitated from Station 2 that he was unable to stand up, walk, remove his equipment or physically move himself to Station 3. Thus, his freedom of movement was terminated.

415.    This incapacity was known to all Individual Police Defendants and rendered him into police custody.

416.    These intentional assaults also terminated his ability to voluntarily consent to continue fighting and risk further bodily injury.

417.    Mr. Moses had a right under the Colorado Constitution Article II, Sections 25 and 3 of the Colorado Constitution, to receive timely reasonable and/or non-deliberately indifferent medical care for his obvious medical emergency, to preserve his liberty and his life, and to secure his enjoyment of his liberties and his right to seek and obtain his safety and happiness.

418.    Under these sections of the Colorado Constitution, he had the right not to be "deprived of life, liberty or property, without due process of the law" and he enjoyed the same rights as "[a]ll persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; of acquiring, possessing and protecting property; and of seeking and obtaining their safety and happiness."

419.    Despite knowing of his incapacity and seizure, and that he was suffering an obvious medical crisis, all the Individual Police Defendants acted unreasonably and/or were deliberately indifferent to their constitutional obligations to timely provide, obtain, or advocate for his emergency medical treatment in violation of the Colorado Constitution.

420.    Individual Defendant Alfaro, along with the paramedics, also participated in misleading Emergency Room doctors into believing that Mr. Moses had not suffered any trauma – further violating his rights under the Colorado Constitution and likely causing further injury.

421.    Mr. Moses also had a Due Process right not to suffer arbitrary government action that shocks the conscience.

422.    The Individual Law Enforcement Defendants' decision to continue assaulting Mr. Moses after he had lost consciousness and while his medical condition became obviously emergent was arbitrary government action, which had no legitimate training (or other) justification.

423.    Continuing to assault an incapacitated individual and doing so to the point of almost killing that person is egregious and shocks the conscience.

424.    The Individual Defendants' arbitrary governmental action shocks the conscience, given the context in which they took this action. Mr. Moses desperately needed real, emergent medical care to avert the serious risk of death and/or life-altering injury that he faced on that mat. Defendants' decision to green-light further assaults on Mr. Moses rather than stopping Fight Day and immediately transporting him to the hospital foreseeably caused his life to be imperiled and ultimately his life-altering injuries.

425.    These violations by Defendants also proximately caused Plaintiff's damages injuries, and losses, and entitle him against each of these Defendants individually and collectively the resulting past, ongoing and future general, compensatory, special, economic, non-economic and punitive damages, attorneys fees and costs he has identified above.

426.     Defendants are jointly and severally liable.

427.     Under 13-21-131, C.R.S., Defendant City and County of Denver is expressly obligated to indemnify the peace officer Defendants to this claim for all the injuries, damages and losses the individual defendants have jointly caused to Plaintiff.

428.     As a relatively new statute, the Colorado Supreme Court has not determined the precise standard for claims against peace officers for deprivations of rights to medical care under Article 2, Sections 25 and 3, of the Colorado Constitution. Specifically, it has not determined the full extent and nature of the right to timely medical care, and thus this is therefore a matter of first impression. *See* Colo. Rev. Stat. § 13-17-201(2).

### FOURTH CLAIM FOR RELIEF
### Willful and Wanton Acts or Omissions in Violation of C.R.S. § 24-10-118
### (Against Paramedic Defendants Wham and Sung)

429.     Plaintiff Moses hereby incorporates the foregoing paragraphs as if fully set forth herein.

430.     Defendants Wham and Sung at all times relevant hereto were public employees within the meaning of the Colorado Government Immunity Act, Colo. Rev. Stat. § 24-10-103.

431.     As set forth above, timely notice of claims was given to Denver Health and Hospitals Authority, "DHHA" under Colo. Rev. Stat. § 24-10-101 et seq including specifically under § 24-10-106 and § 24-10-118 regarding the willful and wanton acts and omissions by the Paramedic Defendants named herein.

432.     These individual Defendants are not entitled to immunity under the Colorado Government Immunity Act because their acts and omissions were willful and wanton within the meaning of Colo. Rev. Stat. §§ 24-10-105(1) and 24-10-118.

433.     At all times relevant hereto, these Defendants were acting within the scope of their employment when they committed willful and wanton acts that were a proximate cause of Plaintiff's herein described severe and permanent injuries, damages and losses.

434.     These Defendants had EMT-patient relationships and duties to Mr. Moses, which they breached.

435.     In so acting, Defendant Wham and Sung were consciously aware that their overt acts or omissions were creating serious danger and risk to the safety and continued health or life of Plaintiff and yet they decided to act not to act despite duty, heedlessly, recklessly, consciously and in conscious disregard of the rights, well-being, health, life and safety of others, particularly with respect to the rights of the Plaintiff here.

436.    Defendants Wham and Sung willfully and wantonly, thereby recklessly and consciously created an unreasonable risk of physical harm and caused the Plaintiffs to be put in danger.

437.    In the complained of conduct, Defendants Wham and Sung then knew that Mr. Moses had:

> sickle cell trait; an altered mental state and had been beaten into repeated bouts of unconsciousness; extreme fatigue; extreme leg cramping; abnormally low blood pressure after such extreme exertional activity; had hit his head hard on the tile; had fallen repeatedly; had lost ability to consent; and that many of these symptoms are associated with an extremely dangerous sickling event requiring emergency medical attention.

438.    The Paramedic Defendants intolerably, willfully, wantonly joined and approved the continuation of obviously excessive force even though they were consciously aware it was likely cause serious harm or injury.

439.    These Defendants were then consciously aware of the dangers and risks to Victor Moses life, health and wellbeing but consciously disregarded those dangers and risk.

440.    These Defendants also participated in misleading Emergency Room doctors into believing that Mr. Moses had not suffered any trauma – likely causing further injury.

441.    These Defendants practiced medicine recklessly outside their scope, even though they knew that was likely to cause significant injuries.

442.    These two Paramedic Defendants thus willfully and wantonly gave their entirely non-medical and utterly pretextual willful and wanton approval and decisional imprimatur to facilitating Victor Moses continuing to be subjected to excessive force.

443.    After engaging in their charade of a medical assessment wherein they knew every terrible fact that was then known, as summarized above, the Defendant Paramedics intentionally blessed this police excessive force continuing knowing it could or would likely further harm Victor Moses after they removed themselves from the mat to facilitate it.

444.    As a direct and proximate cause and result of Defendants willful and wanton conduct and omissions, Plaintiff Moses suffered the past, continuing and future injuries, damages and losses described with particularity in the incorporated herein damages section above and he is entitled to all the general, compensatory, special, economic and non-economic damages, in amounts to be proven at trial.

445.    There is no cap under the Colorado Governmental Immunity Act on this state law claim because these Individual Defendants acts and omissions in this case were willful and wanton within the meaning of Colo. Rev. Stat. §§ 24-10-118.

446.    Plaintiff also hereby gives notice that he may be seeking to add a remedy for exemplary damages for the willful and wanton acts of the Individual Defendants on this state law claim upon suitable amendment, but is not included such damages in this claim for relief against these Defendants at this time.

### FIFTH CLAIM FOR RELIEF
### Negligence in the Operation of a Public Hospital in violation of
### Colo. Rev. Stat. § 24-10-106,
### (Against Denver Health and Hospital Authority)

447.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if they were fully set forth again here.

448.    Pursuant to the Colorado Governmental Immunity Act, Colo. Rev. Stat. § 24-10-106, governmental immunity is waived for any action which lies in tort or could lie in tort, resulting from the negligent operation of any public hospital. A public hospital is an institution or place where sick or injured persons are given medical or surgical care.

449.    DHHA operates Denver Health or Denver Health Medical Center, a public hospital.

450.    DHHA is vicariously liable for the negligent acts and omissions of their agents and/or employees, including but not limited to, Courtney Wham and Taegin Sung, who were acting as government employees in the scope of their employment.

451.    DHHA is also directly liable for its own negligence in the operation of a public hospital.

452.    At all times relevant hereto, the Individual Defendant Paramedics were exercising and performing the powers, duties and functions vested in them by law with respect to the purposes and operation of a public hospital.

453.    At all times relevant hereto, the Individual Defendant Paramedics were licensed paramedics obligated to provide care to Victor Moses with whom they had a patient paramedic caregiver relationship together with all the attend legal duties of due care.

454.    The work of Individual Defendant Paramedics through the Defendant DHHA furthers and is directly related to the operation and the purposes of DHHA's public hospital. The paramedic services are a core service of DHHA which through the hospital oversees and controls the paramedic division's operations, policies and practices. The work of Individual Defendant Paramedics is supervised and overseen by the public hospital, they are trained by physicians who work at the hospital.

455.    In the complained of conduct, Defendants Wham and Sung then knew that Mr. Moses had:

sickle cell trait; an altered mental state and had been beaten into repeated bouts of unconsciousness; extreme fatigue; extreme leg cramping; abnormally low blood pressure after such extreme exertional activity; had hit his head hard on the tile; had fallen repeatedly; had lost ability to consent; and that many of these symptoms are associated with an extremely dangerous sickling event requiring emergency medical attention.

456.   The Individual Defendant Paramedics to this claim negligently breached their duties of due care owed to Plaintiff.

457.   DHHA has long supplied paramedics to cover, to participate and to augment the law enforcement training staff administering Fight Day.

458.   It is approved policy and established practice of DHHA to supply paramedics to cover and assist Denver Police Department with the Academy's Fight Day. Such attendance and participation is intended to support the Denver Police Department's training regimen for new recruits and give the impression that Fight Day is safe, when in fact DHHA knows that Fight Day causes many injuries and that the paramedics are not licensed to be "clearing" recruits to continue.

459.   Denver Health and Hospital Authority is not only vicariously liable for its two paramedics' negligent acts and omissions while acting within the scope of their employment and agency at all times relevant hereto but also had and directly breached its' own duties of due care owed to Plaintiff including by, but not limited to:

    a.  Having a longstanding policy, practice and custom of assigning, allowing and encouraging its paramedics to be posted during Fight Day on location and not properly training them that they must not tolerate significant police recruit injuries and rather must at all times act as fully independent paramedic professionals rather than as police adjuncts and agents with compromised duties of due care in the service of non-medical DPD goals of having police recruits like Victor Moses complete fight day regardless of the known high risk medical consequences to that recruit;

    b.  Not in any way requiring attending paramedics to be reliably aware of or supplied in advance with recruit disclosed medical facts relevant to each police recruits Fight Day participation that are known to DHHA from its administration of the medical clearance assessments of each and every such recruit, including Plaintiff Moses who disclosed he had SCT to DHHA agents and employees;

    c.  Failing to adequately supervise, and monitor paramedics performing fight day duties for DPD;

    d.  Failing to exercise reasonable care in the training of its paramedic employees, including training regarding their duties of due care in supervising fight day;

e.  Negligently requiring and allowing paramedics to practice medicine recklessly outside of the scope of their licensure in "clearing" recruits to keep fighting; and

f.  Inadequately training paramedics to respond to medical emergencies which foreseeably result from Fight Day drills, causing them to focus primarily on causing the recruit to complete the drill even if doing so is medically contraindicated, unwise or dangerous, rather than properly focusing just on the medical health, welfare and well-being of the recruit that is undergoing physically and emotionally rigorous and exhausting trauma.

460.    As a direct and proximate cause and result of Defendant Wham, Defendant Sung and Defendant Denver Health and Hospital's negligent acts and omissions in the operation of a public hospital, in breach of their duties of due care owed to this Plaintiff, Plaintiff Moses has suffered and these Defendants are all liable to him for the extensive general, compensatory and special damages, losses and injuries outlined in the statement of facts damages section above which is incorporated again at this point, all in an amount to be determined by the jury at trial.

461.    Plaintiff does not seek attorneys' fees or punitive damages with respect to this claim for relief.

**SIXTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – 14th Amendment Deliberate Indifference to Medical Needs and Conscience Shocking Behavior**
**(Against All Defendants)**

462.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if they were fully set forth again here.

463.    42 U.S.C § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

464.    Victor Moses is a citizen of the United States and Defendants to this claim are all persons for the purposes of 42 U.S.C. §1983.

465.    Each individual Defendant to this claim was acting under color of state law and is liable to the Plaintiff for violation of 42 U.S.C. §1983.

466.    It is clearly established that police officers, including police recruits, do not forfeit their constitutional rights when they become a member of the police force. Rather they maintain constitutional rights (including Fourteenth Amendment rights to be free from deliberate

63

indifference to medical needs) which, if violated by a state actor, can result in liability under state and federal law.

467.    Victor Moses became incapacitated as he was in and out of consciousness.  Because of his incapacitated state, he was unable to consent to continue Fight Day, but continued to be assaulted.

468.    These intentional assaults created a custodial wardship and a joint duty among all the Defendants to secure provision of the immediate emergency medical care he obviously needed. Mr. Moses was seized, incapacitated, and involuntarily in custody.

469.    As such, Mr. Moses was protected from deliberate indifference to his known serious medical needs by the Fourteenth Amendment.

470.    All police officers know they must obtain or provide medical care to people who become incapacitated after intentional police force has been inflicted upon them. All paramedics know they may not be deliberately indifferent in providing care to their patients These drills were governed by these core Fourteenth Amendment principles, with the stated purposes in DAD documents of conducting training and testing recruits in de-escalation of force, and rendering aid during police contacts as needed.

471.    All Defendant officers who were involved in supervising, training, testing, assisting or role playing in the training of police recruits during Victor Moses's Fight Day drills knew that these constitutional principles applied to them as well, including their disengaging and de-escalating as appropriate and their "rendering aid" for recruits whose health or safety was jeopardized during these events.

472.    All reasonable police officers involved in this training should have realized that the failure to immediately stop using force and secure emergency care and aid was unconstitutional.

473.    All police Defendants were also all on fair notice that the conduct complained of hereinafter was an egregious violation of the Fourteenth Amendment rights of Plaintiff Moses jeopardizing his health and safety -- the very rights they were there to train and teach recruits to follow.

474.    Mr. Moses also had a substantive due process right to be free from arbitrary, egregious and outrageous behavior by governmental officials including the Individual Defendants to this claim that may be fairly said to shock the contemporary conscience in a constitutional sense.

475.    Continuing to assault an incapacitated individual and doing so to the point of almost killing that person is egregious and shocks the conscience.

476.    The Individual Defendants' arbitrary governmental action shocks the conscience, given the context in which they took this action. Mr. Moses desperately needed real, emergent medical care to avert the serious risk of death and/or life-altering injury that he faced on that mat.

Defendants' decision to green-light further assaults on Mr. Moses rather than stopping Fight Day and immediately transporting him to the hospital foreseeably caused his life to be imperiled and ultimately his life-altering injuries.

477.    Each of the Individual Defendants personally participated in the deliberate indifference to the known serious medical needs of Plaintiff.

478.    Each Individual Defendant knew of his incapacity, his SCT, his extremely concerning medical condition, yet paramedic defendants "cleared" Mr. Moses to continue being assaulted, and Individual Law Enforcement Defendants continued the assault.

479.    At the time, Paramedic Defendants were caregivers to Plaintiff with patient paramedic duties. Their conduct in abandoning him as a patient was egregious and shocking.

480.    All Individual Defendants to this claim were acting as gatekeepers to Mr. Moses being transported emergently to the hospital, as he clearly needed to be. Their delay in obtaining timely care for a person in their custody and control constituted deliberate indifference.

481.    All Individual Defendants, as willful participants in a joint activity, actually knew of Mr. Moses' serious medical needs and deteriorating condition and nonetheless, with deliberate indifference, decided not to provide him with obviously necessary urgent medical care.

482.    The Individual Defendant Paramedics were deliberately indifferent in 'clearing' Mr. Moses when they knew he was in an emergency condition, needed higher level care than they could provide, and delayed access to that care in service of a police and non-medical goal.

483.    Individual Law Enforcement Defendants were deliberately indifferent in recklessly failing to obtain obviously needed medical emergency care.

484.    In doing so, all Individual Defendants were aware of Plaintiff's serious medical needs and recklessly disregarding a substantial risk of physical harm and death to Plaintiff.

485.    Individual Defendants Alfaro, Wham and Sung also participated in fraudulently misleading Emergency Room doctors into believing that Mr. Moses had not suffered any trauma.

486.    Defendant City and County of Denver and Defendant DHHA are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, which resulted in the violation of Mr. Moses' Fourteenth Amendment right to constitutionally adequate medical care and to humane conditions of confinement.

487.    The unconstitutional acts and omissions of Entity Defendants were moving forces in the unconstitutional acts of the Individual Defendants.

488.    Entity Defendants jointly facilitate Fight Day.

489.    It is a well settled practice of the City and County of Denver and of DHHA to jointly operate "Fight Day" with deliberate indifference to the obvious likelihood of resulting serious injury and medical needs, but simultaneously enforce and/or tolerate a culture of completing Fight Day no matter what the cost. This custom and practice is so widespread and settled they constitute a "custom or usage" with the force of law. *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 and fn. 56 (1978).

490.    It was the execution of Entity Defendants policies and customs that inflicted the injuries upon Plaintiff Moses. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978).

491.    Defendant Denver Police and DHHA were both deliberately indifferent in failing to adequately train Academy law enforcement and medical staff regarding SCT, a foreseeable and recurring issue, despite knowing of the well-established dangers to the safety, health and well-being of people with sickle cell trait, the vast majority of whom are Black, when subjected to extreme physical stressors at substantial elevation with only short rest periods, such as were mandated for the Fight Day event at issue here.

492.    Entity Defendants were deliberately indifferent in failing to adopt obviously needed regulations or procedures for Fight Day for recruits with SCT, a foreseeable and recurring issue, despite knowing of the well-established procedures that allow those with SCT to fully participate in similar professions, such as the army, and the recurring nature for the need for such procedures.

493.    Entity Defendants have made a policy decision to allow paramedics to serve as part of law enforcement, serving the reckless end goal of pushing recruits through excessive force with deliberate indifference to their known serious medical needs.

494.    Entity Defendants have a deliberately indifferent policy, pattern, practice and custom of requiring paramedics assigned to Fight Day to practice medicine recklessly outside their scope in diagnosing and "clearing" recruits to keep fighting in the face of serious symptoms.

495.    As a proximate result of Defendants' unlawful conduct, Mr. Moses has suffered injuries and losses, including economic damages in the form of lost past and future wages, diminished earning capacity, past and future medical expenses, and including non-economic damages in the form of loss of constitutional rights, pain, suffering, inconvenience, loss of enjoyment of life, and diminished quality of life and other special damages, all in amounts to be proven at trial.

496.    The acts or omissions of Defendants deprived Mr. Moses of his constitutional rights and were substantial significant contributing proximate causes of Mr. Moses' injuries and damages.

497.    The unconstitutional acts and omissions of Entity Defendants were moving forces in the unconstitutional acts of the Individual Police Defendants and Individual Paramedic Defendants and were substantial significant contributing proximate causes of Mr. Moses' injuries and damages.

498.     DHHA, Denver Police, Individual Police Defendants and Individual Paramedic Defendants are all jointly and severally liable for the complained of injuries.

499.     Plaintiff is also entitled to punitive damages against Individual Defendants to this claim.

500.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A.     All appropriate relief at law and equity;

B.     Declaratory relief and other appropriate equitable relief;

C.     Economic losses including past and future lost earnings, impaired earnings capacity, past, ongoing and future medical and hospital charges on all claims and all other past, ongoing and future damages specified in the complaint in this category including a life care plan, as allowed by law;

D.     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and all other past, ongoing and future pain and suffering, disfigurement, permanent disabilities, scarring, and the like including all such damages specified in the complaint factual section pertaining to his injuries, damages and losses on all claims allowed by law in an amount to be determined at trial;

E.     Punitive damages on all claims allowed by law and in an amount to be determined at trial and upon suitable amendment with respect to the Fourth Claim for relief;

F.     Attorney fees and the costs associated with this action under 13-21-131. C.R.S. and 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law Attorney fees are not sought on the Third and Fourth Claims for relief;

G.     Pre-and post-judgment interest at the lawful rate; and

H.     Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 30th day of July 2024.

HOLLAND, HOLLAND EDWARDS, & GROSSMAN, LLC

*/s/ John R. Holland*
John R. Holland, # 5246
Anna Holland Edwards, # 35811
Erica Grossman, #39342
1437 High Street
Denver, CO 80218
john@hheglaw.com

KILLMER, LANE & NEWMAN, LLP

*/s/ Darold W. Killmer*
Darold W. Killmer # 16056
Reid Allison # 52754
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
dkillmer@killmerlane.com

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF REVIEW</u>

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has expertise in the areas of alleged negligence and deliberate indifference. This professional has reviewed the known facts, including such records, documents, and other materials deemed relevant to the Complaint's allegations of negligent acts and omissions by DHHA and the Defendant paramedics including their willful and wanton conduct, and has concluded that the filing of these state law claims do not lack substantial justification and in fact are substantially meritorious and involve clear violations of the standards of care involved.  No such certification is required for the state and federal civil rights claims against the police and City related defendants.

*/s/ John Holland*
John Holland

Plaintiff's Address:
Victor Moses
891 14th Street, Apt 2705
Denver, CO 80202