**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Case No. 1:24-cv-02353-GPG-KAS**

VICTOR MOSES,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
DENVER HEALTH AND HOSPITAL AUTHORITY,
TODD GENTRY, individually,
STEPHEN MARINO, individually,
ANTHONY NORMAN, individually,
FELIPE CERVANTES, individually,
KYLE CARTER, individually,
JOHNNA AITKEN, individually,
LISA AITKEN-NELSON, individually,
JASON MOORE, individually,
DAMON ROMAN, individually,
E. M. ALFARO, individually,
BRIAN CAMOZZI, individually,
COURTNEY WHAM, individually,
TAEGIN SUNG, individually,

      Defendants.

---

### CITY OF DENVER AND POLICE DEFENDANTS' MOTION TO DISMISS

---

      Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants City and County of Denver, Colorado ("City of Denver"); Todd Gentry; Stephen Marino; Anthony Norman; Felipe Cervantes; Kyle Carter; Johnna Aitken; Lisa Aitken-Nelson; Jason Moore; Damon Roman; E.M. Alfaro; and Brian Camozzi (the "Police Defendants" and collectively with City of Denver, the "City of Denver Defendants"), move to dismiss Plaintiff's First, Second, Third, and Sixth Claims for relief against them and, in support, state as follows.

**CONFERRAL PURSUANT TO D.C.COLO.LCivR 7.1(a):** Counsel for the City of Denver Defendants certifies that they conducted substantive conferral in good faith with counsel for Plaintiff, engaging in multiple, lengthy phone calls and emails over the past few weeks.

## INTRODUCTION

Plaintiff Victor Moses, who was employed by Denver Police Department as a recruit in training, suffered a tragic and catastrophic medical event on January 6, 2023, while participating in a training exercise approximately three months through the police academy. Plaintiff applied for and received Worker's Compensation assistance for the medical event that occurred during the course of his employment. Plaintiff now claims civil rights violations and seeks to recover from Defendants.

It is not yet clear what caused Moses's medical emergency, decline, and current outcomes. Regardless, Moses suffered catastrophic injuries and tragically, is now permanently impaired. Moses's colleagues remain shaken and heartbroken by his unexpected medical emergency and his circumstances. This was a terrible workplace incident, but not every workplace incident becomes a constitutional violation because the government is the employer or because a fellow officer was involved in the employee's injury during physical training.

Because Plaintiff has failed to state a claim for which relief can be granted and his claims are otherwise barred by state or federal law, the City of Denver Defendants respectfully request that the Court dismiss the Plaintiff's claims against the City of Denver and Plaintiff Moses's eleven former colleagues from the Denver Police Department, Todd Gentry, Stephen Marino, Anthony Norman, Felipe Cervantes, Kyle Carter, Johnna Aitken, Lisa Aitken-Nelson, Jason Moore, Damon Roman, E.M. Alfaro, and Brian Camozzi.

## BACKGROUND

Plaintiff Victor Moses applied for and was accepted to the Denver Police Department Academy (the "Academy") in 2022. (Compl. ¶ 28.) As part of his training and required by Police Officer Standards and Training ("POST") to graduate and become a certified peace officer, Mr. Moses and his classmates participated in Arrest Control Technique training. (Compl. ¶ 29.) Approximately halfway through the Academy, the recruits were evaluated through a Dynamic Action Drill ("DAD") that is a celebrated and intense day where recruits are tested with dynamic situations, mental and physical stress, and physical exertion, and must exhibit Arrest Control Techniques they have learned thus far in the academy including the ability to "engage/escalate and disengage/de-escalate as appropriate." (Compl. ¶¶ 39-40.)

Plaintiff Moses is originally from Florida and completed a Bachelor of Science Degree in 2016 at Florida State University. (Compl. ¶ 27.) At the age of 27, he moved to Denver to pursue a career with the Denver Police Department. (Compl. ¶ 27.) "Moses excelled through his first three months of training, including frequent and strenuous gym workouts, as well as practicing use of force techniques." (Compl. ¶ 30.) After three months of training, the recruits are evaluated through the Dynamic Action Drills, which are designed to last a maximum of only eight minutes. (Compl. ¶ 43.)

When applying to the Academy, Moses completed health information paperwork where Moses shared that he and his parents have sickle cell trait but specified that he had "never had any problems." (Compl. ¶ 35.) Additionally, he passed a physical exam attested to by a physician that confirmed he was able to participate as a recruit in the training regimen with no limitations.

3

(Compl. ¶ 36.) Having sickle cell trait does not mean Moses will get sickle cell disease or could not participate safely in vigorous activity. (Compl. ¶ 58.)

Once at the Academy, and for the three months leading up to the DAD, Moses was instructed by the dedicated team of instructors including Technicians Gentry, Norman, Aitken, Aitken-Nelson, Moore, Roman, and Alfaro. In fact, he participated and excelled without any physical limitations or accommodations. (Compl. ¶ 30.)

The DAD is a large-scale training production that includes volunteer officers who play the roles of suspects and the Academy staff who encourage, instruct, and evaluate the class of approximately 40 recruits midway through their training. (Compl. ¶¶ 28, 62.) DAD is mentally and physically challenging. (Compl. ¶ 42.) As is possible with any physical training or the contact sports referenced in the Complaint, injuries may and do occur. When injuries occur, training is stopped, and volunteer Emergency Medical Technicians (EMTs) are readily available on site. (Compl. ¶¶ 51-52.) DAD attempts to simulate, in a safe[1] training environment, the importance and difficulty of decision-making and use of defensive measures in high stress situations. (Compl. ¶ 42.) Demonstration of proficiency of Arrest Control Techniques ("ACT") is a requirement for POST certification. (Compl. ¶ 39.)

---

[1] Simulated drills may result in some injuries, even when safety measures are in place to minimize injuries, analogous to athletes who suffer cramps, sprains, or breaks at practice rather than the game or boxers who are injured while sparring. A safe, controlled environment allows recruits a taste of the stimuli that might exist in the real world when they will be faced with a decision on whether or not to deploy force. Practice where it is safe to make mistakes or access additional training is imperative. Recruits are given feedback and have three more months of training before the POST test. While not contained in the complaint, incidental injuries occur and are important to learning such as a recruit whose nose was broken when he hit himself in the nose with his baton. As the complaint states, injuries do occur at such trainings, which is exactly why the police academy ensures that medical personnel are on hand to immediately render aid if needed whether emergent or not.

Per POST, the DAD must at least include the following techniques: "proper initial approach and contact, verbal skills, de-escalation of subject/scenario, escalation and de-escalation of force, self-defense, arrest control, overcoming resistance, and proper follow-up procedures such as handcuffing, rendering aid, etc." (Compl. ¶ 39.) The scenario-based drills of the DAD evaluated and taught, through role playing simulation, ACT techniques taught at the academy and required by POST for certification. (Compl. ¶¶ 39, 48). In fact, following the DAD on January 6, 2023, POST investigated and concluded that the "Denver Police Academy followed all standard safety protocols [and there was] no evidence of wrongdoing on behalf of the Denver Police Academy." (Compl. ¶ 294.)

On January 6, 2023, Moses was the last recruit in his class to enter the gym and participate in the drills. (Compl. ¶ 63). DAD Station 1 required the recruits to follow commands, while being subjected to multiple distractions, and to deliver punches, kicks, or knee strikes against a dummy or officers with sparring pads. (Compl. ¶ 44.) Moses exerted himself in Station 1 and was visibly fatigued. (Compl. ¶ 65.) Instructors ended Station 1 and Moses moved on to Station 2, sometimes referred to as the "baton station." (Compl. ¶ 66.) The baton station requires participants to react to multiple possible "assailants" played by officers and instructors holding training pads and moving dynamically. (Compl. ¶ 45.) Moses alleges he was pushed down multiple times and got back up to continue participating. (Compl. ¶ 67.) He asserts he was pushed by Officer Moreno and fell, hitting his head past the edge of the training mat on the floor. (Compl. ¶ 67.) His instructors checked on him and he complained of cramping. (Compl. ¶ 42.) The instructors called over the paramedics who attended to him. (Compl. ¶ 70.) He was "cleared" by the paramedics and continued to participate. (Compl. ¶¶ 70, 84.) He was encouraged by his instructors to continue and

asked if "he was good." (Compl. ¶ 192.) Moses, who dreamed of being a police officer, chose to apply to the Academy, to participate in DAD, and to continue the training. (Compl. ¶¶ 89-90.)

It is important to note that recruits wear protective gear during the first two DAD stations, including a padded helmet and chest protector. (Compl. ¶¶ 125, 162, 199.) Moses's instructors helped him remove his gear while he was checked out by paramedics and before he began Station 3. (Compl. ¶ 132.) Station 3 starts with the recruit prone on their back, pinned by a trained officer, and the recruit must use their defensive techniques to protect themselves and radio for help. (Compl. ¶ 42, 224.) Officer Camozzi, the officer participating in Station 3, is trained in both ACT and mixed martial arts, which allowed for him to safely control a recruit using ground maneuvers and to use light, open-handed head tapping to demonstrate to a recruit when they leave their head or neck exposed. (Compl. ¶ 224.) Officer Camozzi was able to come to where Moses was resting to begin Station 3. (Compl. ¶ 92.) About thirty seconds into Station 3, Moses said he was having trouble breathing; this stopped the training, and the EMTs were called over and proceeded to treat him. (Compl. ¶ 232.) They put him on a stretcher, and Moses was taken in an ambulance to Denver Hospital. Moses had multiple complications and was hospital-ridden for four months, during which time he underwent multiple surgeries and procedures, including the below-the-knee amputations of both of his legs.

## ARGUMENT

Plaintiff raises four claims against the Police Defendants, which essentially boil down to: (1) two excessive force and unreasonable seizure claims, one raised under the Colorado Constitution (Claim 1) and one under the United States Constitution (Claim 2), and (2) two due process claims, again with one raised under the Colorado Constitution (Claim 3) and one raised

under the United States Constitution (Claim 6). Plaintiff has raised its federal constitutional claims against the City of Denver as well, pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), (Claims 2 and 6).

Defendants first address Plaintiff's failure to state a claim as to the federal and state constitutional claims against the Police Defendants. Defendants then assert that, as to the federal constitutional claims, the Police Defendants are entitled to qualified immunity from suit. Defendants next address Plaintiff's failure to state a claim as to *Monell* liability for the City of Denver. Finally, Defendants argue that the exclusive remedies contained in Colorado's Worker's Compensation Act bar Plaintiff's state claims against the Police Defendants.

In addressing these claims, City of Denver Defendants are conscious of the fact "that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). Nonetheless, the Constitution does not "endow[] public employees with greater workplace rights than those enjoyed by their counterparts in the private sector." *Driebel v. City of Milwaukee*, 298 F.3d 622, 637 (7th Cir. 2002). And so, "in cases involving the constitutional rights of police officers, courts must distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state." *Id.* Here, any actions by the City of Denver Defendants were taken in their capacities as employer and co-employees.

## I.    Plaintiff's Complaint Fails to State any Viable Claim Upon Which Relief May Be Granted.

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive such a motion, a plaintiff must allege sufficient facts that, if accepted as true and taken in the light most favorable to the

plaintiff, state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

### a.  Plaintiff Fails to State Constitutional Claims Against Police Defendants.

Plaintiff's First and Second Claims against Police Defendants are for unreasonable seizure and excess force, arising under the Colorado Constitution and the U.S. Constitution, respectively. Because "[t]he Colorado and U.S. Constitutions are generally coextensive with regard to warrantless searches and seizures," Police Defendants address the two together. *Eddie's Leaf Spring Shop & Towing LLC v. Colo. Pub. Utils. Comm'n*, 218 P.3d 326, 333 (Colo. 2009); *see Woodall v. Godfrey*, 2024 COA 42, ¶ 13 (noting that, when analyzing an excessive force claim under C.R.S. § 13-21-131, courts "may look to cases analyzing § 1983 claims for excessive force as persuasive authority"). Plaintiff's Third and Sixth Claims against Police Defendants are for violations of due process, under the Colorado Constitution and U.S. Constitution, respectively. When interpreting textually identical constitutional provisions, Colorado courts look to federal precedent; and, "[t]he due process clauses of the U.S. and Colorado Constitutions are indeed identical." *People v. Dunaway*, 88 P.3d 619, 631 & n.10 (Colo. 2004). Thus, Police Defendants also address Plaintiff's due process claims together.

### i. Plaintiff's Constitutional Right Against Unreasonable Seizure Was Not Violated.

#### 1. Because Plaintiff was not constitutionally seized, he has failed to state a viable claim.

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *People v. Tweedy*, 126 P.3d 303, 305 (Colo. App. 2005) ("Whether a seizure occurred depends on whether a reasonable, innocent person in the defendant's position would have believed that he or she was free to leave or disregard the officer's requests."). "Not every interaction with police, however is a seizure." *People v. Taylor*, 415 P.3d 821, 824 (Colo. 2018). "Consensual encounters are not seizures . . . and do not implicate the Fourth Amendment." *People v. Marujo*, 192 P.3d 1003, 1005 (Colo. 2008). Further, the threat of employment consequences does not implicate the Fourth Amendment and is irrelevant to a Fourth Amendment inquiry. *See Fournier v. Reardon,* 160 F.3d 754, 757 (1st Cir. 1998) (holding that it was irrelevant for Fourth Amendment purposes that a corrections officer allowed himself to be handcuffed during a training exercise because it might have resulted in "negative consequences for his continued employment").

Additionally, "[t]he application of physical force to the body of a person with intent to restrain is a seizure." *Torres v. Madrid*, 592 U.S. 306, 309 (2021). Importantly, the officer's intent must be to restrain the person. "Accidental force will not qualify. Nor will force intentionally applied for some other purpose satisfy this rule." *Id.* at 317; *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (noting that a seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*"). Courts have consistently

determined, looking at all the circumstances surrounding the incident, that physical force used during a police training exercise does not constitute a seizure. *See, e.g.*, *Feirson v. D.C.*, 315 F. Supp. 2d 52, 60 (D.D.C. 2004), aff'd, 506 F.3d 1063 (D.C. Cir. 2007); *Fournier*, 160 F.3d at 756-57.

In *Feirson*, the plaintiff was a police sergeant who participated in an Armament Systems Proficiency (ASP) training on the use of an ASP baton. 315 F. Supp. 2d at 54. The training "requires a trainee to engage his training instructor, who plays the role of a violent suspect, in physical combat and to use the ASP baton to defend himself. Bruce Feirson was injured while participating in the combat exercise portion of ASP training." *Id.* Feirson sued, alleging that he was seized in the combat ring. The court concluded Feirson was not seized, as "a reasonable person would have believed he was free to call an end to the combat—even though he might very well have understood doing so would lead to embarrassment or 'losing face' before his peers, or to employment consequences for failure to complete mandatory training." *Id.* at 60.

The First Circuit addressed a similar situation in *Fournier*. 160 F.3d at 754. Fournier was a corrections officer who breached academy protocol while participating in a basic training academy for the County Sheriff's office. *Id.* at 755. As punishment, his supervisor handcuffed his hands behind his back and placed him under "house arrest." *Id.* at 756. Fournier brought suit, alleging that he had been seized when he was handcuffed and placed under house arrest. *Id.* at 757. Considering the totality of the circumstances, the court determined that "a reasonable observer would conclude that Fournier was the subject of improper hazing, which might give rise to a state law claim based on tort or employment theories, but would not believe that Fournier was not free to call an end to the 'house arrest' and have the handcuffs removed." *Id.*

*Mallar v. City of Adelanto* is also instructive in this situation. No. CV 11-02549 GAF JEMX, 2013 WL 8148647, at *9 (C.D. Cal. July 24, 2013). In that case, a corrections officer was injured while participating in a mock hostage-taking training exercise. Mallar was playing the role of a hostage taker during the exercise when he "was assaulted and injured by fellow ACCF prison guards who, acting as a mock Special Assignment Team ('SAT Team') used pepper spray and riot gear in 'subduing' him." *Id.* at *9. Mallar alleged he was seized when he was "taken to the ground, handcuffed, and removed from the exercise by the SAT Team." *Id.* The court disagreed, noting "it is undisputed that Plaintiff submitted to the training exercise voluntarily [and] was fully aware that as part of the Exercise he may be victim to some level of force and restraint." *Id.* at *8. The court went on, "Plaintiff may not have agreed to the actual level of force that was eventually against him had he known about it in advance, but that is immaterial to the analysis." *Id.* And, importantly, "it was first, foremost and always an exercise." *Id.* at *1. Just as the courts concluded in *Feirson* and *Fournier*, the *Mallar* court concluded that because Mallar was free to withdraw from the exercise, he was not seized under the Fourth Amendment.

Here, Plaintiff alleges he was seized during training because "he was incapacitated, and his freedom of movement was terminated" by the Police Defendants' use of force. (Compl. ¶ 146.) The use of force during the DAD exercise was intended not to restrain, but rather "to train and test [recruits] on arrest control techniques." (Compl. ¶ 39.) For example, at Station 2, the intent is to "simulat[e] an attack by more than one assaultive subject." (Compl. ¶ 45.) The force used at Station 3 is intended to "maintain[] a dominant position" over the recruit while the recruit attempts to call for help. (Compl. ¶ 47.) In short, the Police Defendants' use of force was not a seizure, as it was not intended to restrain Plaintiff, but to train him.

Moreover, just like Fierson, Fournier, and Mallar, Plaintiff chose to participate in the training exercise. He was free to withdraw from the training if he was uncomfortable with its physicality. Even if it were true that he knew he could not repeat DAD, continue in, or graduate from the Academy if he withdrew from or failed to complete the training, concerns of adverse employment consequences relating to withdrawing are irrelevant to the Fourth Amendment inquiry. Plaintiff consented to and participated in the exercise fully aware that Police Defendants would be playing assailants and using force on him, and Plaintiff elected not to withdraw from the training. *See Mallar*, 2013 WL 8148647, at *6 ("Everyone involved understood that the exercise was being performed for the purpose of allowing the SAT Team to engage in realistic practice to better prepare it to respond to a true hostage situation and that, in these circumstances, Plaintiff's injuries do not implicate any constitutional violation.").

When faced with this situation, considering the training circumstances of this exercise occurring at the academy for the purpose of education and Moses's voluntary participation, a reasonable person would believe he was free to call an end to the exercise. Thus, Plaintiff was not subject to a constitutional seizure.

### 2. Police Defendants Did Not Use Excessive Force against Plaintiff.

To succeed on a Fourth Amendment excessive force claim, a plaintiff must prove both that he was seized and that the seizure was unreasonable.[2] *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989); *Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015) ("Without a seizure, there can be no violation of the Fourth Amendment."). "Determining whether the force used to effect a particular

---

[2] To the extent Mr. Moses was not seized, his claim for excessive force arises under the due process clause and is discussed *infra* Section (I)(a)(ii). *See, e.g.*, *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003).

seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (cleaned up); *Woodall v. Godfrey*, 2024 COA 42, ¶ 18 (applying *Graham*'s "objective reasonableness" standard to claims arising under the Colorado Constitution). When balancing the nature and quality of the intrusion with the countervailing governmental interests, "courts must focus on the totality of circumstances confronting an officer in each particular case." *Id.* ¶ 17.[3]

First, as explained above, Plaintiff was not seized. Even if he were, the force used was objectively reasonable. Under the circumstances here, the governmental interest vastly outweighs the nature and quality of the intrusion. The excessive force alleged here took place during a use-of-force training exercise. In that exercise, the Police Defendants were not acting as police officers; instead, they were playing the role of suspects, intending to create a real-life simulation in a controlled environment. The actions of real-life suspects are not confined by constitutional limitations. The government has a significant interest in training its police officers to face myriad situations. Indeed, the purposes of the DAD include teaching recruits how to escalate and de-escalate situations, to use and respond to force as appropriate, and to do so in a controlled test environment. (Compl. ¶ 40.) Similar to sparring, pushing recruits with sparring pads, light open hand slaps, and ground wrestling, are reasonable uses of force given these training circumstances. Allowing police recruits to become police officers without facing levels of force that may be used against them and, even more importantly, without allowing recruits to practice how to

---

[3] The *Graham* court first noted that the incident at issue was an investigatory stop and then set forth three factors to consider. 490 U.S. at 396. Because the incident here was not an investigatory stop, the *Graham* factors are inapplicable.

appropriately respond to such force in a controlled environment would be irresponsible and dangerous; officers need to know how to respond to all levels of force and to practice decision-making under stress and varied stimuli. Plaintiff voluntarily subjected himself to the training exercise, knowing that force would be used against him and knowing injury was possible. Just like Mallar, discussed *supra*, "Plaintiff may not have agreed to the actual level of force that was eventually against him had he known about it in advance, but that is immaterial to the analysis." *Mallar*, 2013 WL 8148647, at *8. Considering the totality of circumstances, particularly the training circumstances and the goals of the training exercise, the force used during DAD was objectively reasonable.

Because Plaintiff was neither seized nor subject to excessive force, his constitutional rights against unreasonable seizure were not violated. Plaintiff has failed to state a viable state or federal constitutional violation, and the Court should dismiss Plaintiff's first and second claims against Police Defendants.

### ii. Police Defendants' Conduct Was Not Conscience-Shocking and did not Violate Due Process.

The due process clause of the United States Constitution provides procedural and substantive guarantees that prohibit state actors from depriving others of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1; *Archuleta v. Colo. Dep't of Insts.*, 936 F.2d 483, 490 (10th Cir. 1991). But it does not guarantee safe working conditions for government employees. *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992); *Moore v. Guthrie*, 438 F.3d 1036, 1040-41 (10th Cir. 2006); *Digliani v. City of Fort Collins*, 873 P.2d 4, (Colo. App. 1993). But even if it did, a government employee would need to prove that he was injured by government action that "shocks the conscience of federal judges." *Moore*, 438 F.3d at 1040. To

prove conscience shocking government action, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power … Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking." *Id*. (internal citations omitted). To rise to this level, officers' conduct must violate the "decencies of civilized conduct." *Rochin v. California*, 342 U.S. 165, 173 (1952). As the Supreme Court has repeatedly stated, the due process clause "does not transform every tort committed by a state actor into a constitutional violation." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989).

In *Moore*, for example, a police officer was injured during a training exercise. During the exercise, instructors used plastic, liquid-filled projectiles to simulate live gunfire, and the police chief provided officers riot helmets for protection. 438 F.3d 1036, 1038. As the exercise progressed, a projectile flew under the officer's riot helmet and struck him in the eye, causing partial blindness. *Id.* The officer sued under § 1983, arguing that the police chief should have provided better protective equipment because he knew the riot helmets were insufficient. *Id.* at 1040. Ultimately, the Tenth Circuit concluded that the due process clause did not guarantee his safety during the training exercise, and even if it did, the police chief's conduct did not violate the officer's due process rights. *Id*. at 1040-41. This conclusion is consistent with those of courts across the country addressing similar situations. *See, e.g.*, *Fraternal Ord. of Police v. Gates*, 602 F. Supp. 2d 104, 106 (D.D.C. 2009) (concluding that training officers on pepper spray with "a direct spray into the faces of trainees" did not violate due process).

Police Defendants' conduct did not constitute a "conscience-shocking constitutional violation of [Plaintiff's] substantive rights," particularly in light of the training context. *Feirson*,

315 F. Supp. 2d, at 62. The City of Denver has a significant interest—as do its residents—in training a competent police force that is capable of handling unsafe incidents and is experienced in Arrest Control Tactics (as required for POST certification), such as handcuffing a suspect who is fighting the officer with force and exercising effective self-defense techniques. Further, officers who may have to decide whether to use force in extremely stressful situations, should have an understanding and appreciation of different levels of force and escalation and de-escalation techniques, including experiencing simulated situations with force such as sparring drills. The actions of the Police Defendants were not undertaken to abuse or misuse governmental power; they were taken to test the recruit class to determine whether they were making progress such that they would be competent officers at the end of training and pass POST requirements. Training officers to handle violent and resisting suspects does not shock the conscience; it is something that most people would assume happens during police training. Simply put, Police Defendants did not violate Plaintiff's rights to due process.

Finally, to the extent Plaintiff's claims arise from a failure to intervene, such claims also fail. Without a deprivation of an individual right, there can be nothing in which to intervene. *Routt v. Howard*, 764 F. App'x 762, 768 (10th Cir. 2019) ("Therefore, because the complaint failed to state a claim that the officers used excessive force during the second incident, it also did not state a claim that Sergeant Howard failed to intervene to prevent another law enforcement official's use of excessive force."). Because Plaintiff was not deprived of an individual constitutional right, his failure to intervene claims fail.

**b. Plaintiff Fails to State Constitutional Claims Against the City of Denver.**

Municipalities are not liable under § 1983 "unless action pursuant to official municipal policy . . . caused a constitutional tort." *Monell,* 436 U.S. 658, 691-94 (1978). The official policy requirement imputes liability to municipalities only for their own actions. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986). Thus, a municipality is liable under § 1983 only if its employee violated a plaintiff's constitutional rights and its official policy was the "moving force" behind the violation. *See Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). To prove that a municipal policy was the moving force behind a constitutional violation, a plaintiff must establish: "(1) a municipality enacted or maintained a policy, (2) the municipality was deliberately indifferent to the resulting constitutional violations, and (3) the policy caused the underlying constitutional violation." *Arnold v. Olathe*, 35 F.4th 778, 795 (10th Cir. 2022) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013)); *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022).

"A plaintiff must [first] identify a government's policy or custom that caused the injury." *Cacioppo v. Town of Vail*, 528 F. App'x 929, 931 (10th Cir. 2013). There are only five types of official municipal policies:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). When plaintiffs point to a "custom or usage" as policy, they must set forth sufficient prior events to establish the existence of such a

custom. *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1290 (10th Cir. 2019) (concluding that plaintiff's "allegations—describing only one similar incident of excessive force prior to his own injuries—fall far short of plausibly alleging a 'widespread practice' of excessive force, much less a practice 'so permanent and well settled as to constitute a custom or usage with the force of law'"); *Connick v. Thompson*, 563 U.S. 51, 63 (2011) ("contemporaneous or subsequent conduct cannot establish a pattern"). Moreover, a "plaintiff cannot simply allege that there is a policy in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy exists." *Abila v. Funk*, No. CV 14-1002 JB/SMV, 2016 WL 9021834, at *17 (D.N.M. Dec. 14, 2016). Finally, when identifying the policy at issue, a plaintiff cannot combine different types of policies to fabricate "some sort of hybrid" municipal policy; a policy must be sufficient in itself to cause the constitutional violation at issue. *Cacioppo v. Town of Vail*, 528 Fed. App'x 929, 934 (10th Cir. 2013); *see also Carr v. Castle*, 337 F.3d 1221, 1232 (10th Cir. 2003).

To the extent that Plaintiff alleges a custom of excessive force, he has not made sufficient factual allegations to establish such a custom. Plaintiff's allegations address only two incidents: the one giving rise to this case and a single prior incident, occurring ten years ago. (*See* Compl. ¶¶ 266-76.) Because contemporaneous conduct cannot be used to establish a custom, Plaintiff can only point to the solitary incident to establish a custom of excessive force. One instance is insufficient to give rise to a plausible claim that Denver has a practice of excessive force "so permanent and well settled as to constitute a custom." *Waller*, 932 F.3d at 1290.

Plaintiff makes myriad allegations about numerous different "official policies," some customs, some ratification, some failure to train, etc. (*See, e.g.*, Compl. ¶¶ 396, 400, 489.) In doing so, Plaintiff attempts to create the "hybrid" policy, where it requires all policies, "taken together

[to] make a compelling case for municipal liability." *Cacioppo*, 528 F. App'x at 934. This is insufficient to properly identify an official municipal policy. For the sake of argument, however, Defendants will assume that the concoction of assertions boils down to an allegation that the procedures for, implementation of, and completion requirement of F Action Drills are an official municipal policy.

Under that assumption, Plaintiff must next show the City of Denver was deliberately indifferent to the resulting constitutional violation caused by said policy. Deliberate indifference "is an exacting standard of fault." *See Bryan Cnty. Bd. of Comm'rs v. Brown,* 520 U.S. 397, 410 (1997). To prove deliberate indifference, a plaintiff must establish that a municipality had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation . . . and . . . consciously or deliberately [chose] to disregard the risk of harm." *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998). Actual or constructive notice requires a showing that the municipality's employees engaged in "a pattern of [similar] tortious conduct" or that "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Hinkle*, 962 F.3d at 1241 (internal citations omitted); *see also Waller*, 932 F.3d at 1285-86. And "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates." *See Connick*, 563 U.S. at 63 n.7 (cleaned up).

The City of Denver was not deliberately indifferent to constitutional violations that may arise from its policy surrounding DAD. Recruits may have been physically injured during DAD, as Plaintiff notes, but there have never been constitutional violations found in the past. To the extent Plaintiff is asserting the DAD policy encourages recruits to use excessive force against

civilians when they become commissioned officers, that is neither true nor the violation plead here. Finally, if the Police Defendants did not violate Plaintiff's constitutional rights, then the City of Denver has no *Monell* liability. *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) ("It is well established, therefore, that a municipality cannot be held liable under section 1983 for the acts of an employee if a jury finds that the municipal employee committed no constitutional violation."). Here, Plaintiff has failed to state a claim both that Plaintiff's constitutional rights were violated and that the City of Denver had a policy that was deliberately indifferent to and caused the resulting constitutional violations.

## II.    Qualified Immunity Bars the Federal Claims Against the Police Defendants.

When a plaintiff brings a suit under § 1983, a defendant can raise qualified immunity as a defense. Qualified immunity is immunity from suit, not merely a defense to liability, and it "protects all but the plainly incompetent or those who knowingly violate the law." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). When a defendant raises qualified immunity, a plaintiff must prove the defendant (1) violated the plaintiff's (2) clearly established rights. *Pearson v. Callahan,* 555 U.S. 223, 232-33 (2009). A right is clearly established if "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). To prove a right is clearly established, "the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1027 (10th Cir. 2015).

This precedent must have clearly established the right "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up).

### a. Plaintiff Does Not Set Forth a Clearly Established Unreasonable Seizure.

As explained above, the Police Defendants did not violate Plaintiff's right to be free from unreasonable seizures, as no seizure occurred. Moreover, the right Plaintiff alleges to have been violated is not clearly established. Defendants could find no cases in the Tenth Circuit or Supreme Court addressing unreasonable seizures in a police training context. Outside the Tenth Circuit, courts addressing unreasonable seizures in such context have consistently found that there was no constitutional violation and/or that those rights were not clearly established. *See, e.g.*, *Humes v. Gilless*, 108 F. App'x 266, 269 (6th Cir. 2004) (concluding that a claim for unreasonable seizure "was (and is) not clearly established with respect to this law enforcement training situation"); *Feirson v. D.C.*, 506 F.3d 1063, 1068 (D.C. Cir. 2007) (affirming trial court's finding no constitutional violation because "Feirson submitted to the exercise, and no evidence would support a finding that the instructors would not have stopped if Feirson asked them to do so"); *Fournier*, 160 F.3d at 758 (1st Cir. 1998) (qualified immunity defense unnecessary because plaintiff "has not been able to show a violation of a federal right"); *Mallar*, 2013 WL 8148647, *9 (C.D. Cal. 2013) (noting that "the only similar cases have been decided in other circuits and those cases have held against officers asserting constitutional claims arising out of training injuries" and stating that "[t]he court has found no case that remotely suggests that the defendant officers' conduct in the hostage training exercise is subject to constitutional limitations"); *Ploski v. Medenica*, No. 17-CV-2306, 2019 WL 4014193, at *3 (N.D. Ill. Aug. 26, 2019) ("[T]he Court is not aware of any precedent stating that freedom from battery in the police training context is a constitutional right.").

Plaintiff does not have a clearly established right to be free from unreasonable seizures, including excessive force, in a police training situation.

**b.  Plaintiff Does Not Set Forth a Clearly Established Due Process Violation.**

Defendants are entitled to qualified immunity for Plaintiff's due process claim because Defendants did not violate Plaintiff's constitutional rights and, even if they did, the right was not clearly established. *Cf. County of Sacramento v. Lewis*, 523 U.S. 833, 859 (Stevens, J., concurring). The only case in the Tenth Circuit addressing a similar situation is *Moore v. Guthrie*, 438 F.3d 1036 (10th Cir. 2006), discussed *supra*. The *Moore* court noted that "Plaintiff cannot be said to have a 'right to bodily integrity in a safe work environment.'" *Id.* at 1040. In declining to find as constitutional violation, the court emphasized that "characterization of state tort law claims as federal ones was of particular concern in cases against public employers, where state employment law would normally govern the terms of the relationship," and the court stated that this was the "precise relationship" in that case. *Id.* at 1041.

Even out of circuit cases agree. For example, in *Fierson*, discussed *supra*, the plaintiff was injured during police combat training, and his injuries resulted in permanent disabilities and forced him into retirement. 506 F.3d at 62. Yet, in analyzing Feirson's substantive due process claim, the Court held that "even though [the force] caused Sgt. Feirson serious injuries, [it] did not rise to the level of a conscious-shocking constitutional violation of his substantive due process rights." *Id.* Considered in context, the Court determined that the police department maintained an "important interest in training its officers" in the manner effectuated, and that the force applied during the training was not malicious or sadistic. *Id.* at 63. In short, while the force "may [have] seem[ed] excessive," it did not rise to the level of conscience-shocking "when viewed in the context of a

combat exercise." *Id.*; *Fraternal Ord. of Police v. Gates*, 602 F. Supp. 2d 104, 109 (D.D.C. 2009) (officer training that required being pepper sprayed in the face "is not enough to shock the conscience in this context").

There is no caselaw clearly establishing a due process right in this context. Plaintiff has failed to show a clearly established due process right that was violated and thus, Police Defendants are entitled to qualified immunity.

### III.    Colorado's Worker's Compensation Act Bars Plaintiff's State Claims Against the Police Defendants.

Prior to bringing this suit, Plaintiff followed the procedures for—and received—worker's compensation benefits for the workplace injuries he incurred as an employee during his police recruit training. (Compl. ¶ 341.[4]) The Worker's Compensation Act of Colorado, C.R.S. §§ 8-40-101 to 8-47-209 (the "WCA"), is a statutory scheme intended to provide "speedy" compensation to employees for on-the-job injuries without regard to fault. *Williams v. White Mountain Const. Co.*, 749 P.2d 423, 428 (Colo. 1988). Under the WCA, employers who comply with its provisions "shall not . . . be subject to any other liability for the death of or personal injury to any employee," excepting the liability imposed by the WCA, and "all causes of action . . . for and on account of such death of or personal injury to any such employee and accruing to any person are abolished." C.R.S. § 8-41-102; *Oliver*, 2016 COA 180M, ¶ 21 ("The Act provides the *exclusive* remedy to a covered employee for injuries sustained while the employee is performing

---

[4] Plaintiff has received approximately $1.25 million in Worker's Compensation benefits. *See* WC Case No. 23-0065. The Court may take judicial notice of Plaintiff's Worker's Compensation benefits on a motion to dismiss. *Walker v. Van Laningham*, 148 P.3d 391, 397 (Colo. App. 2006) ("[M]atters which are properly the subject of judicial notice may be considered without converting the motion [to dismiss] into one for summary judgment.") "[A]dministrative agency files and decisions are properly the subject of judicial notice . . . ." *Id.* (citing *Northgate Motors, Inc. v. Gen. Motors Corp.,* 111 F. Supp. 2d 1071, 1077 (E.D. Wis. 2000)).

services arising in the course of his or her employment."). That is to say, the WCA is the exclusive remedy for injured employees, and it bars the employees from bringing any other cause of action for work-related injuries.

The Denver Police Department, as "an agency of the City and County of Denver, is a public employer and, therefore, is required to provide all such benefits and compensation to all of its employees under the [WCA]." *People v. Oliver*, 2016 COA 180M, ¶ 21; C.R.S. § 8-40-203(a) (defining employer). And Plaintiff is a covered employee. C.R.S. § 8-40-202(1(a)(I)(A) (defining employee and stating that "[p]olice officers and firefighters who are regularly employed shall be deemed employees"). Plaintiff was injured on the job while he was an employee of a public employer. Thus, the provisions of the WCA are Plaintiff's exclusive remedy for his injuries.

The WCA's exclusive remedy bars claims against co-employees who may have caused or contributed to the employee's work-related injuries, not just claims against the employer. *Kelly v. Mile Hi Single Ply, Inc.*, 890 P.2d 1161, 1165 (Colo. 1995) (noting prior decision that "covered employees were immune from actions brought by co-employees"); *see also* C.R.S. § 8-41-203(1)(a). This bar applies even when the co-employees acted intentionally. *Kandt v. Evans*, 645 P.2d 1300, 1304-05 (Colo. 1982) (concluding that "intentional wrongs arising out of the course of … employment are covered under Colorado's [WCA]"); C.R.S. § 8-41-102; *see also Schwindt v. Hershey Foods Corp.*, 81 P.3d 1144, 1146 (Colo. App. 2003). An employee may recover against a co-employee only if the co-employee acted outside the course and scope of employment when he injured the employee. *Kandt*, 645 P.2d at 1304-06. A co-employee acts outside the course and scope of employment only if his conduct toward the employee is "inherently private." *Horodyskyj v. Karanian*, 32 P.3d 470, 475 (Colo. 2001). Cases involving inherently

24

private conduct "typically center on disputes over love interests or spouses; they generally involve parties who know one another in private life or, having met on the job, elect to enter into a private relationship just as they might have had they met elsewhere, and subsequently develop a private quarrel." *Id.* at 477.

The WCA is Plaintiff's exclusive remedy, and it bars Plaintiff's state claims against the Police Defendants for their conduct during DAD. Even if the Police Defendants' actions during DAD were intentional as Plaintiff alleges, the Colorado Supreme Court has held that "intentional wrongs arising out of the course of the employment are covered under Colorado's [worker's] compensation scheme." *Kandt*, 645 P.2d at 1303. Plaintiff does not allege that any of the Police Defendants were acting outside the course and scope of their employment; on the contrary, Plaintiff affirmatively alleges that the Police Defendants "were acting under the color of law in their capacities as police officers or technicians working for the City and County of Denver and the Denver Police Department." (Compl. ¶¶ 349, 413.) Nor does the Complaint allege any relationships between Plaintiff and the Police Defendants that would make the Police Defendants' conduct during DAD "inherently private." Because Plaintiff does not allege conduct that would remove the bar created by the WCA's exclusive remedy, Plaintiff's state law claims against the Police Defendants are barred.

## CONCLUSION

For the foregoing reasons, the City of Denver Defendants respectfully request that the Court dismiss Plaintiff's First, Second, Third, and Sixth Claims for Relief against them.

Respectfully submitted this 21st day of October, 2024.

GARNETT POWELL MAXIMON BARLOW & FARBES

*s/ Stanley L. Garnett*
Stanley L. Garnett, #12282
David D. Powell, Jr., #16152
Elaina Shively, # 42737
Lys Runnerstrom, #47423
Kristin L. Arthur, #52397
1125 17th Street, Suite 2200
Denver, CO 80202
Phone:   (303) 991-3344
E-mail:  stan.garnett@garnettlegalgroup.com
         david.powell@garnettlegalgroup.com
         elaina.shively@garnettlegalgroup.com
         lys.runnerstrom@garnettlegalgroup.com
         kristin.arthur@garnettlegalgroup.com

*Attorneys for Defendants City and County of Denver, Colorado; Todd Gentry; Stephen Marino; Anthony Norman; Felipe Cervantes; Kyle Carter; Johnna Aitken; Lisa Aitken-Nelson; Jason Moore; Damon Roman; E. M. Alfaro; and Brian Camozzi*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 21st day of October, 2024, a true and correct copy of the foregoing **CITY OF DENVER AND POLICE DEFENDANTS' MOTION TO DISMISS** was electronically filed using the Court's CM/ECF system upon the following:

John R. Holland
Anna Holland Edwards
Erica Grossman
Dan Weiss
Holland, Holland, Edwards & Grossman, LLC
1437 High Street
Denver, CO 802018
(303) 860-1331
john@hheglaw.com
anna@hheglaw.com
erica@hheglaw.com
dan@hheglaw.com

*Attorneys for Plaintiff*

Darold W. Killmer
Reid R. Allison
Killmer Lane
1543 Champa St., Suite 400
Denver, CO 80202
(303) 571-1000
dkillmer@killmerlane.com
rallison@killmerlane.com

*Attorneys for Plaintiff*

Anthony E. Derwinski
Jeffrey C. Staudenmayer
Michele S. Carey
Ruegsegger Simons & Stern, LLC
1700 Lincoln St., Suite 4500
Denver, CO 80203
(303) 575-8026
aderwinski@rs3legal.com
jstaudenmayer@rs3legal.com
mcarey@rs3legal.com

*Attorneys for Defendants Denver Health and Hospital Authority, Courtney Wham, and Taegin Sung*

<u>*s/ Tracy Williams*</u>
Tracy Williams