**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.: 24-cv-2353-GPG-TPO**

VICTOR MOSES,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO, et al

     Defendants.

---

**RESPONSE TO CITY OF DENVER AND POLICE DEFENDANTS'
MOTION TO DISMISS [DOC. #32] WITH REQUEST FOR HEARING**

---

     Plaintiff responds to City of Denver and Police Defendants' Motion to Dismiss and requests an in-person hearing so he may attend.

## I.  INTRODUCTION

     The Colorado and Federal constitutions do not create a rights-free zone for police training where Denver police can use as much excessive force as they want during their officially sanctioned violent "Fight Day" so long as they only use it on a fellow police recruit. Police are protected from excessive force inflicted by other police.

     Denver Defendants cherry-pick only certain facts from the Complaint in arguing that no claims are stated. But when *all* allegations are accepted as true, as required at this motion to dismiss stage, the burden is easily cleared. Movants do not address Plaintiff's factual showing regarding his being assaulted repeatedly into unconsciousness and becoming incapacitated *before* he was further assaulted into total

1

unresponsiveness.[1] In unaddressed ¶¶ 155-236, Plaintiff alleges each officer's excessive force and/or failures to intervene and their shocking conduct.

The Motion does not include the word 'unconscious' despite the extraordinary witness accounts from multiple police recruits who saw Plaintiff repeatedly rendered unconscious. See, e.g., ¶130 for recruit Zachary Vasquez's account:

> Shortly into the [baton] drill I witnessed one of the pad holders strike [M]oses with a pad, pushing Moses off the mats where he fell back and hit his head on the tile of the hanger. Moses got back up and kept trying to fight, **however he began what appeared to be blacking out (arms and legs going limp, eyes closing, head falling back approximately 3 or 4 times.)**.[2]

Defendants instead weakly argue that Moses initially consented to participate in this

---

[1] Defendants ignore so many factual allegations that it is not possible to summarize all material facts omitted. *See* Complaint ¶¶ 64-236. Defendants ignore allegations detailing their knowledge of Mr. Moses's **repeated unconsciousness** (¶¶ 5, 68-69, 72, 104, 123, 127, 129, 136-137, 140, 173, 179, 212, 227, 241); **crashed blood pressure "90/60";** (¶¶ 5, 76, 85, 159, 170, 180-181, 216, 228, 241); head slamming off mat on the tile floor (¶¶ 5, 67-69, 72, 104, 116-117, 123, 125-128, 130, 133-138, 165-166, 173, 204, 211); repeated assaultive collapses (¶¶ 5, 70, 125-126, 128, 130, 132-138, 173, 197, 199, 226-227); extreme leg cramping and extreme fatigue (¶¶ 5, 65, 68, 74, 91, 104, 126, 134-135, 137, 157, 167, 178, 180, 185, 199, 216, 228); seizure by termination of movement from prior incapacitating intentional assaults rendering him unable to move, stand up, walk or independently leave to get care (¶¶ 5, 69, 91-92, 128-130, 140, 145, 156, 167-168, 179, 199-202, 205-206, 213, 217-219, 227); his falling on his own when let go of after being lifted and held up (¶¶ 5, 91, 137-138, 205-206, 213, 227); Defendants' knowledge of his SCT (¶¶ 5, 81, 158); and his being pressured to "not give up" and endure additional devastating assaults despite obvious inability to consent to continue and his then having been thereby rendered into police custody, until unarousable and facing death (¶¶ 5, 69, 89-90, 97-100, 123, 127, 138, 140, 145, 192, 207-208, 213, 217-219, 229, 232) ["omitted allegations."]. Only by ignoring allegations can Defendants assert that no claim is stated.
[2] See also ¶140, where Recruit Wright reports that: "**The part that blows my mind is after [M]oses woke back up they tried to make him finish it again.** . . **once I saw him wrestling after going down and passing out I was totally fucked." "Moses legit was out cold.** Woke back up. And then they let him go straight back into the wrestling portion and then passed back out cold." See ¶¶ 117-143, including ¶127 (Lacrue), ¶129 (Herkimer), ¶133 (Riley), ¶134 (Anderson), ¶137 (Keiller).

training, that utilizes no precautions to protect from foreseeable injuries during extreme exertion (¶¶ 58-61, 261-297), while ignoring robust allegations that Moses' lack of capacity and defenselessness vitiated any conceivable prior consent.[3]

Worried their freedom-terminating intentional assaults created an unconstitutional seizure in which all force had to stop, Defendants cynically argue that the officers who assaulted Victor Moses and failed to intervene to stop it "were not acting as police officers" and should be treated instead as "suspects" who "are not confined by constitutional limitations." Defendants' Motion p. 13. However, Defendants omit the devastating contrary fact alleged in ¶51 that DPD has an express rule for these exercises, **including for all officers role-playing suspects** (who signed their names to instructions) mandating they were required **"to immediately stop a drill if they have reason to believe a participant's health or safety is in jeopardy."** (emphases added).

On January 6, 2023, during the official "Fight Day" exercise, whose completion is a mandatory condition of becoming a badged officer, Victor Moses was horrifically injured as described in ¶¶ 309-345. Moses was the last recruit officer to run the Fight Day gauntlet. Previously one of his fellow recruits had suffered a broken nose, and several others sustained injuries requiring treatment at the hospital. As pleaded regarding the Municipal defendants, these injuries are a result of – *caused by* – a well-established violent official City program approved by all policymakers that has been occurring annually for years and causing a pattern of injuries from such brutal hazing. ¶¶ 38-53,262.

---

[3] "Consent" is a continuing concept and here a much-disputed question of fact, unresolvable on a Motion to Dismiss. See FN 4, infra.

After Station 1, Moses was extremely fatigued, which individual Defendants knew. Despite this fatigue, Moses began the Station 2 Baton Drill that was ungoverned by training protocols which, if in place, would have ended this activity at Station 1. During Station 2, he was knocked down multiple times. Defendant Marino so violently drove Moses off the large mat that he caused him to slam his head on the hard tile floor. ¶67. Thereafter, despite Moses being seen by many to be passing out and collapsing from further assaults, Defendant Technicians exerted pressure and coercion to continue, including physically lifting him up. Still, Moses fell when they let go. ¶¶ 125, 206.

Shockingly, Defendants knew then Moses did not have capacity to voluntarily consent to any continued fighting and they could not with any objective reasonableness ask, pressure, or coerce to continue a man they had knocked out and concussed.[4] At Station 2, Moses was widely seen unable to stand up, move, walk or remove equipment as needed. This activity had by then devolved into shocking group think. ¶281 n.6.

---

[4] In life and in law, consent is not forever. It is a changeable state that is impossible to give or rely upon when a person is rendered unconscious. Once Moses lost consciousness, he no longer could consent to proceed further. He was *at that point* incompetent to consent to further force because he had significant injuries compromising his cognition and ending his movement. Judge Domenico held *in a seizure case* that consent is a fact question. *Midgett v. Denver C.A.R.E.S.*, No. 1:19-cv-1941-DDD-NRN, 2017 U.S. Dist. LEXIS 239209, at *15-18 (D. Colo. Sep. 28, 2023). Judge Domenico also discusses the factors, none of which are dispositive, considered in analyzing consent fact issues in seizure cases since *United States v. Hill*, 199 F.3d 1143, 1148 (10th Cir. 1999). Plaintiff's non-consent is robustly plead and must be accepted as true. See ¶¶ 5, 69, 89-90, 97-100, 123, 127, 138, 140, 145, 192, 207-208, 213, 217-219, 229, 232 and 241.

4

Egregiously, Trainer Gentry next ordered Station 3 brought to Moses because he could not move himself. ¶92.[5] Moses was thus pressured to participate in Station 3, where an officer dominantly mounts the recruit, who is supposed to try to break free. Defendant Camozzi mounted Victor Moses and began "ground fighting" with Moses, admittedly hitting him in the head several times. About 30 seconds in, underneath the full body weight of Camozzi, Moses gasped "I can't breathe." ¶¶ 91-95. He was not then reasonably free to go because, *already subdued*, he was being pinned down. The ¶96 photo shows Camozzi intentionally terminating Moses's movement.

Moses was not a suspect, did not pose any threat, was known to be unarmed, was not fleeing or resisting.[6] Despite knowing these facts, Defendants participated in, and/or tolerated without intervening, additional assaults in a coordinated use of excessive force while he was in obvious medical crisis. All Defendants contributed to this nightmare under *Booker v. Gomez* until Moses was unarousable and facing death.[7] Defendants were shockingly indifferent in failing to secure or provide emergency medical care. In football or boxing, such injury and unconsciousness would have ended these events immediately.

In addition to violating his constitutional rights to be free from unlawful seizure and excessive force, Defendants' derelictions easily rise to conscience shocking violations of his federal and state substantive due process rights. See ¶¶ 422-424, 474-476.

---

[5] Defendants pretend Camozzi – an MMA champion called "The Mantis" -- kindly came over to a "resting" Moses, who was in fact collapsed. Compare Motion, p. 6 to ¶¶ 90-97, 229-234. This characterization is ridiculous, not at all in the light most favorable to Plaintiff.
[6] See discussion, p.13, of *Graham*'s test for **all** seizures -- not just arrests or *Terry* stops.
[7] *Est. of Booker v. Gomez*, 745 F.3d 405, 422 (2014) ("an officer who is present [and] fails to take reasonable steps to protect the victim of another officer's [] excessive force, can be held liable for nonfeasance" under § 1983) (internal citation and quotations omitted).

Months before Fight Day, Victor Moses was asked about and disclosed having SCT in his DPD/DHHA application which sought to identify any **"issues of particular concern," including "risk factors for rhabdomyolysis (**such as thyroid disease, renal disease, statin use, sickle cell trait, and sickle cell disease.)."** Moses disclosed his  SCT adding that "both my parents & I have the trait but never had any problems" ¶¶ 31-37.

Denver and DHHA both knew of Moses SCT but with deliberate indifference both failed to share this information or to implement training guidelines widely used in military, professional sports and police training to prevent rhabdomyolysis and related long understood extreme exertion collapses, including from SCT. ¶¶ 58-61. Denver's extensively plead 5-part *Monell* violations are discussed in a specific section below.[8]

## II.  ARGUMENT

### A. Defendants Ask to Forfeit Plaintiff's State and Federal Constitutional Rights with a Strawman Workplace Safety Case Not Before this Court

Defendants wrongly assert that Plaintiff has failed to allege a seizure or force violation because the "excessive force alleged here took place during a use of force

---

[8] Victor Moses' case is no one-off. It is part of a recurring, persisting, and terrifying national pattern affecting police recruits. There is a decades-long literature on exertional collapse during training, ranging from the military to athletics and including police and firefighters. Indeed, from 2021 to 2023 there were at least 8 police deaths or severe injury involving black recruits with SCT and more this year. Eichner, Randy, MD, To Protect and Serve: Preventable Collapse and Death of Police Trainees, 2023, American College of Sports Medicine (last viewed Dec. 13, 2024), *available at* https://journals.lww.com/acsm-csmr/fulltext/2023/07000/to_protect_and_serve__preventable_collapse_and.1.aspx.
("Until police chiefs begin to heed the message, these ES deaths will continue. All police (and fire) forces should know who among their ranks has SCT and should train them accordingly. Educate them — and their instructors—on ES. Give SCT trainees more time to complete the timed distance run. At the very first sign or symptom of any undue distress, stop and help them; never pace them or urge them on. Let them walk home in good health and try again — without penalty — another day.").

training exercise." Defendants' Motion p. 13. However, there is no *per se* exclusion of

police training from the ambit of the Fourth or Fourteenth Amendment. As stated in the

oft-cited decision in *Jensen v. City of Oxnard,* it is clear that Moses:

> [D]id not forfeit all constitutional rights when he became a member of the police
> force. . . In particular, he retained the right at issue here - the Fourth Amendment
> right to be free from unreasonable seizure by fellow officers while performing
> police work.

145 F. 3d 1078, 1083-84, (9th Cir. 1998), *cert denied* 525 U.S. 1016. As in *Jensen,*

Denver Defendants miscast this case, arguing that because Moses accepted employment

and was engaged in training, he merely brings a safe workplace claim that must fail

because there is no constitutional right to a safe working environment.[9]

Faced with this same strawman, *Jensen* held that in the actual case it faced, as

here, "alleges a particular constitutional violation – Fourth Amendment seizure – which

exists independent of the workplace." *Id*. at 1084 n.1. The *Jensen* Court held:

> We reject this argument and . . . attempt to turn this into a safe workplace case.
> Although this case is similar to the safe workplace cases in that they both concern
> individuals who "voluntarily accepted . . . an offer of employment," this case is
> different in one significant way - the nature of the injury alleged. The other cases
> cited [] involve a variety of workplace injuries, including attacks by third parties. .
>
> **None of these cases, however, involve the use of excessive force by a**
> **government agent against a government agent.** Oxnard argues that this is a
> "distinction without a difference." We conclude that the difference is quite
> significant. **While the safe workplace cases concern the failure of the state**
> **adequately to train, prepare, or protect government employees from non-**
> **state actors, <u>this case involves the allegedly intentional or reckless acts of</u>**

---

[9] Denver cites *Driebel v. City of Milwaukee* to argue that Moses asks for more workplace
rights than his private sector counterparts. Defendants' Motion p. 7. *Driebel* was an
internal employment dispute case, *not involving any use of force*, where some police
declined to cooperate in an investigation and refused a lawful order. While disobedience
is not a seizure, police still have "equal protection of their rights under the law" and do not
lack constitutional protections while at work. 298 F.3d 622, 637-39 (7th Cir. 2002).

**a government employee directed against another government employee.**

*Jensen*, 145 F.3d at 1083-84 (emphasis added). Courts follow *Jensen* to hold the Fourth Amendment prohibits excessive force by officers against other officers, just as much as it protects a citizen during an arrest or stop. All reasonable police also know this.[10]

Victor Moses does not demand greater protection at work than another type of worker. He does not complain about *generalized workplace rules* that he wants protection from under state or federal constitutions. He also does not complain that Fight Day was unconstitutional because he would lose his job if he didn't complete it. Rather, Moses complains about excessive and shocking force by governmental employees against him during an officially sanctioned Denver program, force purposefully targeted at him. This force was not just an unreasonable mistake of shooting an officer rather than a suspect. Moses was first rendered incapacitated into police custody by serial DPD/City sponsored intentional police assaults. Defenseless and seized, his freedom to leave was terminated because he could not move, stand or walk. Then he was purposely, not mistakenly, attacked until his life was all but destroyed.

Since at least *United States v. Mendenhall* 446 U.S 544, 554 (1980), Courts have clearly established, *including* in police recruit cases, that a person is constitutionally seized "if, in view of all of the circumstances… **a reasonable person would have believed that he was not free to leave**."  The published cases cited by Defendants do

---

[10] Such cases can involve police shooting each other. In *Davies v. City of Lakewood*, Judge Jackson, noting *Jensen*, held police generally "are not entitled to qualified immunity" as the court "cannot say as a matter of law" they "made a reasonable mistake". No. 14-cv-1285-RBJ, 2016 U.S. Dist. LEXIS 18355, *9, 16-17 (D.Colo. Feb. 16, 2016).

not support their p. 10 assertion that "physical force used during a training exercise does not constitute a seizure". Rather these were training cases where the courts just analyzed the factual circumstances, fully in keeping with settled seizure or due process constitutional principles. *Fournier*, for example, concerned training where the Plaintiff consented to handcuffing. At no time was Fournier assaulted or unconscious or lacking capacity to consent. In the classroom still handcuffed, he tried to sit down and missed the chair. Gravity and accident caused injuries, not excessive force. *Fournier* held no seizure occurred but not because of a rights-free police training zone. It simply held a seizure was not shown because, under *Mendenhall*, Fournier did not show he "was not free to leave *at any point* during the scenario." 160 F.3d 754, 756-57 (emphasis added).[11]

In contrast, Victor Moses was rendered into a very different context by Defendants' multiple intentional assaults on his person, continuing after he lost consciousness and

---

[11] In *Feirson*, Plaintiff did not lose consciousness or the ability to continue consenting. He stopped when his instructor said: "you can't take any more, you've had enough." 315 F. Supp. 2d 52, 59 (D.D.C. 2004). On appeal, the D.C. Circuit cited *Mendenhall* to hold there was **no** evidence that "would support a finding that the instructors would not have stopped if Feirson asked them to do so." *Feirson*, 506 F.3d 1063, 1068 (D.C. Cir. 2007). Defendants' citation to *Ploski v. Medenica* is inapposite. The *Ploski* court pointed to *Mendenhall,* to hold that Plaintiff was not restrained in a way that would "lead a reasonable person to believe he was not free to leave." No. 17-cv-2306, 2019 U.S. Dist. LEXIS 144189, *13-14 (N.D. Ill. Aug. 26, 2019). Indeed, he "walked away and went to the locker room." *Id.* at *14. Similarly, Defendants cite the inapposite *Humes v. Gilless,* involving brief interference with free movement during a mock jail takeover, but **no** excessive force. 108 Fed. App'x 266, 267 (6th Cir. 2004) (unpublished). The unpublished *Mallar* decision also doesn't hold there can never be training seizures, just that Plaintiff was free there to withdraw from participation. No. CV 11-2549 GAF, 2013 U.S. Dist. LEXIS 186698, * 23 (C.D. Cal. July 24, 2013). Per *Mendenhall's* discussion of non-exclusive factors, p. 554, there are multiple such factors here: Plaintiff yielded to undue pressure while incapacitated, he was restrained by an officer laying on him, multiple officers pressured him "not to quit," and *a trainer ordered Stage 3 brought to Moses since he could not move.*

was decidedly unfree to leave. Plaintiff *initially* agreed to participate in Fight Day but did so after notifying DPD about his sickle cell trait and agreed to participate in a venue governed by constitutional rules and DPD rules, which obligated Defendants, *inter alia*, "to immediately stop a drill if they have reason to believe a participant's health or safety is in jeopardy." In further contrast, Moses was knocked cold and concussed by Defendants' conduct during this exercise, vitiating any capacity to consent to continue or leave. Instead of stopping, because Moses could not stand or walk, Defendants moved the next stage along with the paramedics to Mr. Moses, and all shockingly "cleared" him to continue. Any person in such a state of body and mind could not reasonably believe they were free to leave. His "trainers" every word and deed told him he had to continue.

While Defendants offer platitudes about the paper version of Fight Day, claiming a benign intent to train, Moses's reality belies that claim. At the point Moses was knocked unconscious, Fight Day no longer had any justifiable constitutional purposes. This was just a seized free citizen being excessively beaten and intentionally restrained after subdued to the point of unconsciousness. There was no longer any intent to legitimately train. There appears to be an intent to haze Moses for being physically unable to complete the training. This begs the question how much force is too much during a training exercise: If a trainer tased or shot Moses to punish him for not being able to continue, instead of assaulting him further after he was entirely subdued until he collapsed, would Defendants argue the Fourth and Fourteenth Amendment can never apply to police training?

**B. Plaintiff Plausibly Alleges he was Seized and Subjected to Excessive Force in Violation of the Colorado Constitution and the Federal Constitution.**

Defendants removed this case from state court, hoping to bury the state civil rights claims in their discussion of qualified immunity ("QI") related to the federal Fourth and Fourteenth Amendment claims. But the outcome of this case cannot be so determined because Plaintiff's Colorado Constitutional claims are not subject to QI. At this stage, Plaintiff need only plausibly allege Defendants seized Moses and subjected him to unreasonable force.[12] There are also numerous factual disputes about Defendants' seizure and use of excessive force, precluding summary dismissal. See FN 2.

> ### i.    Qualified Immunity Has Been Expressly Abrogated for Claims Brought Under the Colorado Constitution Pursuant to §13-21-131 C.R.S.

Plaintiff's first claim is under the Colorado Constitution and §13-21-131, C.R.S., enacted in 2020 as the Enhanced Law Enforcement Integrity Act ("ELEIA") to actualize the right of Coloradoans to be secure from unreasonable searches, seizures, and the attendant use of excessive force. The liability provision of § 13-21-131 (1), C.R.S., which also expressly authorizes failure-to-intervene claims, states as follows:

> A peace officer, [] who, under color of law, subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief.

"Person" includes police recruits like Victor Moses. The ELEIA also abolishes QI and statutory immunities to these types of claims, § 13-21-131(2), C.R.S.:

> (a) Statutory immunities and statutory limitations on liability, damages, or attorney fees do not apply to claims brought pursuant to this section. The "Colorado Governmental Immunity Act", article 10 of title 24, does not apply to claims brought

---

[12] Federal cases can be persuasive, only to the extent they speak to seizure and force. *K.W. v. Child's Hosp. Colo.,* 2016 CO 6, ¶23. There is no need to "scavenge-hunt" for a case with identical facts because QI was expressly rejected by the legislature.

pursuant to this section; (b) Qualified immunity is not a defense to liability pursuant to this section.[13]

The statute is abundantly clear that when an officer causes a deprivation of rights protected by Article II, § 7, liability follows. The legislature rejected any importation of "qualified immunity" and "clearly established" concepts for peace officers who violate the Colorado Constitution. Hence, employing clearly established QI analysis of these claims improperly contravenes the legislature's policy choice rejecting this doctrine. The legislature expected Colorado violations to be redressed even if the officers might be granted immunity under § 1983. This statute created a civil claim which, while similar to § 1983, may be brought under more expansive state law than its federal analogue -- expressly allowing failure-to-intervene and barring statutory or QI defenses.[14]

### ii.    Victor Moses Was Seized Under State Law and the Fourth Amendment.

Article II, § 7 of the Colorado Constitution guarantees Coloradoans the right to be free from unreasonable searches and seizures. *Woodall v. Godfrey*, 553 P.3d 249, 256

---

[13] See *Washington v. Niccum, et al.*, No. 1:24-cv-344-STV, Doc. No. 48, at 28 (D.Colo. Oct. 11, 2024); *Athanas v. Orth, et al.*, 2023CV30010, *6-11 (Chaffee Cnty. Dist. Ct. Apr. 5, 2024); *Est. of Manzanares v. Bailey* et al, No. 2023CV31683 (Denver Dist. Ct., Dec. 5, 2024) (notably again this month rejecting *all* Denver Police QI defenses under ELEIA).

[14] Courts are to "engage in an independent analysis of state constitutional principles in resolving a state constitutional question." *People v. Young*, 814 P.2d 834, 842-43 (Colo. 1991). As our high Court has held: "[T]he Colorado Constitution provides more protection for our citizens than do similarly or identically worded provisions of the United States Constitution," repeatedly recognizing "that the Colorado Constitution…is a source of protection for individual rights. . . **independent of and supplemental to the protections provided by the [U.S.] Constitution.**" (emphasis added.) *Id*.; *People v. McKnight,* 446 P.3d 397, 406 (Colo. 2019) ([D]espite. . . similarity between article II, section 7 and the Fourth Amendment, we are not bound by the [] Supreme Court's interpretation….")

(Colo. App. 2024).[15] In Colorado, an unconstitutional seizure is a broadly defined concept that "occurs when an officer, by means of physical force or show of authority, **has in some way restrained the liberty of a citizen.**" *Id*. Colorado's broad definition of "seizure" is consistent with numerous federal courts, unequivocally holding such seizures can occur in the criminal context, as an arrest or investigatory stop, and in non-criminal contexts. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, **or other 'seizure' of a free citizen** should be analyzed under the Fourth Amendment. . .") (boldface added); *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989) ("a seizure occurs when **governmental termination of a person's movement is effected *through means intentionally applied*.**") (boldface added); *Mendenhall,* 446 U.S at 554 (1980).[16]

These cases teach that the test for a constitutional "seizure" is not a rigid or mechanical one[17] but a flexible test requiring consideration of the full context of a governmental actor's restraint, that actor's intent, and whether the person reasonably believed he was not free to leave. Faced with a similar attempt to improperly narrow the reach of the federal analogue to Colorado's Article II, § 7, the Supreme Court held that

---

[15] *See also People v. Oates*, 698 P.2d 811, 815 (Colo. 1985) ("**[W]e have determined that the Colorado proscription against unreasonable searches and seizures protects a greater range of privacy interests than does its federal counterpart**.") (emphases supplied); *Rocky Mountain Gun Owners v. Polis*, 2020 CO 66, ¶36).

[16] *See also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer **restrains the freedom of a person to walk away**, he has seized that person."). (emphasis added.) In *Torres v. Madrid*, the Court expanded seizure concepts, holding that the "application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." 592 U.S. 306, 325 (2021).).

[17] Defendants' Motion p. 13 n. 3 wrongly states that: "Because the incident here was not an investigatory stop, the *Graham* factors are inapplicable."

the "purpose of [the Fourth] Amendment. . . is to safeguard. . . the security of individuals against arbitrary invasions by government officials," and **"it would be anomalous to say that the individual [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."** *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (citation omitted) (emphasis added).[18] Surely police recruits are to be fully and equally protected.

Plaintiff has plausibly alleged that he was unconstitutionally seized, and that Defendants' group think efforts to continue to assault him while he was in his disabled state have no legitimate governmental purpose. Here, "Fight Day" devolved from training to a brutal hazing ritual. During this Lord of the Flies-like event, Defendants terminated Plaintiff's freedom of movement "through means intentionally applied." They then intentionally applied additional means by unreasonably pressuring a disoriented Moses to continue after their assaults caused him to repeatedly lose consciousness, crashed his blood pressure and destroyed his capacity to consent to anything, much less additional beating. Defendants' continued assaults rendered Moses so unfree to leave that he could not even get to the next station. Instead of stopping, Defendants brought Station 3 to him -- a man completely unable to stand or walk. Then, Camozzi intentionally applied his entire

---

[18] Citing *O'Connor*, our circuit takes a broad view of the reach of the Fourth Amendment to government workers, reiterating that "the strictures of the Fourth Amendment apply to child welfare workers, as well as **all** other governmental employees." As explained in *Dubbs v. Head Start, Inc.*: "More fundamentally, however**, the defendants' contention that the Fourth Amendment does not apply in the "noncriminal" and "noninvestigatory" context is without foundation. The Fourth Amendment protects the right of the people to be "secure in their persons" from government intrusion, whether the threat to privacy arises from a policeman or a Head Start administrator**." 336 F.3d 1194, 1205-1206 (10th Cir. 2003) (emphasis added.)

body weight to Moses, as illustrated by the photo in ¶96. Under State and federal law, any reasonable person in his position would understand he was not free to leave.[19]

### iii.    Moses was Subjected to Excessive Force Under State and Federal Law.

Plaintiff has also plausibly and robustly alleged that Defendants' conduct in effectuating this seizure was unreasonable. "A claim that an officer used excessive force when restraining a citizen's liberty [] implicates the reasonableness requirement of article II, § 7." *Woodall*, 553 P.3d at 256 (citation omitted). When analyzing the reasonableness of an alleged use of excessive force, Colorado courts use the *Graham* test, while noting that its three most recognizable factors "are not exclusive," and that "courts must focus on the totality of circumstances…rather than relying on a mechanically applied test." *Id*. at 257 (citing omitted). Reasonableness "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 256-57 (citations omitted). "Physical contact is not required for an excessive force claim—patently unreasonable conduct is." *Cortez v. McCauley*, 478 F.3d 1108, 1131 (10th Cir. 2007). What happened here is patently unreasonable.

Such determinations turn on assessment of the objective reasonableness of officer actions, while ignoring their subjective intent or motivation, and allowing for the fact that police are often forced to make split-second judgments in tense, uncertain, and rapidly

---

[19] *See, e.g.*, *Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006) (holding police officer was seized by an officer's punch in his face, which knocked him to the ground causing him to black out momentarily, writing: "A blow by a police officer that immobilizes the recipient easily meets [the constitutional] definition of a seizure.") It equally persuasively meets the SB 217 test where there is no QI.

evolving circumstances. *Id*. ¶15. Still, an officer's "continued use of force after an individual

has been subdued is a violation of the Fourth Amendment." *Vette v. Sanders*, 989 F.3d 1154,

1170-72 (10th Cir. 2021) (discussing *Perea v. Baca*, 817 F.3d 1198, 1204-05 (10th Cir.

2016), *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991), and cases dating to 1991

holding use of force against a subdued person is clearly unconstitutional).

Plaintiff's Complaint alleges in detail how during this particular seizure Defendants

were not at all in a tense, uncertain, rapidly evolving, or hyper pressurized situation

requiring split-second decisions. Here, DPD protocol mandated stopping the exercise if

there was any reason to think Moses' health and safety were being jeopardized, and there

were many such reasons, all known to these officers. ¶¶ 5, 51, 241, 355-356, 363, 379,

387-388. The truth is that this exercise lacked any reasonable justification but continued

until it rendered Moses obviously subdued and incapable of responding. All Defendants

had ability, opportunity, time, and the duty to deliberate on their group conduct, and how

they had rendered Victor Moses into such disabling circumstances, *before* making their

intolerably unconstitutional decisions to continue the assault, or to stand by without

intervening while it continued, severely injuring Mr. Moses for life.[20]

As shown herein, these Constitutions equally apply to police officers as free

persons. Police can, and here did, unconstitutionally seize a police recruit. During Fight

Day, the rules of excessive force they were supposedly training demanded Defendants

immediately de-escalate and render aid, instead of continuing to coerce and inflict

---

[20] See *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284-85 (10th Cir. 2007), (police liable for attacking a non-threatening suspect, finding when *Graham* analysis shows a violation, as here, no additional cases are needed to clearly establish the law.

violence on a totally subdued recruit. Because *Graham* seeks to cabin all excessive force claims into the 4th Amendment's objectively unreasonable test, the clear rule that police cannot continue to use force on a subdued person fairly shouts for its fair application to this motion and compels its denial. Whether Defendants acted unreasonably is not hard. Victor Moses was incapacitated by their actions. They had to stop. They had to prevent further harm by ensuring Moses was emergently *treated* and taken to the hospital.[21]

### iv. Defendants are Not Entitled to Qualified Immunity to the Federal Constitutional Claim.

As demonstrated above, Plaintiff has more than plausibly alleged that he was seized and subjected to excessive force in violation of the Colorado Constitution, Art. II, §7. The same analysis and caselaw also shows that Victor Moses's Fourth Amendment rights to be free from excessive force were violated. While Defendants are statutorily foreclosed by the Colorado legislature from asserting QI to Plaintiff's *state* constitutional claims, at p. 20-23, they raise a QI defense to his *federal* constitutional claims.

Defendants' assertion of QI on a motion to dismiss "subjects [them] to a more challenging standard of review than would apply on summary judgment." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). *Hope v. Pelzer*, "shifted" the QI analysis "from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (citing

---

[21] Had Defendants just stopped Moses's exertion, started him on oxygen and IV fluids, and transported him to the ER, Moses likely makes a complete recovery. ¶337.

*Hope,* 536 U.S. 730, 741 (2002)).[22] When reviewing a motion through the lens of QI, a court "should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Peterson,* 371 F.3d at 1201-02 (citation omitted). "Rather, it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness." *Est. of George*, 2020 U.S. Dist. LEXIS 271077, at *11, (rev'd on other grounds at 85 F.4th 1300 (10th Cir. 2023)). "[G]eneral statements of the law can clearly establish a right for [QI] purposes if they apply with obvious clarity to the specific conduct in question." *Id*. at *20. Such statements do so here, for a surfeit of reasons, all concerning what was then known to these officers. ¶¶ 5, 241, 355-356, 363, 379, 387-388.

Defendants cannot reasonably argue they were unaware of the obvious clarity of *Mendenhall*, and other Supreme Court cases discussed above, clearly establishing the contours of what constitutes an unconstitutional seizure. Nor can they reasonably assert they were not on fair notice of the *Graham* objective reasonableness test, or of the long-settled principle that officers cannot use more force on an already subdued person. Defendants also cannot reasonably argue they were unaware of failure-to-intervene liability and their constitutional duty to stop violations of citizens' constitutional rights when, as here, they had ample opportunity and time. *Booker*, 745 F.3d at 422-23.

Defendants' disclaimer of their knowledge of the law is yet another deeply cynical assertion that basic constitutional principles don't apply to police training of recruits like

---

[22] In *Taylor v Riojas,* 592 U.S. 7, 9 (2020) the Court reiterated *Hope's* teaching that general constitutional rules "apply with obvious clarity to the specific conduct in question."

Moses. At bottom, their request here is that the Court impermissibly effect an "anomalous" forfeiture of trainees' constitutional rights by unequally interpreting the broadly applicable Fourth Amendment to afford recruits, severely injured in objectively unreasonable training circumstances, less rights than are routinely afforded to criminal suspects and criminals.

### C. Plaintiff has also Plausibly Alleged a Due Process Violation for Excessive Force Under the Fourteenth Amendment and the Colorado Constitution.

Even if Plaintiff had not been Fourth Amendment seized, this use of force was unconstitutional under the Fourteenth Amendment. *Adkins v. City of Colo. Springs,* 20-cv-01022-KMT, 2021 U.S. Dist. LEXIS 39554, at *15-16 (D. Colo. Mar. 3, 2021) (denying dismissal of excessive force under the 14th Amendment). Where there is no seizure, "[f]orce inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment." *Booker*, 745 F.3d at 423.[23] Three factors guide this determination: "(1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor." *Id.* "The level of culpability required for action to shock the conscience largely depends on the context of the action." *Browder v. Casaus*, 675 F. App'x 845, 847 (10th Cir. 2017). Here, because Defendants unquestionably had time to deliberate, Plaintiff need not show that the officers intended to hurt him. Rather, he need only allege "conscious, deliberate indifference to

---

[23] While ultimately a police use of force is to be analyzed under substantive due process only where a court finds the Fourth Amendment inapplicable, at this early stage, both claims are plausibly alleged and both should proceed. *County of Sacramento v. Lewis*, 523 U.S. 833, 842-43 (1998); *see also Killnapp v. City of Cleveland*, 2022 U.S. Dist. LEXIS 223681, discussed further in FN 33, *infra*.

an extreme risk of very serious harm." *Adkins,* 2021 U.S. Dist. LEXIS 39554, at *15-16.[24]

Moses was in an intense use of force exercise. Officers knew he had slammed his head on a hard floor, repeatedly lost consciousness, and was unable to move or consent to continue. Continuing to pummel him was reckless, egregious, and disproportionate to any legitimate governmental objective. *Booker,* 745 F.3d at 427 (a jury could conclude the use of force while Booker was subdued and struggling to breathe demonstrated the requisite level of culpability for a due process violation.). While Defendants may or may not have been motivated by malice or an intent to harm, their force was at least "inspired by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience." *Id.* at 426. Here, force was disproportionate to any need (there was no need), and the injury was unquestionably serious. *See Adkins,* 2021 U.S. Dist. LEXIS 39554 at 16 ("at this stage . . . these allegations suffice to show [Defendant's] conduct was deliberately indifferent to such an extent, as to shock the conscience.").[25]

Multiple courts have applied these conscience shocking principles to remedy police training abuses, also holding that police training is *not* a constitution-free zone. *E.g., Marrero-Rodriguez v. Municipality of San Juan,* 677 F. 3d 497 (1st Cir. 2012); *Chisler v. Johnston*, *2010 U.S. Dist. LEXIS 30349 *20-31 (W.D. Penn. Mar. 29, 2010)

---

[24] This language is merely a "general definition of the term 'deliberate indifference.'" *Browder*, 675 F. App'x at 850; *see also Browder v. City of Albuquerque*, 787 F.3d 1076, 1080 (10th Cir. 2015) **("[I]n cases where forethought is feasible some form of recklessness…may be enough…we can and should usually expect more from the sovereign than deliberate indifference to fundamental rights like life, liberty, and property.")** (emphasis added) (Gorsuch, J.).

[25] The Tenth Circuit instructs Courts not to "dispose[] of a due process excessive force claim solely on the 'motive' factor where disproportionate force and serious injury were present." *Booker,* 745 F.3d at 426.

(trainers' conduct violated the 14th Amendment and was "unjustifiable" by any legitimate government interest). Moses' situation is similar to the *Marrero* Plaintiff, who was shot in the back during training. The Court allowed a 14th Amendment claim to proceed against the trainer -- who did not empty his gun before shooting into the "back of a prone officer…motionless, under control, and unarmed" -- for using force disproportionate to "any reasonable need, in conducting the lesson." *Marrero-Rodriguez* at *502-503. The same claim was permitted against a supervisor who did not stop the use of force, and against supervisors who played a role in the training structure. Fair inferences included both that absentee supervisors' *and the entity's* "failure to implement policies, protocols or correct training about use of live firearms" was so unjustified "as to be shocking to the conscience." *Id.; see also Kedra v. Schroeter*, 876 F.3d 424, 436-37, 440-44 (3d Cir. 2017) (allowing trainee's 14th Amendment claim to proceed against training officer, turning on the second element of the 3rd Circuit's state created danger test (conscience shocking), analogous to our Circuit's due process test as stated in *Booker*).[26]

Defendants also erroneously argue, at p. 8, that the relevant sections of Colorado Constitution are identical to, and thus no more protective than, the federal Constitution. However, § 3, Article II of the Colorado Constitution goes well beyond the guarantees of

---

[26] Defendants' reliance on *Moore v. Guthrie* is misplaced. In *Moore*, an officer was unluckily injured in training by a bouncing "Simunition" plastic bullet that flew under his helmet injuring his eye, with allegations they should have had better equipment. *See* 438 F.3d 1036, 1039-40 (10th Cir. 2006). This is a far cry from the shocking intentional conduct alleged here. The *Moore* court determined the Chief's allowance of a *generalized risk*, applying to everyone, based on budgetary concerns of a small-town police chief, was not conscience shocking. *Id.* at 1040-41. Moses' near-death experience and permanent injuries – from the very specific and personalized risk he faced during this brutal ritual – are shocking and a very far cry from the negligent-at-best *Moore* scenario.

the federal constitution, stating that: "All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; of acquiring, possessing and protecting property; **and of seeking and obtaining their safety and happiness**." (emphasis added). On its face, Colorado's Bill of Rights is more protective than its federal counterpart and thus requires an analytical framework appropriate for its more protective nature.

The high bar of the "shocks the conscience" test, applied to the more restrictive Fourteenth Amendment, has no place in this Colorado claim. Colorado's constitution does not require that a Judge be "shocked" to find a constitutional violation. Moses has more than sufficiently alleged Defendants' deliberate indifference to his rights and safety, and this deliberate indifference violates his Colorado constitutional rights.

No immunity defense is available under state law. Defendants are also not entitled to federal QI because the law was clearly established to put them on notice that, "a reasonable jury could find them liable under § 1983 for engaging in "[f]orce inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience." *Booker,* 745. F.3d at 428-29 (quoting *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1279 (10th Cir. 2003)). They are also on notice that they cannot continue to use force against someone who is subdued and incapacitated.[27]

Courts must afford plaintiffs the opportunity to conduct discovery into whether the

---

[27] Fourth Amendment cases are used to show Fourteenth Amendment excessive force too. *Booker,* 745. F.3d at 427-28 ("Fourth Amendment case law addressing whether force is "reasonable" is relevant to the first due process excessive force factor: the relationship between the amount of force used and the need presented.").

conduct "could be conscience shocking." *Sanchez v. Guzman*, No. 1:19-cv-01871, 491 F. Supp. 3d 904, 918-919 (D. Colo. 2020); *Briggs v. Johnson*, 274 F. App'x 730, 736 (10th Cir. 2008) (unpublished); ("*A.A. v. Martinez*, No. 12-cv-00732, 2012 U.S. Dist. LEXIS 164847, (D. Colo. Nov. 19., 2012) (whether behavior is conscience shocking "will need to be fleshed out in the evidence, and such determination is not appropriate for resolution" by MTD). Continuing force after Moses hit his head and lost consciousness, knowing of his SCT, and causing him permanent disabilities, "demonstrate[s] a degree of outrageousness and harm that could be construed as conscience-shocking depending on the context, to be revealed through further discovery." *Sanchez*, 491 F. Supp. at 919. Defendants are properly alleged to have violated the Fourteenth Amendment, and Colo. Const. Art. II, §§ 25 & 3. ¶¶ 424-425,475-476.

### D. Plaintiff has Plausibly Alleged that Defendants Violated his Colorado and Federal Constitutional Rights to Adequate Medical Care.

The Constitution requires that the police obtain medical care for people who are injured by police conduct. See *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). It is clearly established that the deliberate indifference standard applies where, as here, police have seized a person who has a serious medical need. Arrestees, pre-trial detainees, convicted prisoners *and other seized persons alike* are protected by the United States and Colorado constitutions from deliberately indifferent medical care while in police custody. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1310, 1315-16 (10th Cir. 2002) (reversing summary judgment to officer and holding that a panic attack caused by an arrestee's obsessive-compulsive disorder, which took place in the police car on the way to jail, satisfied the objective component of the deliberate indifference claim).

Officers have a clearly established duty to obtain medical care, particularly **"when, as here, the Defendants were responsible for placing [Moses] in his vulnerable state and engaged in activity. . . that could produce foreseeable, rapid, and deadly consequences."** *Booker*, 745 F.3d at 432. (emphasis added.)[28] Here, officers were deliberately indifferent to Moses' obvious and serious medical needs by continuing to assault and further injure him, rather than obtaining urgent medical care, until it was too late. As further discussed in Plaintiff's Response to Individual Paramedic Defendants' Motion, Plaintiff was rendered into custody through incapacity after intentional assaults.

### E. Denver - Monell Liability.

This case falls squarely within the jurisprudence of when it is appropriate to hold a municipality liable for violation of a person's constitutional rights. The essential question is "was the execution of a <u>Denver</u> program or policy responsible for Moses's injuries?" Denver's Motion, in service of its argument that the Complaint inadequately alleges municipal liability, ignores dozens of specific allegations that Moses's devastating injuries were caused by the planning, implementation and execution of "Fight Day," an official, known, approved and long-standing city policy.

The Supreme Court in *Monell v. Department of Social Services of the City of New*

---

[28] *See also Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 600-01, 603-04 (6th Cir. 2005) (no QI where the evidence showed that officers, after beating a suspect, locked him in the back of a police cruiser and observed him in significant physical distress, "yet made no attempt to summon or provide any medical care" until after greetings, preparing for their superiors' arrival, and adjusting their uniforms); *McCowan v. Morales*, 945 F.3d 1276, 1289-95 (10th Cir. 2019) (delay or denial of medical care claims against police, between warrantless arrest and booking, are analyzed under 14th Amendment deliberate indifference principles and applying the well-settled constitutional principle that once in custody, a person is entitled to protection against denial of or delayed medical care).

*York* held that a municipality can be liable under §1983 only where the municipality itself causes the constitutional violation at issue. 436 U.S. 658, 690–91 (1978). The Supreme Court has further held that "[i]t is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). As expressly cited in the Complaint (¶263) and set forth also in Denver's Motion (p. 17), *Bryson v. City of Okla. City* is the 10th Circuit case best explaining the five recognized circumstances warranting the imposition of municipal liability. *Id.*, 627 F.3d 784, 788 (10th Cir. 2010).

Any **one** method identified in *Bryson* is sufficient to impose municipal liability, but this Complaint robustly *factually a*lleges **all five** methods: (1) a formal regulation or policy statement[29] (¶¶ 261-263, 283-285, 380, 382-384, 393, 396-397, 470, 486-488); (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law (¶¶ 261-279, 289, 399-400, 486-490); (3) the decisions of employees with final policymaking authority (¶¶ 280-286, 292, 382-384, 393, 396-397, 402-404; 486-490, 493-494; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated

---

[29] A municipality's omission or failure to have a policy can ***by itself*** represent a policy for *Monell* liability. *Paugh v. Uintah Cnty.*, No. 2:17-cv-01249 JNP-CMR, 2020 U.S. Dist. LEXIS 145141, at *125-28 (D. Utah Aug. 11, 2020*). Id.* at *124-25 ("a reasonable jury could find that not having, using, or providing training for an alcohol withdrawal assessment tool such as CIWA was the Jail's policy or custom."). Here, Denver used DHHA to gather critical safety information concerning SCT and rhabdomyolysis. But then Denver completely abdicated its policy- and protocol-making responsibility to properly communicate such risks, or to develop any exertional collapse protocols (including as part thereof, SCT), including related training in such widely recognized protocols.

subject to these policymakers' review and approval (¶¶ 282, 285-286, 292, 382-384, 393, 396-397, 402-404, 486-90, 493-494)[30]; or (5) the failure to adequately train or supervise employees, as long as that failure results from deliberate indifference to potential injuries (¶¶ 60-61, 280-288, 290-295, 382-384, 393-394, 400-405, 486-492, 494, 496-497).

In *Monell*, the universally understood authority outlining the basis of municipal liability in § 1983 cases, the Supreme Court held that municipalities

> can be sued directly under § 1983…where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers… Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights…local governments, like every other § 1983 "person,"…may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval …."

*Id*. at 690-91. Here, it is not complicated:  As part of an ongoing pattern, Moses suffered injury during the execution of Denver's annual, official, long-implemented "Fight Day" training regimen. This program is official, specific, approved by all relevant Denver Police policymakers and their delegates, and fairly attributable to Denver as a city.

Denver initially tries to cabin Plaintiff's basis of municipal liability only to the issue of "custom," and then just wrongly asserts that "Plaintiff's allegations address only two incidents: the one giving rise to this case and a single prior incident, occurring ten years ago." Defendants' Motion p. 18. In doing so, Defendants ignore a breathtaking number of specific factual allegations, and misrepresent others, to reach their conclusion that the

---

[30] Notably, nowhere in Defendant's Motion is there an assertion that the Individual Defendants' conduct as described throughout the Complaint was *in any way* beyond or in contravention of the official customs, policies, and training of Denver. They did as they were trained to do and as they were instructed. Complaint, ¶¶ 39-48.

Complaint fails to show a past custom of violence leading to injury as a direct result of the officially sanctioned "Fight Day." Besides Moses, the Complaint sets forth the experience of Kimberly Lockinour. ¶¶ 266-276. Moreover, a *different* female recruit in Lockinour's class described that **she and others** too were subjected to dangerous force, including chokeholds, that caused some to lose consciousness. ¶270. The Complaint further alleges that other recruits (in the very same "Fight Day" exercise as Moses) also suffered serious injuries from the excessive force. ¶64. Additionally, recruit Kimmie Shui suffered a serious knee injury from excessively forceful violence visited upon her in a *previous* "Fight Day" training. ¶64. There is no basis to believe that the program that led to all these injuries was anything other than an official, Denver-sanctioned program. The Complaint specifically further alleges, and discovery will no doubt show, that "many injuries" have been inflicted on other recruits during "Fight Day" over the years. See ¶¶ 262-63.

Nor is Defendants' argument availing that Moses is trying to establish municipal liability by crafting a "hybrid" of theories, citing to the unpublished 10th Circuit case of *Cacioppo v. Town of Vail*, 528 Fed. App'x 929, 934 (10th Cir. 2013). Motion, 18-19. Moses seeks to build no such hybrid. Rather, as described above, municipal liability in this matter can be *independently* justified by **any** of the five methods recognized in *Bryson*. No combining is necessary; each of those circumstances is robustly pled in the Complaint, none of which is conditioned on the other.

Finally, Denver blindly asserts that Moses fails to plead deliberate indifference adequately. It is hard to know how to respond other than to point to the innumerable allegations in the Complaint which allege exactly that. ¶¶ 60, 150, 161, 280-283, 289-292,

297, 299-300, 304-308, 393, 403-405, 417, 419, 466-470, 477-494. Defendants effectively ask this court to impose a heightened pleading standard on an important civil rights case, a stance that has been explicitly and repeatedly rejected. *E.g.*, *Walker v. Zepeda*, 2012 U.S. Dist. LEXIS 74386, at \*14 (D. Colo. May 29, 2012) ("The reasons for not requiring heightened fact pleading in a § 1983 municipal liability complaint remain even in the wake of *Twombly* and *Iqbal*: a plaintiff, as an outsider to municipal government, is not expected to have information about a city's official policies, practices, or training programs at the pleading stage.") As this court readily understands, a complaint sufficiently alleges municipal liability where "it contain[s] not only 'a boilerplate recitation of the grounds for municipal liability,'" but also makes "*some additional allegation to put the municipality on fair notice* of the grounds for which it [is] being sued." *Id.* at \*14 (citation omitted; italics in original). Despite being on the wrong side of asymmetrical access to information at the pleading stage, Plaintiff has made many additional here-listed allegations putting Denver on fair notice of the grounds of this lawsuit. As such, he has more than met the Rule 8 pleading standard. "To require more could foreclose legitimate § 1983 claims that, after appropriate discovery, turn out to have evidentiary support." *Id*. at \*15-16 (citation omitted).

**F. Colorado's Workers' Compensation Law Does Not Preclude Federal or State Civil Rights Claims Against the Officers and the City.**

The WC exclusivity/immunity statute contained in §8-41-102, C.R.S. has long been interpreted by the Colorado Supreme Court to also include co-employees and afford them immunity. *Ryser v Shelter Insurance Company*, 480 P.3d 1286, 1291 (Colo. 2021). However, there is a more powerful supremacy principle that ensures federal civil rights

claims cannot be barred by WC statutory exclusivity immunity rules. The Tenth Circuit firmly established this in 1982 in *Rosa v. Cantrell*, involving the Rock Springs, Wyoming Chief of Police killing an undercover officer who was apparently planning to expose him for corruption, after first luring him into his police vehicle with two other officers. The widow received WC benefits and then filed a §1983 claim for excessive force and due process violations. The Tenth Circuit emphatically rejected Defendants' effort to hide behind WC:

> The exclusive remedy of state Workers' Compensation statutes does not bar recovery against an employer. . .The simple answer to the defendant's argument that Rosa's acceptance of Workers' Compensation bars any recovery under § 1983 because the state has pronounced workmen's compensation to be an exclusive [remedy] is that the state law conflicts with the remedy provided by § 1983 and therefore it must be superseded in this lawsuit.

705 F.2d 1208, 1221 (10th Cir. 1982).[31] Defendants also cite to the Colorado Supreme Court's decision in *Horodyskyj v. Karanian*, (which in turn cites *Popovich v. Irlando*, both cases involving undersigned counsel.) Defendants' Motion pp. 24-25. Contrary to Defendants' analysis, these cases hold that federal and state civil rights claims are *not* barred by co-employee immunity because rigidly applying that rule would thwart strong public policies. 32 P.3d 470, 478-80 (Colo. 2001) (en banc).

WC remedies are well understood to be grossly insufficient to redress Moses

---

[31] *See e.g. Gorsline v. Daniels*, 674 F. Supp. 3d 968, 983-984 (D. Nev. 2023) (WC "does not preclude recovery for claims involving substantive rather than procedural constitutional rights.") (rev'd on other grounds with leave to amend, 2024 U.S. App. LEXIS 27521 (9th Cir. Oct. 30, 2024)) (quoting *Jensen*, 145 F.3d at 1084 n.3) (citing *Daniels v. Williams*, 474 U.S. 327, 338 (1986) (where the claim concerns a violation of one of the specific constitutional claims of the Bill of Rights "a plaintiff may invoke [§]1983 regardless of the of the availability of the state law remedy.").

damages compared to full civil rights remedies.[32] Furthermore, as shown earlier, §13-21-131(2)(a) expressly prohibits police from invoking "statutory immunities or statutory limitations" defenses like the WC co-employee immunity statute on "liability" or "damages". When the Colorado legislature enacted the ELEIA it is presumed to have known about our much older WC statute and its employer/co-employee immunity provision.[33] There is no ambiguity about what the legislature did or intended to do when expressly prohibiting "statutory immunities or statutory limitations" to claims brought under the ELEIA. Defendants' effort to invoke WC co-employee immunity is therefore an invitation to improperly nullify a state statute, and it too must fail. [34]

---

[32] Defendants for some reason choose to note spending over a million dollars, vastly on Moses' extensive painful treatments caused by their unconstitutional conduct, but do not share that they are still actively fighting his receiving even a full WC average weekly wage.

[33] *E.g., Athanas*, 2023CV30010, *9 (citing *Robbins v People*, 107 P.3d. 384, 389 (Colo. 2005) and *Vigil v. Franklin* 103 P.3d 322, 327-328 (Colo. 2004)) ("[I]n interpreting statutes, the court presumes the legislation was passed with deliberate and full knowledge of all existing law dealing with the same subject.").

[34] Finally, see *Killnapp v. City of Cleveland*, where the court denied qualified immunity and held that *both* 4th Amendment seizure *and* 14th Amendment due process violations were pleaded, in a similar police-on-police seizure/force/due process case. There, officer Killnapp sued a fellow officer and the City after Gannon shot his fellow officer while running away from a scene. 2022 U.S. Dist. LEXIS 223681 *8 (N.D. Ohio 2022), aff'd 2023 U.S. App. LEXIS 18620 (6th Cir. 2023). *Id.* at *11-12. It also held that Plaintiff had provided "enough information to create an expectation that discovery will uncover evidence supporting the claim" for entity *Monell* liability. *Id.* at *16-19. Here, Plaintiff has alleged entity claims against both the City and DHHA. Again, quoting *Jensen's* teaching that police do not forfeit constitutional rights when violated by fellow officers, and citing to *Felder v Casey*, 487 U.S. 131, 138-139 (1980), the Court also emphatically rejected a WC defense stating: "[A]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." The Court added that in *Felder* the Supreme Court also held "a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted. . . because the application of the state immunity law would thwart the congressional remedy, see *Martinez v. California*, 444 U.S. 277, 284. . . (1980)." 2022 U.S. Dist. LEXIS 223681, *12-13.

WHEREFORE, Plaintiff requests the Court hear this matter and deny this motion.

Respectfully submitted this 16th day of December, 2024.

/s/ John Holland
John Holland
Dan Weiss
Anna Holland Edwards
Erica Grossman
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO 80218
john@hheglaw.com
*Attorneys for Plaintiff*

/s/ Darold Killmer
Darold Killmer
Reid Allison
KILLMER LANE, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
dkillmer@killmerlane.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of December, 2024, the foregoing was filed using the CM/ECF system. I hereby certify I will send electronic notification of said filing to the following recipients.

Stanley L. Garrett
David D. Powell
Elaina E. Shively
Lys Runnerstrom
Kristin L. Arthur
GARNETT POWELL MAXIMON BARLOW & FARBES
stan.garnett@garnettlegalgroup.com
David.powell@garnettlegalgroup.com
Elaina.shively@garnettlegalgroup.com
Lys.runnerstrom@garnettlegalgroup.com
Kristin.arthur@garnettlegalgroup.com
*Attorneys for City and County of Denver*

Darold Killmer
Reid Allison
KILLMER LANE, LLP
dkillmer@killmerlane.com
rallison@killmerlane.com
*Attorneys for Plaintiff*

Anthony E. Derwinski
Jeffrey C. Dtaudenmayer
Michele S. Carey
RUEGSEGGER SIMONS & STERN, LLC
aderwinski@rs3legal.com
jstaudenmayer@rs3legal.com
mcarey@rs3legal.com
*Attorney for Denver Health, Wham & Sung*

/s/ Brooke Thiele-LaForest
Brooke Thiele-LaForest, Paralegal