**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 24-cv-2353-GPG-TPO

VICTOR MOSES,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO, et al

    Defendants.

---

**RESPONSE TO DEFENDANTS COURTNEY WHAM'S AND TAEGIN SUNG'S
MOTION TO DISMISS [DOC. 33] WITH REQUEST FOR IN-PERSON HEARING**

---

### I.    INTRODUCTION

On January 6, 2023, Defendant Paramedics Courtney Wham and Taegin Sung were assigned to the DPD's Fight Day for recruits. Though Fight Day is billed as a training exercise, over the years it has taken on the form of a hazing ritual, causing many serious recruit injuries. The likelihood of such injuries is so high Denver arranges for paramedics, with two ambulances, to be present throughout the day.

When it was Victor Moses's turn to go (last), he visibly became very fatigued during Stage 1, and then was knocked unconscious multiple times by DPD Defendants during Stage 2. After witnessing Moses collapse multiple times and struggle to stand, the Paramedics standing by watching were called upon to provide medical care. Shockingly, while every medical indicator screamed that Moses was in a perilous, emergent medical condition and could not safely be allowed to continue being beaten, these paramedics

1

cleared him and told the DPD Defendants to proceed with their nonsensical uses of force. Mere minutes later, Moses was rendered unconscious for the last time on Fight Day. He was rushed to the hospital, where he remained for months, undergoing over a dozen surgeries (including below the knee amputations of both legs) to save his life.

In their Motion to Dismiss, Defendants disregard the serious allegations regarding their willful and wanton conduct, and their personal participation in *enabling, authorizing, and approving* the objectively unreasonable and shocking excessive force. Just as in the Denver Defendants' motion, the fact that Moses was repeatedly rendered unconscious is completely glossed over. Moses's claims are far worse than negligence[1] -- they involve Defendants' conscious awareness that their reckless conduct would likely cause him significant harm. Defendants enabled and failed to intervene to end excessive force, and to obtain obviously needed hospitalization, as the Fourth and Fourteenth Amendments mandated, despite full opportunities to do so. Their conduct is also a substantive due process violation, and willful and wanton within the meaning of C.R.S. §24-10-118.

## II.   FACTUAL ALLEGATIONS

Defendants Wham and Sung were present for all of Fight Day and had seen other recruits injured before Moses began. ¶¶ 62-64, 72. After Moses completed Station 1, Defendants Wham and Sung knew that he was very fatigued. ¶¶ 65-66. They then saw Moses shoved off the mat during Station 2, slamming his head on the hard tile floor. ¶¶

---

[1] Despite multiple allegations, the paramedics erroneously state that Plaintiff has not asserted a negligence claim against them. *See* ¶¶ 23, 247,450, 459 and the Complaint's Certificate of Review. DHHA hospital is alleged to be vicariously liable for their conduct in the 5th Claim for Relief – Negligence in the Operation of a Public Hospital.

66-67. During Station 2, Moses was winded and collapsed multiple times, even losing consciousness. ¶ 68. After Moses collapsed again, Defendants Wham and Sung were called to care for him. ¶¶ 70-72. Moses was unable to stand or freely move, telling the paramedics that he was very fatigued and experiencing extreme leg cramping. ¶¶ 73-74. Defendants took his blood pressure, which was a critically low **90/60** – another significant fact omitted in their Motion. The paramedics knew this was only about half the expected systolic blood pressure for a person engaging in such exertion. Wham was then a medical student. ¶¶ 76-79. Moses told them again that he had SCT. "Any reasonably trained paramedic knows that exertional sickling is a medical emergency in persons carrying the sickle cell trait, that fatigue, debilitating leg cramping, and low blood pressure during strenuous activity is associated with SCT, and that these serious medical symptoms put people at risk for serious injury and death without proper treatment and rest." ¶¶ 80-81.

Thus, per ¶ 241, Paramedics were *consciously aware* at the time, that Moses:

- had SCT;
- was experiencing an altered mental state and had been beaten into repeated bouts of unconsciousness;
- had extreme fatigue;
- was experiencing extreme leg cramping;
- had an abnormally low blood pressure of 90/60;
- had hit his head hard on the tile;
- had fallen repeatedly, after being hit and just on his own;
- was then incapacitated and defenseless;
- did not have the capacity to take off his safety equipment, to get up on his own, or remain standing, even when being held up by officers;
- could not walk voluntarily to the mats where Stage 3 was held; and
- could not make rational decisions or give voluntary consent to continue.

Despite knowing Moses' symptoms could be life-threatening, the paramedics affirmatively medically cleared him, telling DPD officers that they could proceed with Fight

3

Day. ¶¶ 80-87. They knew that Moses was in serious peril, as made clear by their plan to stand nearby with medical equipment. ¶ 88. They also knew that Moses did not have the capacity to voluntarily consent to continued violence, having just regained consciousness after being knocked out. ¶ 90.[2] Instead of ending his Fight Day exertion and immediately transporting Moses to the hospital while starting IVs and oxygen, the paramedics acted as police adjuncts rather than care providers, while police goaded him to "not give up." ¶¶ 246, 257, 302.[3] Other police recruits described these paramedics as culpable for abandoning Moses to his fate at the hands of the officers. *See, e.g.*, ¶ 131. After getting him to the hospital far too late, the paramedics joined police in affecting care by misleading doctors, falsely stating Moses experienced no "direct trauma" in response to repeated questions by the ER medical team. ¶¶ 104-106.

The Paramedics' actions and inactions were key causal factors in Moses' horrific injuries: "Had the infliction of this unreasonable excessive force been stopped when Moses first began collapsing and losing consciousness or shortly thereafter, and had he been emergently treated and hospitalized, it is medically probable that he would not have suffered the devastating losses of limbs and other injuries described herein. ¶ 337.

---

[2] ¶ 241. To the extent the Paramedics argue Moses consented to continue, his non-consent and repeated undue pressure to continue is robustly and plausibly plead. *See* ¶¶ 5, 69, 89-90, 123, 127, 129-131, 140, 213, 217-219, 229, 238-239, 241, 455. Whether Moses consented is a question of fact not appropriately resolved at this stage. *Midgett v. Denver C.A.R.E.S.*, 2017 U.S. Dist. LEXIS 239209, at *15-18 (D. Colo. Sep. 28, 2023).
[3] Defendants describe these acts as treating and releasing Plaintiff. What they did was not a release, but a reckless abandonment of *their* incapacitated knocked unconscious patient *without treatment* in a medical crisis. They did this while he was in their care with his freedom of movement terminated. They did so knowing that when they cleared him ("released" in their parlance) he would continue to be beaten. ¶¶ 5, 86, 478.

### III. ARGUMENT

**A. Plaintiff has Plausibly Alleged that Defendants' Actions and Inactions were Willful and Wanton, in Violation of C.R.S. § 24-10-118 (Claim Four).**

Defendants' complete disregard for Moses's emergent medical condition, and their decision to clear him for further beating, constitutes willful and wanton conduct, such that they are not entitled to immunity under Colorado law. To be "willful and wanton," "public employees must be consciously aware that their acts or omissions create danger or risk to the safety of others, and they then act, or fail to act, without regard to the danger or risk." *Gray v. Univ. of Colo. Hospital Authority*, 284 P.3d 191, 198-199 (Colo. App. 2012) (overruled as to the holding that public entities are immune from suit).

Here, knowing that Moses lacked the ability to consent (as set forth in ¶¶ 241 & 437), paramedics "blessed" and enabled additional force, knowing it would likely further harm him. ¶¶ 260, 443. They then misrepresented to ER doctors that Moses had not suffered direct trauma. Plaintiff has thus plausibly alleged that these paramedics were consciously aware that their conduct created risk to Moses, and then acted and failed to act without regard to such risk and danger. ¶ 436; *Gray*, 284 P. 3d at 198-200 (finding that plaintiff alleged willful and wanton conduct where doctor provided insufficient staff and *intentionally misrepresented* that such a danger or risk did not exist during his care.).

Defendants rely on *Quintana v. Dodge*, 2024 U.S. App. LEXIS 5810 (10th Cir. March 11, 2024), for the incorrect proposition that the paramedics must have "specifically calculated or planned for Plaintiff to sustain his injuries" in order to be liable. Defendants' Motion, p. 10. In *Quintana*, the Tenth Circuit granted officers summary judgment because there was no evidence that defendants knew a fire would *likely* result when they threw a

5

gas canister into a home of a shooting suspect, who then shot himself and died. But the *Quintana* holding *did not* require Plaintiff prove officers knew that the final shooting outcome was likely, but only that they knew their actions likely would start a fire. Neither the Tenth Circuit nor Colorado requires defendants know that Moses would almost die and ultimately lose both his legs. It is enough that they knew clearing him to be further beaten was likely to cause harm, and consciously disregarded that danger, as pled in detail. Defendants knew Moses was *in extremis.* While they tell this Court he was stabilized, the alleged evidence shows the opposite. ¶ 241. In fact, because he was so unstable, they guiltily decided to stay by him with their pram ready. ¶ 88. Had they acted as professionals not adjuncts, they would have stopped the fight. They stayed ready because they knew it was likely he would suffer harm with more beatings. Had they acted as professionals, not adjuncts, Plaintiff would likely now be fine. *See* ¶ 337.

Based on the showing in the Complaint, including the very detailed allegations in ¶¶ 70-90, 237-260, Plaintiff has far more than met his burden at this procedural stage and the motion should be denied. *See Davis v. Paolino*, 21 P.3d 870, 873-74 (Colo. App. 2001) (allegation that officer intentionally left spilled coffee and juice on the floor to cause injury was sufficient to plead a claim for willful and wanton conduct). However, if this Court for any reason, is not ready to find willful and wanton conduct, Plaintiff asks the Court defer ruling, permit "any discovery necessary to decide the issue of sovereign immunity" under 24-1-0-118 (2.5) and hold an evidentiary *Trinity* hearing. C.R.S. §24-10-118(2.5), provides:

> If a public employee raises the issue of sovereign immunity prior to or after the commencement of discovery, the court shall suspend discovery; except that any

discovery necessary to decide the issue of sovereign immunity ***shall*** be allowed to proceed, and the court shall decide such issue on motion.[4] (Emphasis added.)

### B. Plaintiff has Plausibly Alleged that Defendants Acted as Police Adjuncts to Aid in Excessive Force, in Violation of the Fourth Amendment (Claim 2).

By the time the Paramedics were called to care for Moses, he had been subjected to overwhelming unreasonable force that had knocked him unconscious multiple times, causing him to collapse. He had been seized, comprehensively, by the DPD Defendants' uses of force, and at the moment the paramedics checked on him, he was in the custody of these state actors. The Paramedics saw Moses subjected to force that had put him in a medically perilous condition, and yet instead of intervening to stop it, they acted as police adjuncts (¶¶ 246, 302), encouraging and enabling force to continue. Plaintiff has plausibly and sufficiently alleged the Paramedics failed to intervene to stop DPD Defendants' use of unreasonable force, in violation of the Fourth Amendment.

#### 1. Victor Moses Was Seized

The Paramedic Defendants follow the DPD Defendants lead in appearing to argue that there cannot be a seizure in the context of a "training exercise." *See* MTD at 11-12. However, as shown fulsomely in the response to Denver Defendants (pp. 11-17), courts have held that Fourth Amendment seizures can indeed occur in non-criminal contexts,

---

[4] As Judge Tymkovich noted in his concurrence in *Quintana*, a determination of "whether the employee's 'conduct exhibited a conscious disregard of the danger'" will generally be made at the summary judgment stage after discovery and Trinity type hearing. 2024 U.S. App. LEXIS 5810, at *20 *citing Martinez v. Estate of Bleck,* 379 P.3d 315, 323 (Colo. 2016). As held in *Gray*, "[s]uch a determination is not susceptible to resolution at an early stage in the litigation process before significant discovery has been undertaken unless there are no disputed issues of fact." 284 P.3d at 198.

7

just as they can in the more typical circumstances of an arrest or investigatory stop. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 395 (1989) (*"**all** claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, **or other 'seizure' of a free citizen** should be analyzed under the Fourth Amendment and its 'reasonableness' standard."*) (italics in original, boldface added); *see also Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989) ("a seizure occurs when governmental termination of a person's movement is effected through means intentionally applied."). The test for a "seizure" is not a rigid or mechanical one but a flexible test requiring consideration of the full context of a restraint by a governmental actor, that actor's intent, and whether the target reasonably "believed that he was not free to leave." *United States v. Mendenhall* 446 U.S 544, 554 (1980) (a person is seized "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.") The "basic purpose of [the Fourth] Amendment. . . is to safeguard. . . the security of individuals against arbitrary invasions by government officials," **and "it would be anomalous to say that the individual . . . [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."** *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (emphasis added).

Police recruits are equally fully protected.[5] *See, e.g.*, *Acevedo v. Canterbury*, 457

---

[5] The Tenth Circuit has adopted this same broad view of the Fourth Amendment. As explained in *Dubbs v. Head Start, Inc.*: "More fundamentally, however, the defendants' contention that the Fourth Amendment does not apply in the 'noncriminal' and 'noninvestigatory' context is without foundation. The Fourth Amendment protects the right of the people to be 'secure in their persons' from government intrusion, whether the threat to privacy arises from a policeman or a Head Start administrator" 336 F.3d 1194, 1205-1206 (10th Cir. 2003) adding "the strictures of the Fourth Amendment apply to child

8

F.3d 721, 724-25 (7th Cir. 2006) (Plaintiff police officer was seized by another officer's punch to his face; "[a] blow by a police officer that immobilizes the recipient easily meets [the constitutional] definition of a seizure."). Plaintiff has plausibly alleged that he was seized, and that Defendants' group think effort to continue to assault him while he was in his disabled state had no legitimate government purpose.

### *2. The Paramedics are Liable for Failing to Intervene to Stop Excessive Force*

It is clearly established that all government officials have a constitutional duty to intervene to prevent excessive force. "A plaintiff states a constitutional violation in the form of failure to intervene by alleging that 1) a government officer violated his constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so." *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022) (citing *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015); *see also Est. of Booker v. Gomez*, 745 F.3d 405, 422-23 (10th Cir. 2014). On Fight Day, the Paramedics witnessed Moses being unreasonably beaten into an emergent medical condition. They were called to care for him and realistically had every opportunity to stop the continued unreasonable uses of force; instead, they told the DPD Defendants to carry on.

These paramedics used their professional expertise solely for law enforcement purposes as police adjuncts rather than for medical purposes. They saw themselves as assisting and collaborating with the police in keeping this egregious hazing ritual going

---

welfare workers, as well as **all** other governmental employees" and citing to the above-quoted language from *O'Connor*. They plainly apply to these governmental paramedics.

9

regardless of the medical cost to Moses. In facilitating the assaults, these Defendants were not remotely acting with a medical purpose and are not qualifiedly immune. They had a duty to intervene under the Fourth Amendment, which applies to all state actors.

Courts have previously determined that the question of whether a state actor acts in a medical capacity or as a law enforcement adjunct is a fact question for the jury. For example, the Sixth Circuit has reasoned that deciding whether a state actor acted in a medical-response capacity or a law-enforcement capacity *"involves a highly factual characterization, not a legal concept* at the center of Fourth Amendment law like reasonableness in the use of force, exigent circumstances, or probable cause." *McKenna v. Edgell*, 617 F.3d 432, 442-43 (6th Cir. 2010). (Emphasis supplied.)

> Moreover, it is not a determination with which we have any unique experience or expertise, and not one for which we can turn to our case law for guiding principles. Like the jury, we would rely on the evidence about medical-responder conduct adduced at trial. Were we to determine this issue, we would simply be substituting our judgment about the overall character of a set of facts for that of the jury.

*Id.*; *see also e.g., Judd v. City of Baxter*, 780 F. App'x 345, 349 (6th Cir. 2019) ("we have held that paramedics who act in a law enforcement capacity are held to the same standard as police officers."); *Reddick v. Bloomingdale Police Officers*, No. 96 C 1109, 2001 U.S. Dist. LEXIS 9619, *25-36 (N.D. Ill. July 11, 2001) (denying defendant firefighters and paramedics qualified immunity argument that it was "not their job" where they "watched and did nothing as the police and/or some of their own colleagues beat and choked the strapped-down Robert Reddick resulting in his death.") (quoting *Ramirez v. City of Chicago*, 82 F. Supp. 2d 836, 839 (N.D. Ill. 1999) with approval for its rejection of a strikingly similar contention by the paramedics there as "an argument of breathtaking

10

cynicism," and *Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991).

This too is a fact-intensive case alleging that, in clearing Moses to continue without the slightest medical basis, these paramedics were not acting with a medical purpose. Defendants' motion impermissibly denies the centrifugal alleged role these paramedics played in failing to intervene and instead, authorizing continued assaults. The paramedics are required to accept the allegations that while clearing the DPD Defendants to continue assaulting Moses, they knew that he was so incapacitated that he was in custody and an obvious emergency patient. They must accept that as caregivers, they facilitated this unreasonably excessive beating by not treating Moses as an injured patient needing immediate care, but instead as a recruit they were there to keep fighting at all costs.

Defendants' mantric repeated assertions that they were not personally involved in the violations here are preposterous. By clearing him, these paramedics personally set in motion the final series of events that permitted officer co-defendants to deprive Moses of his constitutional rights. Plaintiff has plausibly alleged that, with ample time to consider their role, these paramedics chose to act as police adjuncts -- a jury will need to decide this fact-bound issue after discovery. *See* ¶¶ 237-260.

### C. Defendants were Deliberately Indifferent to Moses' Obvious Serious Medical Needs, in Violation of the Fourteenth Amendment (Claim 6).

Plaintiff has plausibly alleged that Defendants violated his Fourteenth Amendment right to medical care while in the custody of state actors. Plaintiff has also plausibly alleged that the Paramedic Defendants' centrifugal affirmative actions in jointly participating in the excessive force constituted arbitrary government conduct that shocks the conscience, in violation of Mr. Moses's substantive due process rights.

11

### 1. *The Paramedic Defendants had the Constitutional Obligation to Provide Adequate Medical Care to Mr. Moses While he was in Custody.*

Defendants' argument for dismissal of this claim is premised on Moses not being in custody—*see* MTD at 13—however, when the Paramedics were called, he had been rendered un-free to leave and, factually, was in the custody of these state actors. By this point, he had collapsed multiple times, been knocked unconscious more than once, and was immobilized. Once custody is established, the paramedics had a clear constitutional obligation not to be deliberately indifferent to his obvious serious medical needs.

> When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . . The rationale for this principle is simple enough: **when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself,** and at the same time fails to provide for his basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the Eighth Amendment[.]"

*Helling v. McKinney*, 509 U.S. 25, 32 (1993). (Emphasis supplied.)

Accordingly, "[t]he Due Process Clause. . . require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243-44 (1983); *see also Ramirez v. City of Chicago*, 82 F. Supp. 2d 836, 840-41 (N.D. Ill. 1999) (denying qualified immunity to the defendant paramedics because "it would have been apparent to a reasonable Fire Department paramedic that he had the duty to provide medical care to a person in the custody of the police").[6] The test for deliberate indifference

---

[6] To establish liability, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm"; the plaintiff "need not show that [the] official acted or failed to act believing that harm actually would befall a[] [specific individual]."

12

"involves 'both an objective and a subjective component.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). The objective component is met if the medical need is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). It is met if a government official "knows of and disregards an excessive risk to [a person's] health or safety." *Id.* at 837.[7]

Defendants repeatedly insist that their actions and inactions were mere negligence. *See* MTD at 1, 13. However, it is simply not mere negligence to disregard every medical indication—extreme cramping, exhaustion, multiple bouts of unconsciousness, alarmingly low blood pressure, inability to move, etc—and tell officers to continue their assaults, on the sole apparent basis that he was briefly conscious and speaking. *Id.* at 2, 11, 14. Moses' medical condition was obviously serious, and these paramedics were deliberately indifferent to it; their motion must be denied.

### 2. Defendants' Decision to Clear Him and Authorize Continued Force was Arbitrary Government Conduct that Shocks the Conscience.

As set forth in Plaintiff's Response to Denver Defendants' Motion to Dismiss, pp. 19-23, even if a jury ultimately were to decide that factually Moses was not in custody when the paramedics were called to check on him, "[f]orce inspired by malice or by

---

*Farmer v. Brennan*, 511 U.S. 825, 842 (1994). "Whether [the defendant] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ….[A] factfinder may conclude that [the defendant] knew of a substantial risk from the very fact that the risk was obvious." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009). It was obvious here.

[7] The subjective component requires a plaintiff to "show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it, which has been strongly pled here. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006).

13

unwise, excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment." *In re Estate of Booker*, 745 F.3d 405, 423 (10th Cir. 2014). Courts have also repeatedly applied these same conscience shocking principles to remedy police training abuses. *See Marrero-Rodriguez v. Municipality of San Juan,* 677 F. 3d 497 (1st Cir. 2012) and *Chisler v Johnston*, 2010 U.S. Dist. LEXIS 30349 *20-31 (W.D. Penn. Mar. 29, 2010). Moses' situation is similar to the *Marrero* Plaintiff, who was shot in the back during training, relating to the 'proper' use of force. The Court allowed a Fourteenth Amendment claim to proceed against the officer for using force disproportionate to "any reasonable need, in conducting the lesson" and against the supervisor for failing to stop the exercise. 677 F.3d at *502-503. *see also Kedra v. Schroeter*, 876 F.3d 424 (3d Cir. 2017) (allowing 14th Amendment claim to proceed against training officer based on conscience shocking conduct).[8]

This medical emergency was eminently predictable given his SCT condition that he alerted Defendants to in advance. Moses's near-death and severe injuries are the result not of negligence, but of Defendants intentionally/recklessly enabling assaults. This training exercise that devolved into a hazing ritual is a very far cry from the negligent-at-

---

[8] Defendants' reliance on *Moore v. Guthrie* is misplaced. There, an officer was injured by a bouncing plastic bullet that flew under his helmet and injured his eye during a training exercise. The Officer argued that the Chief's decision to use inferior protective equipment, caused his Due Process "violation of bodily integrity, based on his alleged right to work in a safe environment." 438 F.3d 1036, 1039-40 (10th Cir. 2006). Acknowledging that a conscience-shocking claim could be viable, the *Moore* court held that these facts did not meet the standard, because the chief's allowance of a *generalized risk*, applying to everyone in the exercise, based on budgetary concerns, did not shock the conscience. *Id.* at 1040-41. In contrast, Moses alleges an unreasonable and *individualized risk* that was not only allowed to persist but was exacerbated and inflamed by the Paramedics authorizing of continued assault on a person in an obvious medical emergency.

14

best scenario alleged in *Moore*. Their actions were so arbitrary and egregious, and occurred in such perilous circumstances, that this Court's conscience ought be shocked.

### D. Defendants are not Entitled to Qualified Immunity.

Defendants violated Moses's clearly established constitutional rights to be free from excessive force, deliberate indifference, and arbitrary government conduct that shocks the conscience. Defendants' assertion of qualified immunity on a motion to dismiss "subjects [them] to a more challenging standard of review than would apply on summary judgment." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). "[G]eneral statements of the law can clearly establish a right for purposes of qualified immunity if they apply with obvious clarity to the specific conduct in question." *Est. of George*, No. 20-CV-00522-CMA-GPG, 2020 U.S. Dist. LEXIS 271077, at *29. In *Hope v. Pelzer*, the Court "shifted" QI "from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Defendants cannot reasonably argue they lacked fair notice of the cases cited herein, clearly establishing the contours of what constitutes an unconstitutional seizure. Nor can they reasonably assert they were unaware that they had a duty to provide care to those who are incapacitated in their custody, rather than authorize continued force when they had complete authority and opportunity to do so. Such clearly established law applies to state-actor paramedics the same as it does to other state actors. *See, e.g., Judd*, 780 F. App'x at 349 ("we have held that paramedics who act in a law enforcement

15

capacity are held to the same standard as police officers."); *Peete v. Metro. Gov't of Nashville.*, 486 F.3d 217, 220 (6th Cir. 2007) (4th Amendment applies to firefighters, paramedics, and EMTs because "courts have held that the protection extends to actions by other government officials"). Defendants' attempt to disclaim knowledge of the law is just a refusal to accept that they too are bound by the Constitution.

## CONCLUSION

Plaintiff requests an in person hearing and that the motion be denied.

DATED this 16th day of December 2024.

KILLMER LANE, LLP

*/s/ Darold W. Killmer*
Darold W. Killmer
Reid Allison
KILLMER LANE, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax
dkillmer@killmerlane.com
rallison@killmerlane.com

John R. Holland
Anna Holland Edwards
Erica Grossman
Dan Weiss
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, CO 80218
john@hheglaw.com
anna@hheglaw.com
erica@hheglaw.com
dan@hheglaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing will was filed via CM/ECF, which will send notification to the following:

Stanley L. Garnett
David Powell
Elaina Shively
Lys Runnerstrom
Kristin Arthur
GARNETT POWELL MAXIMON BARLOW
900 Arapahoe Ave.
Boulder, CO 80302
(303) 991-3344
stan.garnett@garnettlegalgroup.com
david.powell@garnettlegalgroup.com
elaina.shively@garnettlegalgroup.com
lys.runnerstrom@garnettlegalgroup.com
kristin.arthur@garnettlegalgroup.com

*Counsel for Defendants City and County of Denver, Todd Gentry, Stephen Marino, Anthony Norman, Felipe Cervantes, Kyle Carter, Johanna Aitken, Lisa Aitken-Nelson, Jason Moore, Daman Roman, E.M. Alfaro, and Brian Camozzi*

Anthony E. Derwinski
Michele S. Carey
RUEGSEGGER SIMONS & STERN, LLC
1700 Lincoln St., Suite 4500
Denver, CO  80203
T: 303.575.8026
F: 303.623.1141
aderwinski@rs3legal.com
mcarey@rs3legal.com

*Counsel for Defendants Denver Health and Hospital Authority, Courtney Wham, and Taegin Sung*

                                                         KILLMER LANE, LLP

                                                         *s/ Jesse Askeland*
                                                         _____
                                                         Jesse Askeland