IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 24-cv-2353-GPG-TPO

VICTOR MOSES,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO, *et al.*,

    Defendants.

---

**RESPONSE TO DEFENDANT DENVER HEALTH'S
MOTION TO DISMISS [DOC. 34] WITH REQUEST FOR IN-PERSON HEARING**

---

## I. INTRODUCTION

For years, Denver Health ("DHHA") paramedics have been integrated teammates on Denver Police Department's ("DPD" or "Denver") Fight Day program for police recruits. Denver and DHHA have this arrangement because each entity knows that Fight Day is dangerous and has routinely led to serious recruit injuries.

DHHA's deliberate indifference to Sickle Cell Trait ("SCT") in policy making, training, and custom caused this injury and their motion should be denied. DHHA knew that recruits with SCT were at increased risk of serious harm at Fight Day, and even developed a procedure to ascertain which recruits were at such risk, but then did absolutely nothing with that information. With deliberate indifference, it stopped the policy making, procedure development and training with this information gathering, not even communicating it to the paramedics it stationed at Fight Day. DHHA argues essentially that their paramedics just happened to be present at Fight Day and that Victor Moses's

1

horrific experience was a one-off, disavowing any responsibility to conform its behavior to the Constitution. DHHA ignores the fulsome allegations DHHA was deliberately indifferent in policy making and training paramedics, who were stationed there as part of a joint policy approach to Fight Day's mission. Because of its dereliction of duty in policy making, procedures and training, Mr. Moses was predictably and devastatingly injured when paramedics authorized his continued beating during a medical crisis.

## II. FACTUAL ALLEGATIONS

Victor Moses was hired to be a DPD recruit and accepted into the Academy. ¶¶28-29. Recruits undergo what has become known as "Fight Day," which DHHA is consciously aware has caused serious injury to multiple recruits in the past. ¶¶39-48,53, 64, 265-76. Knowing this, DHHA requires recruits to fill out a mandatory *DHHA Medical History Form*, explicitly designed to collect information regarding recruit conditions that may require accommodations during the training process. ¶¶31-37.

DHHA for years has facilitated Fight Day by stationing paramedics to be present, ostensibly to provide medical care. ¶¶52, 298. Because of its specific knowledge of the risks posed by SCT and rhabdomyolysis, DHHA specifically asks on the History Form about "risk factors for rhabdomyolysis (such as thyroid disease, renal disease, statin use, sickle cell trait, and sickle cell disease.)" ¶33. Moses indicated that he has SCT. ¶35. DHHA with deliberate indifference did not share this information with DPD or its own paramedics. ¶302-5. DHHA obviously knew it was important to collect and act on this information but made a deliberate and reckless policy choice to develop no protocols, policies or training beyond information collection. ¶¶60-61, 289, 303, 305, 403, 486, 492.

People with SCT can safely participate in extensive physical training exercises, but

they are at increased risk for serious medical complications such as exertional collapse, rhabdomyolysis, and even death. Rhabdomyolysis is a life-threatening medical condition that can occur when the body is pushed too hard -- such as during high-intensity exercise -- that can lead to permanent disability or death. ¶58-9. Denver Health acknowledges the same in their information collection form, but then utterly failed to implement well-known protocols, polices or training guidelines to mitigate the known risks associated with SCT and extreme physical exertion or force, guidelines widely used in similar situations such as training for the military or professional athletics.[1] ¶ 60-1. "Despite knowing of the potential complications associated with sickle cell trait, and that Mr. Moses had explicitly disclosed to them that he had it, Defendants Denver and DHHA did not adequately train its officers or the paramedics" to monitor and care for a recruit at specific risk inherent in exertion at high altitudes for those with SCT. ¶¶ 58-61.

The conduct of Defendant paramedics Wham and Sung is extensively discussed in the Response to their Motion to Dismiss and is only summarized here.  Paramedics Wham and Sung saw other recruits be injured before Victor Moses began. ¶¶62-64, 72. In clearing him to continue, the paramedic defendants knew that he was very fatigued, had been shoved off the mat and hit his head on the hard floor, collapsed multiple times,

---

[1] There is a known recurring national pattern of training and SCT related injuries among police, causing at least eight police deaths or serious injury between 2021 and 2023, and decades of literature on exertional collapse during such training, ranging from the military to athletics and including police and firefighters. *See* Eichner, To Protect and Serve: Preventable Collapse and Death of Police Trainees, American College of Sports Medicine, 2023 (all police "should know who among their ranks has SCT and should train them accordingly. Educate them — and their instructors—on ES. Give SCT trainees more time to complete the timed distance run. At the very first sign or symptom of any undue distress, stop and help them; never pace them or urge them on. Let them walk home in good health and try again — without penalty — another day.").

lost consciousness multiple times, couldn't stand, was extremely fatigued with leg cramping, had a very low blood pressure (half the expected systolic for a person engaging in exertion) and importantly, that he had SCT. ¶¶65-81, 103-104, 241.

Any reasonably trained paramedic knows that these symptoms indicated exertional sickling -- a serious medical condition -- which is why Defendant Paramedics made a plan to stand nearby with medical equipment while the extreme force against Moses continued. ¶¶80, 71-73, 88. *See* ¶¶131, 141, 255. Attributing benign causes to serious symptoms or "medically clearing" a person to continue despite serious symptoms, is recklessly outside the scope of practice for a paramedic. Yet, this is exactly the role DHHA assigns paramedics at Fight Day. ¶¶301 493, 402, 306-7. Deciding not to take a person who is in and out of consciousness to the hospital, without the skill or tools to evaluate the person, was reckless and in furtherance not of medical care, but of their work as police adjuncts. ¶¶80-88.

DHHA's deliberate indifference in policy making, protocols and training was the moving force in this recklessness by the paramedics. DHHA's need to adopt more or different policies or protocols, and to train paramedics differently to provide care during Fight Day, was so obvious that its failure to do so is properly characterized as deliberate indifference. ¶¶60-291, 299-308, 403, 486. Specifically, DHHA allows paramedics to focus primarily on helping recruits complete Fight Day drills, even where medically contraindicated or dangerous, rather than properly focusing solely as paramedics on the health and well-being of the recruit that is undergoing physically exhausting trauma. ¶299. DHHA has had a longstanding "custom of allowing, training and instructing its paramedics to be posted during Fight Day on location, and to tolerate significant police recruit injuries

4

while acting not as independent paramedic professionals but rather as police adjuncts." ¶302. DHHA has "a custom and practice of obtaining critically important medical information from Denver Recruit Officer applicants and then ignoring such information, failing to share it with officers or paramedics, demonstrates deliberate indifference to the constitutional rights of such patients." ¶305. DHHA's participation in Fight Day "is an implemented or executed policy statement, ordinance, regulation, or decision officially adopted or promulgated by" DHHA. ¶¶397-398. Fight Day, and each entity's participation in it, is so well-settled that it "constitute[s] a 'custom or usage' with the force of law." ¶¶ 400-401. DHHA's deliberate indifference was a moving force in paramedics allowing the beating to continue, causing Mr. Moses's extreme injuries. ¶337, 497.

### III.   STANDARD OF REVIEW

"There is a strong presumption against the dismissal of claims under [Rule 12(b)(6)]." *Blevins v. Reid*, 2008 U.S. Dist. LEXIS 46168, at *9 (D. Colo. June 12, 2008). A complaint should survive a Rule 12(b)(6) motion if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court in this context must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

### IV.   ARGUMENT

**A. Plaintiff has Plausibly Alleged Municipal Liability Against Denver Health.**

The Supreme Court in *Monell v. Department of Social Services of the City of New York* held that a municipal entity can be liable under §1983 only where the municipality

5

itself causes the constitutional violation at issue. 436 U.S. 658, 690–91 (1978). The Supreme Court explained that municipal entities:

> can be sued directly under §1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers… Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision making channels.

*Id.* at 690-91. Since *Monell*, the Supreme Court has further held that "[i]t is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

In *Bryson v. City of Okla. City*, the Tenth Circuit laid out the five recognized circumstances warranting the imposition of municipal liability:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

627 F.3d 784, 788 (10th Cir. 2010) (citation and quotations omitted). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

### 1. Plaintiff has plausibly pleaded that Denver Health was deliberately indifferent in policy making and protocol adoption.

An entity's "failure to act" may constitute and unconstitutional policy or custom:

> A municipality is responsible for both "its action or failure to act" when doing so "is substantially certain to result in a constitutional violation.' *Barney*, 143 F.3d at 1307-08. Thus, a municipality's omission or failure to have a policy can itself represent a policy for *Monell* liability." *See id.* at 1309 n.8 (recognizing a cause of action for "fail[ing] to adopt various policies to adequately protect" a class of persons); *Stella v. Davis Cty.*, No. 1:18-CV-002, 2019 U.S. Dist. LEXIS 163363, 2019 WL 4601611, at *13 (D. Utah Sept. 23, 2019) (unpublished) (concluding that a policymaker's "decision to operate the jail without a written medical policy" itself constitutes an actionable policy). Here, it is undisputed that the Jail operated without any policy or directives, formal or informal, establishing the protocols officers should follow for inmates experiencing alcohol withdrawal. . . . A reasonable jury could determine that this omission "amounts to an intentional choice, not merely an unintentional negligent oversight.

*Paugh v. Uintah Cty.*, No. 2:17-cv-01249 JNP-CMR, 2020 U.S. Dist. LEXIS 145141, at *125-28 (D. Utah Aug. 11, 2020).

DHHA knew that SCT posed special risks to recruits, developed a protocol to collect that information, and then deliberately chose to develop no further policies or procedures to react to or even communicate the information collected about recruits' health. ¶¶33, 59, 60-61, 306, 402-403, 492-494. DHHA made a policy decision to give paramedics unfettered discretion in clearing recruits to continue, even when they were known to have SCT, providing no protocols on managing recruits with the condition. *Id.*

In *Paugh*, the Court evaluated a jail operating without use of tools frequently used in the industry to evaluate inmates for alcohol withdrawal, finding that where an entity decides not to employ a protocol, that can be found to be a deliberate policy choice. *See* 2020 U.S. Dist. LEXIS 145141, at *124-25 ("a reasonable jury could find that not having, using, or providing training for an alcohol withdrawal assessment tool such as CIWA was

7

the Jail's policy or custom."). Just as in *Paugh*, Plaintiffs here have extensively alleged that DHHA actively knew of the danger of SCT and rhabdomyolysis (as shown by their collection of the information itself) but decided not to implement protocols for communication, protocols to protect affected recruits during exertional training, or otherwise create policy or train on this known condition. ¶31-35, 303-8. Plaintiff specifically alleged and claimed that entity defendants here were:

> deliberately indifferent in failing to adopt obviously needed regulations or procedures for Fight Day for recruits with SCT, a foreseeable and recurring issue, despite knowing of the well-established procedures that allow those with SCT to fully participate in similar professions, such as the army, and the recurring nature for the need for such procedures.

*See also*, ¶¶403, 493. These decisions to stop the procedure making process at information collecting, to send people they knew were at high risk into Fight Day without putting into place any protections based on the information collected to communicate that information, or otherwise adopt well-known required safety procedures, was deliberately indifferent and caused this devastating injury.

### 2. Plaintiff has plausibly pleaded that Denver Health has a longstanding custom, practice, and policy for Fight Day

Denver and DHHA had full control of Fight Day, and each recruit relied entirely on the DHHA for any needed medical care (or for intervention and cessation for medical reasons) during this obviously dangerous day. By January 6, 2023, Denver and DHHA also had the benefit years' worth of information that Fight Day routinely caused serious injuries and medical emergencies among recruits. DHHA repeatedly and incorrectly argues that this is a single-incident case. *See, e.g.,* MTD at 4-6. In doing so, it ignores many specific factual allegations and misrepresents others to argue that Complaint fails to show a past custom of violence leading to injury as a direct result of the official and

8

sanctioned "Fight Day." Besides Moses, the Complaint sets forth the experience of Kimberly Lockinour. ¶¶265-276. Moreover, a different female recruit in Lockinour's class described that **she and others** too were subjected to dangerous force, including chokeholds, that caused some to lose consciousness. ¶270. The Complaint alleges both that Kimmie Shui suffered a serious knee injury from violence in a previous Fight Day and that she reported there were "lots of injuries getting thrown everywhere" on this very Fight Day. ¶64.

The program that led to all of these injuries was an official, Denver-sanctioned program that DHHA knew the day was rife with danger to the recruits. This wealth of experience, and the well-known need to train and policy-make for people with SCT in these settings, explicitly informed DHHA that protocols were needed for over-exertional collapse, unconsciousness, dehydration, and conditions like Sickle Cell Trait that heighten the risk to recruits. ¶¶ 52-53, 60-61, 298-308. One needs only to read DHHA's MTD to know that the entity has done no such thing. *See, e.g.,* MTD at 4-5, 9 (expressly disclaiming any responsibility, or even ability, to establish policies or protocols for anything to do with Fight Day).

Similarly, Defendant's citations reveal the massive distinction between these facts and those typical of a true "single-incident" case. *Moss v. Kopp* involved allegations of an unlawful home search, 559 F.3d 1155, 1159-60 (10th Cir. 2009); *Jenkins v. Wood* involved an excessive force and an illegal warrant claim, 81 F.3d 988, 994 (10th Cir. 1996); and *Butler v. Norman* involved excessive force claims, 992 F.2d 1053, 1055 (10th Cir. 1993). Read properly and together, each of these cases involved on-the-street law enforcement actions wherein the officers did not have full control over the circumstances

9

and where the municipal entity in charge of them was not directing how they acted in the moment. These cases are nothing like the facts here. Moses's injuries were the product of the execution of the official and semi-annual Fight Day program. Multiple recruits were injured during the January 2023 Fight Day, and many recruits have been injured in previous Fight Days. The injuries occur **because of** Fight Day.

Moreover, courts have routinely held that a widespread custom or practice may be inferred from the conduct of a municipality after an incident when, as here, no steps are taken to reprimand or otherwise taken in response to plainly unconstitutional conduct. *See Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (finding that, while a failure to discipline an officer after the violation could not have caused that particular violation, "[a] failure to investigate or reprimand might [] cause a future violation by sending a message to officers that such behavior is tolerated"); *Ortega v. City and Cty. of Denver*, 944 F. Supp. 2d 1033, 1039-40 (D. Colo. 2013) (holding that plaintiff met its burden of demonstrating a custom of condoning excessive force where plaintiff produced evidence of "specific instances in which [the department] has failed to adequately investigate a citizen complaint of excessive force and the implicated officer was not disciplined"); *Trujillo*, 2017 U.S. Dist. LEXIS 57530, at *10-11.[2] This "subsequent acceptance of

---

[2] *See also Johnson v. City of Roswell*, 2016 U.S. Dist. LEXIS 109994, at *55-56 (D.N.M. Aug. 18, 2016) (holding that plaintiffs' allegations that the city "failed to investigate or take disciplinary actions against subordinate officers or provide any avenue of redress for complaining citizens, despite being aware of the pattern of conduct… presumed true, may create the plausible inference of a widespread unlawful custom… Accordingly, Plaintiffs have sufficiently stated a claim for the existence of an actionable municipal custom."); *Hunter v. City of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011) ("a custom or practice can be supported by evidence of repeated constitutional violations which went uninvestigated and for which the errant municipal officers went unpunished"); *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) ("A section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional

10

dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy," and where there is no indication that the municipality took any corrective action, it is reasonable to infer that such conduct is in accordance with a policy. *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 171 (5th Cir. 1985). That inference is reasonable here.

### 3. Plaintiff has plausibly pleaded that Denver Health failed to adequately train its paramedics for Fight Day

Denver Health also utterly failed to train its paramedics on their obligation to provide medical care and the scope of that care in clearing recruits to continue despite serious symptoms in emergent situations during Fight Day. Rather, they are trained to act as police adjuncts with a goal to recklessly continue the drills. An "inadequacy of training" §1983 claim may proceed "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388 (1989). On a failure to train claim, a Plaintiff need only allege that: (1) the government actors "exceeded constitutional limitations"; (2) the constitutional violation "arose under circumstances that constitute a usual and recurring situation with which [these actors] must deal"; (3) the inadequate supervision and discipline "demonstrates a deliberate indifference on the part of the city toward persons with whom the [government actors] come into contact"; and (4) "there is a direct causal link between the constitutional deprivation and the inadequate" supervision and discipline. *Allen v. Muskogee*, 119 F.3d 837, 841-42 (10th Cir. 1997) (citing *Zuchel v. City and County of Denver*, 997 F.2d 730, 734-35 (10th Cir. 1993).

---

violations for which the errant municipal officials were not discharged or reprimanded."); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred" if officials "took no steps to reprimand or discharge" the wrongdoers, "or if they otherwise failed to admit [their] conduct was in error.").

11

"[E]vidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." *Id.* at 842. Moreover, courts have previously found that state actors' use of excessive force in accordance with their training established a *Monell* claim for failure to train. *See Ortega v. City & Cnty. of Denver*, 944 F. Supp. 2d 1033, 1038-39 (D. Colo. 2013) (denying summary judgment on *Monell* failure-to-train claim for excessive force where plaintiff presented evidence that the force used was in accordance with the officers' training); *Surat v. Klamser*, 2021 U.S. Dist. LEXIS 129950, at *14-15 (D. Colo. July 13, 2021) (same). When determining whether a municipal entity is deliberately indifferent to a need to train its state actor employees, the Supreme Court has counseled that:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Harris*, 489 U.S. at 390.

Fight Day presents an obvious need for DHHA to train its paramedics about their responsibility to provide medical care, including serving a gatekeeping function to stop the infliction of force and immediately get recruits to higher level medical care when necessary. SCT also presents an obvious and known need for training, as evinced by DHHA's own data collection form. ¶¶303-305, 31-35, 60. DHHA has years' worth of experience in seeing recruits be injured, and as an entity knows the process of Fight Day itself creates substantial risk of exertional collapse. ¶¶ 262, 298-308. The paramedics here were evidently not trained on how to handle these known, obvious risks, and as a

result, they did not stop Fight Day and get Mr. Moses the urgent medical care he obviously needed. ¶¶ 148-154, 237-259.

### 4. Plaintiff has plausibly alleged municipal liability and should not be punished for the current asymmetry of information regarding Denver Health's written policies and training

Critically, courts have rejected a heightened pleading standard going beyond the "short and plain" statement normally required under F.R.C.P. 8(a) for claims of municipal liability (which Plaintiff easily clears here). As Tenth Circuit Judge Ebel explained in *Walker v. Zepeda*, 2012 U.S. Dist. LEXIS 74386, *14 (D. Colo. May 29, 2012).

> The reasons for not requiring heightened fact pleading in a § 1983 municipal liability complaint remain even in the wake of *Twombly* and *Iqbal*: a plaintiff, as an outsider to municipal government, is not expected to have information about a city's official policies, practices, or training programs at the pleading stage.

Rather, a well-pleaded claim of municipal liability simply "provide[s] fair notice to the defendant, [which] requires more than generically restating the elements of municipal liability." *Taylor v. RED Dev., LLC*, 2011 U.S. Dist. LEXIS 97985, at *9 (D. Kan. Aug. 31, 2011) (quoting *Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 843 (S.D. Tex. 2011)). Municipal liability is sufficiently alleged if "it contain[s] not only 'a boilerplate recitation of the grounds for municipal liability,'" but also makes "*some additional allegation to put the municipality on fair notice* of the grounds for which it [is] being sued." *Walker*, 2012 U.S. Dist. LEXIS 74386, at *14 (emphasis in original). "To require more could foreclose legitimate § 1983 claims that, after appropriate discovery, turn out to have evidentiary support." *Id.* at *15-16. ("[A] plaintiff should be given the opportunity to develop an evidentiary record to determine whether he can provide support for his claims."); *see also Est. of Ward v. Lucero*, 2024 U.S. Dist. LEXIS 6170, at *9 (D. Colo. Jan. 11, 2024).

Courts routinely factor in that "asymmetry of access to information" when ruling on

motions to dismiss *Monell* claims, a stage where no discovery into policies or decision makers has yet happened. *See, e.g., Arredondo v. Reams*, 2021 U.S. Dist. LEXIS 253061, at *18 (D. Colo. Feb. 4, 2021) (plaintiff's failure to allege the specifics of a purported contract between a jail and a medical provider was not fatal due to the asymmetry of access to information between the parties); *Kerns v. Sw. Colorado Mental Health Ctr., Inc.*, 2019 U.S. Dist. LEXIS 217229 at *12 (D. Colo. Dec. 18, 2019) (in the context of a motion to dismiss, plaintiff need not plead the failure to train with additional specificity due to the asymmetry of information); *Estate of Blodgett v. Correct Care Sols., LLC*, 2018 U.S. Dist. LEXIS 209535 at *6 (D. Colo. Dec. 12, 2018) (considering asymmetry of information in the context of a motion to dismiss). Despite the early stage, Plaintiff has *far* exceeded the allegation burden, only to be amplified in discovery.

### B. Plaintiff has Plausibly Alleged Negligence Against Denver Health

Finally, Plaintiff has plausibly alleged that DHHA is vicariously liable for its paramedics' negligence and directly liable for its own negligence.[3] As described above, and in Plaintiff's response to the Paramedic Defendants' Motion to Dismiss [Doc. 64], DHHA's paramedics were at the very least negligent in their complete lack of care provided to Moses. As an initial matter, DHHA seems not to have noticed Plaintiff's claim of vicarious liability for the paramedics' negligence and instead argues only direct liability

---

[3] Judge Sweeney recently rejected an attempt by DHHA and its paramedics to evade negligence liability. *See* Judge Sweeney's unequivocal denial of dismissal in a case against DHHA and its paramedics for negligence in the operation of a public hospital, *Sobecke v. Kozlowski et al*, Case No. 1:22-cv-01191-CNS-NRN Document 88, Transcript of Hearing. *See* **Ex. 1**. The Court rejected DHHA's motion to dismiss paramedic negligence claims holding that the paramedics were part of the DHHA controlled by the hospital, trained and supervised by the hospital's doctors, and part of the core operations of a public hospital within the meaning of the CGIA. *Id.*, p. 35-36.

14

theories. MTD at 7-10. For this reason (and in light of the paramedics' clearly negligent actions and inactions), Defendant DHHA's motion should be denied on this claim.

Defendant DHHA's arguments on direct liability are also founded on willfully ignoring what Plaintiff actually pleaded. Defendant baldly asserts that Plaintiff "has not pled any facts" which plausibly indicate that he would have had a better outcome if the paramedics had given him medical care and properly stopped the beating. *See* MTD at 8. Plaintiff's expert reviewed allegation at ¶337 that directly and clearly states Mr. Moses would not have suffered these injuries if he had been cared for and allowed to stop. Similarly, Defendant DHHA pleads ignorance about the dangerousness of Fight Day, *see* MTD at 8. Plaintiff could not have pleaded the obvious danger of the day any more comprehensively and DHHA has years' worth of experience with recruit injuries to know better. ¶¶39-48,53, 64, 265-76, 298-308. DHHA's thoroughly plead itemized failures to train its paramedics about the inherent risks of Fight Day and their obligation to provide medical care, rather than act as police adjuncts, is sufficient to plead direct negligence. ¶¶298-308, 398-406.

Hospitals can be sued both vicariously for the substandard acts of their employees or directly for their own negligence in training, policies and supervision. *See e.g. Roudybush v. Catholic Health Initiatives Colo*, finding that the scope of duty in negligence cases requires evaluating the HealthONE factors and upholding a jury verdict against a hospital for failure to train a nurse. No. 22CA0663, 2023 Colo. App. LEXIS 712, at *1 (Ct. App. May 11, 2023), unpublished opinion attached hereto as **Exhibit 2**, citing *HealthONE v. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002). To put it in DHHA's terms, Plaintiff has plausibly pleaded that "the employer knows or should have known that the employee

15

would cause harm," when DHHA did not adopt protocols or train them to properly provide care to recruits who are in emergent medical conditions, like Mr. Moses. *See* MTD at 8 (quoting *Westin Operator, LLC v. Groh*, 347 P.3d 606, 612 (Colo. 2015). Because DHHA's arguments are misguided, contradict Plaintiff's allegations, and completely ignore the entity's clear vicarious and direct liability for their paramedics' negligence, this Court should deny the motion.

## CONCLUSION

WHEREFORE, Plaintiff requests in person hearing and that the motion be denied.

Respectfully submitted this 16th day of December 2024.

        KILLMER LANE, LLP

        */s/ Darold W. Killmer*
        Darold W. Killmer
        Reid Allison
        KILLMER LANE, LLP
        1543 Champa Street, Suite 400
        Denver, CO 80202
        (303) 571-1000
        (303) 571-1001 fax
        dkillmer@killmerlane.com
        rallison@killmerlane.com

        John R. Holland
        Anna Holland Edwards
        Erica Grossman
        Dan Weiss
        HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
        1437 High Street
        Denver, CO 80218
        john@hheglaw.com
        anna@hheglaw.com
        erica@hheglaw.com
        dan@hheglaw.com

        *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing will was filed via CM/ECF, which will send notification to the following:

Stanley L. Garnett
David Powell
Elaina Shively
Lys Runnerstrom
Kristin Arthur
GARNETT POWELL MAXIMON BARLOW
900 Arapahoe Ave.
Boulder, CO 80302
(303) 991-3344
stan.garnett@garnettlegalgroup.com
david.powell@garnettlegalgroup.com
elaina.shively@garnettlegalgroup.com
lys.runnerstrom@garnettlegalgroup.com
kristin.arthur@garnettlegalgroup.com

*Counsel for Defendants City and County of Denver, Todd Gentry, Stephen Marino, Anthony Norman, Felipe Cervantes, Kyle Carter, Johanna Aitken, Lisa Aitken-Nelson, Jason Moore, Daman Roman, E.M. Alfaro, and Brian Camozzi*

Anthony E. Derwinski
Michele S. Carey
RUEGSEGGER SIMONS & STERN, LLC
1700 Lincoln St., Suite 4500
Denver, CO  80203
T: 303.575.8026
F: 303.623.1141
aderwinski@rs3legal.com
mcarey@rs3legal.com

*Counsel for Defendants Denver Health and Hospital Authority, Courtney Wham, and Taegin Sung*

                                                                        KILLMER LANE, LLP

                                                                         *s/ Jesse Askeland*
                                                                         _____
                                                                         Jesse Askeland