IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 24-cv-02353-GPG-TPO

VICTOR MOSES,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
DENVER HEALTH AND HOSPITAL AUTHORITY,
TODD GENTRY, individually,
STEPHEN MARINO, individually,
ANTHONY NORMAN, individually,
FELIPE CERVANTES, individually,
KYLE CARTER, individually,
JOHNNA AITKEN, individually,
LISA AITKEN-NELSON, individually,
JASON MOORE, individually,
DAMON ROMAN, individually,
E. M. ALFARO, individually,
BRIAN CAMOZZI, individually,
COURTNEY WHAM, individually, and
TAEGIN SUNG, individually,

    Defendants.

## ORDER

Before the Court are City of Denver and Police Defendants' Motion to Dismiss (D. 32) filed by Defendants City and County of Denver, Colorado (Denver); Todd Gentry; Stephen Marino; Anthony Norman; Felipe Cervantes; Kyle Carter; Johnna Aitken; Lisa Aitken-Nelson; Jason Moore; Damon Roman; E.M. Alfaro; and Brian Camozzi (the Officers and, collectively with Denver, Denver Defendants); Defendants Courtney Wham and Taegin Sung's Motion to Dismiss

1

(D. 33); and Defendant Denver Health and Hospital Authority's Motion to Dismiss (D. 34). The Court GRANTS IN PART all motions and remands the remaining claims to state court.

## I. BACKGROUND

This civil action arises from tragic and wholly avoidable injuries to Plaintiff Victor Moses at the Denver Police Department's Academy.[1] Moses was hired to be a recruit and accepted into the Academy (D. 1 at ¶¶ 28–29). Moses was asked about and disclosed having sickle cell trait (SCT) in his application which sought to identify any "issues of particular concern," including "risk factors for rhabdomyolysis (such as thyroid disease, renal disease, statin use, sickle cell trait, and sickle cell disease[])" (*id*. at ¶¶ 31–37). Moses added that "both my parents & I have the trait but never had any problems" (*id*.).

During the Academy and as a requirement to graduate, recruits undergo what has become known as "Fight Day," where recruits must complete scenario-based drills related to arrest, arrest control, overcoming resistance, self-defense, and rendering aid (D. 1 at ¶ 3). This four-stage "run the gauntlet" event has caused serious injury to multiple recruits in the past (*id*. at ¶¶ 4, 39–48, 53, 64, 265–76). Defendant Denver Health and Hospital Authority (Denver Health) for years has facilitated Fight Day by stationing paramedics to be present (*id*. at ¶¶ 52, 298). Recruits are required to fill out an additional medical history form designed to collect information regarding recruits' conditions that may require accommodations during the training process (*id*. at ¶¶ 31–37). Because of the known risks posed by SCT and rhabdomyolysis, Denver Health specifically asks about "risk factors for rhabdomyolysis (such as thyroid disease, renal disease, statin use,

---

[1] The Court draws the operative facts as set forth in the Complaint and Jury Demand with Certificate of Review (Complaint) (D. 3).

2

sickle cell trait, and sickle cell disease.)" (*id*. at ¶ 33).  Moses again indicated that he has SCT (*id*. at ¶ 35).  There are known accommodations that can be used in exertional training for persons with SCT to prevent rhabdomyolysis and related extreme exertion collapses, but they were not used here (*id*. at ¶¶ 58–61).

On January 6, 2023, during the official "Fight Day" exercise, whose completion is a mandatory condition of becoming a badged officer, Moses was horrifically injured (D. 1 at ¶¶ 309–345).  Moses was the last recruit officer to run the Fight Day gauntlet.  One of the prior recruits had suffered a broken nose, and several others sustained injuries requiring treatment at the hospital. After Station 1, Combatives/Defensive tactics, Moses was extremely fatigued, which the Defendants present knew (*id*. at ¶¶ 68, 74).

Despite this fatigue, Moses began the Station 2 Baton Endurance Drill.  He was knocked down multiple times. Defendant Stephen Marino so violently drove Moses off the large mat that he caused him to slam his head on the hard tile floor (D. 1 at ¶ 67).  Moses was seen by many to be passing out and collapsing from further assaults and as unable to stand up, move, walk or remove equipment as needed.  Denver Health assigned Defendants Courtney Wham and Taegin Sung (the Paramedics) to Fight Day, and they witnessed these events (*id*. at ¶¶ 71–73).

The Paramedics physically lifted Moses up, but he fell when they let go (D. 1 at ¶¶ 125, 206).  He told the Paramedics that he was very fatigued and experiencing extreme leg cramping (*id*. at ¶¶ 73–74). Defendants took his blood pressure, which was a surprisingly low 90/60. The Paramedics knew this was only about half the expected systolic blood pressure for a person engaging in such exertion (*id*. at ¶¶ 76–79). Moses told them again that he had SCT. "Any reasonably trained paramedic knows that exertional sickling is a medical emergency in persons

3

carrying SCT, that fatigue, debilitating leg cramping, and low blood pressure during strenuous activity is associated with SCT, and that these serious medical symptoms put people at risk for serious injury and death without proper treatment and rest" (*id*. at ¶¶ 80–81). Despite Moses' symptoms, the Paramedics affirmatively medically cleared him, telling the Officers present that they could proceed with Fight Day (*id*. at ¶¶ 80–87). Nonetheless, the Paramedics planned to stand nearby with medical equipment (*id*. at ¶ 88). Officers present encouraged Moses to "not give up" despite his physical state (*id*. at ¶ 89).

Defendant Todd Gentry ordered Station 3, Ground Fighting Drill, brought to Moses because he could not move himself (D. 1 at ¶92). At Station 3, an officer dominantly mounts the recruit, who is supposed to try to break free (*id*. at ¶ 46). Defendant Brian Camozzi mounted Victor Moses and began "ground fighting" with Moses, admittedly hitting him in the head several times. About 30 seconds in, underneath the full body weight of Camozzi, Moses gasped "I can't breathe" (*id*. at ¶¶ 91–95). Moses became limp and unresponsive (*id*. at ¶ 97). The Paramedics could not revive him, and he was taken to the hospital.

Moses arrived at the hospital unconscious, tachycardic, hypotensive with no effective ventilations, experiencing severe lactic acidosis and hypertrophic cardiomyopathy (D. 1 at ¶ 100). Paramedics and police falsely told hospital staff that Moses experienced no "direct trauma" in response to repeated questions by the ER medical team (*id*. at ¶¶ 104–106). Denver Police also repeatedly falsely stated that Moses was injured due to an "undisclosed" medical condition (*id*. at ¶¶ 113–115).

Moses spent over four months bedridden in the hospital (D. 1 at ¶¶ 110–111). He underwent many surgeries, including below the knee amputations of both legs, multiple

4

fasciotomies, and arm surgeries. He also suffered severe internal injuries to multiple organs, which continue to require significant medical care. Moses now has prostheses which often cause bleeding when he uses them, requiring him to endure the daily risk of infection and further amputation. His arms and hands are severely compromised.

Moses filed this case in Colorado District Court for the City and County of Denver (D. 3). Denver Defendants removed (D. 1). Moses brings six claims: (1) excessive force under the Colorado Constitution and Colo. Rev. Stat. § 13-31-131 against the Officers; (2) Fourth Amendment excessive force under 42 U.S.C. § 1983 against all Defendants; (3) due process violations under the Colorado Constitution and Colo. Rev. Stat. § 13-31-131 against the Officers; (4) willful and wonton acts or omissions in violation of Colo. Rev. Stat. § 24-10-118 against the Paramedics; (5) negligence in operation of a hospital under Colo. Rev. Stat. § 24-10-106 against Denver Health; (6) Fourteenth Amendment deliberate indifference and conscience shocking behavior under 42 U.S.C. § 1983 against all Defendants (D. 3). All Defendants move to dismiss, and the individual defendants raised qualified immunity as a defense (D. 32–34).

## II.  LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed

5

because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[ the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

### III. ANALYSIS

Moses' Complaint is extremely detailed and replete with factual allegations. Accordingly, Defendants do not challenge the pleading as conclusory or insufficient. Instead, they argue that the allegations, even if proven, would not state claims. The Court addresses only the two claims with original federal jurisdiction, Claim Two and Claim Six, and only with respect to the individual defendants. Because the Court finds Moses has not pled a constitutional violation under federal law, the related federal municipal liability claims must also be dismissed. *Arnold v. Olathe*, 35 F.4th 778, 795 (10th Cir. 2022) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013)).

**A. Moses Was Not Seized Within the Meaning of the Fourth Amendment.**

Claim Two asserts that all Defendants violated Moses' Fourth Amendment rights by using excessive force in a seizure of his person (D. 3 at 54–58).  The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. amend. IV.

Claims for excessive force are premised on an unreasonable seizure.  Thus, to show a constitutional violation, a plaintiff must show a seizure and that it was unreasonable. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989) ("'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'").  "Without a seizure, there can be no violation of the Fourth Amendment and therefore no liability."  *Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015).  "Additionally, without a seizure, there can be no claim for excessive use of force in effectuating that seizure." *Id*.

The Supreme Court has held that "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  Accordingly, it has developed two tests to determine whether a person has been subject to a "seizure" within the meaning of the Fourth Amendment.  The first is seizure by application of physical force.  Second is seizure by show of authority.  Both are potentially relevant here, but neither occurred.

### 1. The Police Did Not Intend to Arrest Moses.

The Supreme Court has explained that, as used common law and in the Fourth Amendment, "[t]he 'seizure' of a 'person' plainly refers to an arrest." *Torres v. Madrid*, 592 U.S. 306, 312 (2021). Thus, it held that "common law arrests are Fourth Amendment seizures." *Id*. at 311. Such an arrest occurs upon "application of force to the body of a person with intent to restrain" even if the arrestee ultimately escapes. *Id*. at 312; *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.").

Denver Defendants argue that no such seizure by common law arrest occurred because the officers did not intend to arrest Moses (D. 32 at 9). The Court agrees.

Although Moses argues that the Officers' actions were intentional and restrained him (D. 46 at 14), this is insufficient to constitute a seizure under the Fourth Amendment without the requisite intent. The Supreme Court explicitly held that "the application of the common law rule does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure." *Torres*, 592 U.S. at 317. "A seizure requires the use of force *with intent to restrain*." *Id*. "Accidental force" and "force intentionally applied for some other purpose" do not qualify, "only force used to apprehend." *Id*.; *see also Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) ("A seizure occurs even when an unintended person or thing is the object of the detention or taking, . . . but the detention or taking itself must be willful."). None of the allegations in the Complaint suggest that any of Defendants intended to arrest Moses.

8

### 2. Recruits Were Free to Leave.

Seizure by show of authority is more complex. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. (citations omitted). In a context "when a person has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quotations removed).

As Moses argues, some of the hallmarks of seizure by show of authority were present: he was surrounded by police officers who had used force against him (D. 46 at 14). But the context in which that occurred were highly unusual—Moses was taking part in a police training exercise that involved the use of force. Moses' allegations show that, at least initially, he participated voluntarily and consented to participation. He argues that assaults and related medical effects "destroyed his capacity to consent to anything, much less additional beating" (*id*. at 14). Essentially, he argues that his participation was no longer voluntary because he had lost the

capacity to consent.  This argument is misplaced because it focuses on Moses' subjective circumstances, [2] rather than the objective reasonable person standard that governs.

With respect to the objective standard, he focuses on the ground fighting drill, noting that "Camozzi intentionally applied his entire body weight to Moses" (*id*. at 14–15).  Someone laying on top of a reasonable person would certainly indicate to them that they were not free to leave in almost all circumstances.  Additionally, Moses' allegations portray the surrounding circumstances as a "brutal hazing ritual" with "no legitimate governmental purpose" (*id*. at 14).  Just focusing on these aspects certainly creates the impression of a terrifying circumstance that would cow any reasonable person into believing their freedom is restricted.  But that is not the whole picture provided by Moses allegations, and the Court must consider the totality of the circumstances.  Before the ground fighting drill, Moses has just been checked by the Paramedics.  Although they cleared Moses to continue, their presence certainly suggests that leaving was an option.  Likewise, although the ground fighting exercise allegedly did not generally[3] use protective gear, the other exercises used protective gear, further suggesting that trapping the recruits and causing serious injury was not the goal (D. 3 at 8).  Moses alleges that "one of his fellow recruits had already suffered a broken nose, and several others has sustained injuries, requiring treatment at the hospital" (*id*. at 10), which speaks to the level of violence, but also indicates that off-site treatment was available and could be requested.

---

[2] These issues are perhaps relevant to the related issue of whether the individual submitted to authority and was thereby seized.  Here, the Court does not reach that issue because it concludes that there was no show of authority indicating that Moses was not free to leave.

[3] As discussed below, the photo in the Complaint of Moses participating in the ground fighting drill shows him wearing padded gloves.

Certainly, social and economic pressures were also coercive here.[4] The allegations in the complaint indicate that recruits had to complete Fight Day to graduate, implying that those who do not do so wash out and cannot become badged officers. It is unclear if this applies to recruits that are injured during proceedings and cannot complete Fight Day for that reason. In viewing the facts in the light most favorable to Moses, the Court assumes that giving up by, for example, asking to be taken to the hospital would have resulted in failing the academy. Relatedly, the other officers were encouraging Moses to "not give up" (D. 3 at 13).

Ultimately, the Court concludes that a reasonable person in Moses position would have believed that he was free to leave. Even accepting as true the allegations that the violence was excessive, a reasonable person in Moses' position would have believed that their participation remained voluntary and they could, for lack of a better phrase, tap out. Obviously, the allegations indicate that he was not capable of doing so, which is horrifying. But this does not change the objective situation as a whole, which the Court must consider. Nothing in the allegations suggests, for example, that if Moses had asked the Paramedics to take him to the hospital that they would have refused. There was, of course, a variety of coercive social and economic pressures on Moses to complete the training, including the admonitions of his fellow officers to not give up. But even their misguided encouragements to not give up indicate that giving up and leaving freely was an option. Accordingly, the Court dismisses Moses' federal excessive force Claim Two.

---

[4] It is not clear that these factors are legally relevant because they relate to workplace conditions. *See I.N.S. v. Delgado*, 466 U.S. 210, 218, 104 S. Ct. 1758, 1763, 80 L. Ed. 2d 247 (1984) ("Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers."). The requirements that Moses complete specific tasks and remain at his station or suffer economic consequences are analogous to the pressures on employees in *Delgado*.

### B. Moses Does Not State a Fourteenth Amendment Claim.

Claim Six asserts that Defendants were deliberately indifferent to Moses' medical needs and that their conduct was conscience shocking in violation of the Fourteenth Amendment's due process protections (D. 3 at 64–68). The Due Process Clause of the Fourteenth Amendment prohibits the state from depriving any person "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

#### *1. The Deliberate Indifference Test Does Not Apply Because Moses Was Not Seized.*

Under the deliberate indifference to serious medical needs test, a constitutional violation occurs when a government official or medical provider acts with deliberate indifference to a substantial risk of harm to the health or safety of someone in custody. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015). This test was originally created in the context of the Eighth Amendment, which applies to inmates after conviction; however, the same test applies under the Fourteenth Amendment to pre-trial detainees. *See Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985) ("Nevertheless, pretrial detainees are in any event entitled to the degree of protection against denial of medical attention which applies to convicted inmates.").

As Moses acknowledges, "deliberate indifference standard applies where . . . police have seized a person who has a serious medical need" (D. at 23). This includes "[a]rrestees, pre-trial detainees, convicted prisoners and *other seized persons alike*" (*id*.). It does not, however, apply to the general public or even government employees. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 130 (1992) ("the Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimal levels of safety and security in the workplace").

Because the Court has concluded that Moses allegations do not suggest that he was in seized, the deliberate indifference standard does not apply.

   2. *Defendants Actions do not Shock the Conscience.*

The Fourteenth Amendment embodies, in part, "a substantive due process protection, which protects individuals from arbitrary acts that deprive them of life, liberty, or property." *Miller v. Campbell County*, 945 F.2d 348, 352 (10th Cir. 1991). Substantive due process protects persons from "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice," such that the government actor engaged in "egregious and outrageous" conduct. *Doe v. Woodward*, 912 F.3d 1278, 1300 (10th Cir. 2019) (citing cases). "But the arbitrariness must be extreme." *Camuglia v. The City of Albuquerque*, 448 F.3d 1214, 1222 (10th Cir. 2006). "Due process protection has 'historically been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property.'" *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)) (cleaned up). Acts that are simply negligent and not egregious or deliberate are not substantive due process violations. *Id.* at 1040–41. "The ultimate standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges." *Id*. at 1040. (internal quotation marks omitted). Examples of such conscience-shocking conduct include stomach pumping, paddling a student, and the intentional destruction of an inmate's property. *Id.* "[T]he subjective intent standard for an excessive force due process violation [is] force inspired by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience, or by malice rather than mere carelessness." *Est. of Booker v. Gomez*, 745 F.3d 405, 426 (10th Cir. 2014) (quotation omitted). Court "look to three factors in

evaluating an excessive force claim under the Fourteenth Amendment: (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor." *id*. at 424 (same).

Regarding the Officers, Moses argues that the Officers "knew he had slammed his head on a hard floor, repeatedly lost consciousness, and was unable to move or consent to continue" such that "[c]ontinuing to pummel him was reckless, egregious, and disproportionate to any legitimate governmental objective" (D. 46 at 20).  He notes that "police training is not a constitution-free zone" and various courts have found potential constitutional violations related to such trainings. *Id*.  Regarding the Paramedics, he argues that the decision to clear him shocks the conscience because the "medical emergency was eminently predictable given his SCT condition that he alerted Defendants to in advance" and the Paramedics enabled further assaults (D. 47 at 14).

The Court finds it important initially to distinguish between Moses' ultimately resulting injuries and the Officers and Paramedics alleged actions.  The injuries that Moses ultimately suffered, including bilateral amputations and an extraordinarily painful course of treatment, are truly and undeniably shocking.  As set out in his Complaint, however, this additional treatment occurred because, while in the hospital, Moses "developed MDR [Multi Drug Resistant] Enterobacter infection in BLE [Bilateral Lower Extremity] and RUE [Right Upper Extremity] requiring BLE [Bilateral Lower Extremity] BKA [Below Knee Amputation] and BUE [Bilateral Upper Extremity] surgical interventions" (D. 3 at 40).  The Complaint indicates that "people with SCT like Mr. Moses can safely participate in extensive physical training exercises, they are at increased risk for serious medical complications such as exertional collapse [and] rhabdomyolysis" without appropriate accommodations (*id*. at 10).  Moses suffered exertional collapse and

14

developed Rhabdomyolysis, which "is a life-threatening medical condition causing a breakdown of muscle tissue" (*id*. at 10).  There is nothing in the Complaint indicating that Moses' SCT made him particularly susceptible to bacterial infection or, even assuming it did, that the other Officers and Paramedics thought it did.  Thus, the Officers' and Paramedics' actions could be seen as the but for cause of Moses' injuries, but the degree of injury he would ultimately suffer was unexpected even in view of his SCT trait and the allegations of excessive violence viewed in the light most favorable to Moses.

The degree of violence Moses was subjected to is alleged in detail in the Complaint—strikes that knocked him off the mat and to the ground.  As is the duration—that he was pinned in the wrestling drill even after he had lost (and regained) consciousness and was unable to move freely.  This use of force, nonetheless, occurred in the context of a training exercise that included precautions such as the presence of the Paramedics and protective gear.  Moses was driven off the mat with a strike from a "2 foot by 2 foot padded bag" (D. 3 at 8).  For the ground fighting drill, Moses alleges that the "recruit is stripped of their protective gear" (*id*.), but he is shown in the associated picture wearing padded gloves (*id*. at 13).  In contrast, the cases that Moses cites finding potentially conscience shocking behavior during police training uniformly deal with discharge of firearms or using other deadly force at unprotected trainees.  *Marrero-Rodríguez v. Municipality of San Juan*, 677 F.3d 497, 500 (1st Cir. 2012) (trainer used a real gun rather than the required "dummy" gun, and shot the gun directly into the back of a trainee); *Kedra v. Schroeter*, 876 F.3d 424, 433 (3d Cir. 2017) (trainer "fired a bullet into Kedra's abdomen at close range, causing Kedra's death several hours later"); *Chisler v. Johnston*, No. CIV.A. 09-1282, 2010 WL 1257458,

at *2 (W.D. Pa. Mar. 29, 2010) (trainee required to remove equipment then involuntarily handcuffed, "hog tied," and suffocated).

Applying the three relevant factors, the Court finds that the Officers and Paramedics actions do not raise to the level of conscious shocking. The first factor slightly favors Moses. The training exercises were designed to simulate physical violence and, therefore, some level of violence was necessary. Nonetheless, the level of violence here went beyond the relevant purpose because it was in excess of the safety precautions in that it was sufficient to knock Moses beyond the protective mat and included placing a person's full weight on someone that physically could not resist. The second factor is neutral. The injuries inflicted on Moses at the training were severe insofar as he developed potentially life threatening Rhabdomyolysis and lost consciousness. Such injuries are, however, less severe than being shot at close range or asphyxiated. As discussed above, Moses ultimately developed much more severe injuries, but they were the result of an intervening post-surgical infection, not the Officers' direct actions. Finally, the third factor strongly favors the Officers and Paramedics. Even viewing the Officers' and Paramedics' alleged actions in the light most favorable to Moses, it is not reasonable to infer that they meant him serious harm or otherwise acted with malice. Even if they acted recklessly with terrible consequences, their alleged actions themselves were not egregious or deliberately harmful. They did not, for example, remove his protections or apply deadly force as in cases where conscious shocking actions were found. That police used more force than necessary and, along with paramedics, failed initially to recognize a medical crisis does not shock the conscience despite its tragic and shocking results in this case. The Court dismisses Claim Six under the Fourteenth Amendment.

### C. The Remaining Claims Are Remanded.

The Court has disposed of all of Plaintiff's federal law claims, over which this Court has original subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. All the remaining claims are brought under state law,[5] which implicates this Court's supplemental subject-matter jurisdiction under 28 U.S.C. § 1367. Under 28 U.S.C. § 1367(c)(3), when all the "federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir. 1998). Although Defendants seek dismissal, the Court finds that remand is more appropriate. *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 727, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966)) ("the court may (and indeed, ordinarily should) kick the case to state court"). This case was removed from Denver District Court and will be remanded there.

### IV. CONCLUSION

Based on the foregoing, it is ORDERED that the City of Denver and Police Defendants' Motion to Dismiss (D. 32), Defendants Courtney Wham and Taegin Sung's Motion to Dismiss (D. 33), and Defendant Denver Health and Hospital Authority's Motion to Dismiss (D. 34) are GRANTED IN PART and DENIED IN PART. Claim Two and Claim Six are DISMISSED. It is FURTHER ORDERED that the remaining claims are REMANDED to Colorado District Court for the City and County of Denver. It is FURTHER ORDERED that the parties are to bear their own fees and costs. IT IS FURTHER ORDERED that the Clerk of the Court shall close this case.

---

[5] The standards applicable to constitutional claims are *generally* the same under federal and Colorado law, but Moses makes colorable arguments that the standards are different in these circumstances that should be addressed in the first instance by Colorado courts (*e.g.*, D. 46 at 13, 21–22).

17

DATED August 22, 2025.

                                        BY THE COURT:

                                        Gordon P. Gallagher
                                        United States District Judge